**IN THE UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| UMB BANK, N.A. solely in its capacity as Indenture Trustee under those certain indentures, dated as of June 10, 2009, governing Caesars Entertainment Operating Company, Inc.'s 11.25% Notes due 2017; dated as of February 14, 2012, governing Caesars Entertainment Operating Company, Inc.'s 8.5% Senior Secured Notes due 2020; dated August 22, 2012, governing Caesars Entertainment Operating Company, Inc.'s 9% Senior Secured Notes due 2020; dated February 15, 2013, governing Caesars Entertainment Operating Company, Inc.'s 9% Senior Secured Notes due 2020, | Case No. _____ |
| Plaintiff, | COMPLAINT FOR DECLARATORY JUDGMENT AND DAMAGES |
| v. | JURY TRIAL DEMANDED |
| CAESARS ENTERTAINMENT CORPORATION, | |
| Defendant. | |

Plaintiff UMB BANK, N.A. solely in its capacity as Indenture Trustee ("UMB" or the "Indenture Trustee") under those certain First Lien Indentures (defined below), dated as of June 10, 2009, governing Caesars Entertainment Operating Company, Inc.'s 11.25% Notes due 2017; dated as of February 14, 2012, governing Caesars Entertainment Operating Company, Inc.'s 8.5% Senior Secured Notes due 2020; dated August 22, 2012, governing Caesars Entertainment Operating Company, Inc.'s 9% Senior Secured Notes due 2020; dated February 15, 2013, governing Caesars Entertainment Operating Company, Inc.'s 9% Senior Secured Notes due 2020 (collectively the "First Lien Notes," as described more fully below), by and through it attorneys Katten Muchin Rosenman LLP, submits the following Complaint, and in support thereof respectfully alleges upon personal knowledge as to itself and its own acts, and upon information and belief as to all other matters, as follows:

1

## NATURE OF THE ACTION

1.      Plaintiff UMB, for the benefit of the holders of the First Lien Notes in the principal amount of not less than $6,345,000,000, seeks a declaratory judgment recognizing that Caesars Entertainment Corporation's ("CEC") self-declared, completely non-consensual purported "release" of its obligations as Parent Guarantor under the First Lien Indentures is void for violation of both the Trust Indenture Act of 1939 ("TIA") and the express terms of the First Lien Indentures themselves.  UMB further seeks a monetary award in an amount equal to the outstanding accelerated principal and interest due and payable under the First Lien Indentures, as well as damages for breach of contract and breach of the implied covenant of good faith and fair dealing.  UMB has the authority to bring this suit pursuant to Section 6.08 of the First Lien Indentures, which provides that "[i]f an Event of Default specified in Section 6.01(a) or (b) occurs and is continuing, the Trustee may recover judgment in its own name and as trustee of an express trust against the Issuer or any other obligor on the Notes for the whole amount then due and owing . . . ."[1]

2.      Defendant CEC is the parent holding company of Caesars Entertainment Operating Company, Inc. ("CEOC"), the issuer of the First Lien Notes.  In 2008, CEC was "taken private in a leveraged buyout just as the 2008 recession was overtaking the world economy." *In re: Caesars Entertainment Operating Company, Inc. et al.*, Case No. 15-01145 (Bankr. N.D. Ill), "Memorandum in Support of Chapter 11 Petitions" (the "Chapter 11 Memo") [Dkt. No. 4].  The leveraged buyout was orchestrated by CEC's equity sponsors, Apollo Global

---

[1] An Event of Default has existed since at least May of 2014, when CEC improperly disavowed its obligations under the First Lien Indentures to guarantee the obligations of CEOC, the issuer of the First Lien Notes.  Moreover, CEOC's bankruptcy filing on January 15, 2015 resulted in an additional Event of Default and the automatic acceleration of all payment obligations under the First Lien Indentures.

Management, LLC, and TPG Capital, LP (the "Sponsors"), and funded by "approximately $24 billion in debt, approximately $19.7 billion of which was secured by liens on substantially all of [CEOC's] assets." *Id*. at 2.  This transaction was structured to saddle CEOC, a subsidiary of CEC, with the majority of the debt.  CEC, however, could not have successfully sold this debt to investors without extending its "irrevocabl[e] and unconditional[] guarantees... to each holder and to the Trustee and its successors and assigns [of] (i) the full and punctual payment when due, whether at Stated Maturity, by acceleration, by redemption or otherwise, of all obligations of the Issuer under this Indenture" (the "Guarantee") – reassuring the funding bondholders that, in the event of CEOC's default or insolvency, their notes would be backed by the Guarantee and CEC's assets.  First Lien Indentures § 12.01(a).

3.      As the gaming market and the overall economy suffered from the decline in consumer spending, CEC and the Sponsors shifted their focus from enhancing enterprise value to protecting their equity investments at all costs, and CEOC ultimately succumbed to its massive overleveraging.  In response, CEC and the Sponsors undertook a wholesale restructuring of the Caesars capital structure, one under which CEOC would be stripped of valuable assets – which would go to CEC and its other affiliates – while CEOC's creditors would be deprived of the CEC guarantees that were necessary to ensure that CEOC's creditors were repaid.  The reasons for this restructuring were clearly stated by CEC's Chief Executive Officer, Gary Loveman, at a quarterly earnings call in the spring of 2014:

> [W]e feel that [CEC] is composed of three entities, two of which are financially healthy, CERP and CGP, and one [CEOC] is over-levered and consuming cash at a rate that we are not comfortable with.  So we are going to take steps, including

with asset sales to address CEOC and its overleveraged circumstances.  How we do that remains to be determined.[2]

4.      Beginning as early as 2011, and accelerating rapidly in 2013 and 2014, CEC engaged in a concerted and multifaceted restructuring scheme to deprive CEOC of nearly all of its most profitable and attractive assets while simultaneously attempting to relieve itself of liability on CEOC's debt obligations – leaving CEOC's creditors with a depleted company without the means to repay even its most senior secured debts in full.  This scheme commenced in 2011, when CEC began stripping CEOC of its valuable online gaming asset, Caesars Interactive Entertainment.  In 2013 and 2014, CEC and the Sponsors accelerated this scheme, moving many of CEOC's most valuable and growth-oriented casino and resort properties to its affiliates and out of the reach of CEOC's creditors, dissipating CEOC's intellectual property assets, and engaging in a series of insider debt transactions designed to repay CEC and its affiliates while CEOC continued its downward spiral.[3]  This scheme improperly strengthened CEC and certain of its subsidiaries, to which it transferred many of CEOC's assets without providing reasonably equivalent value to CEOC.[4]  As CEC chief executive Gary Loveman bluntly put it during a May 7, 2014, quarterly earnings call:  "The full complement of financial and operational actions taken to date have led to the creation of substantial value in two stable structures, [CEOC affiliates] Caesars Growth Partners and Caesars Entertainment Resort

---

[2]   CEC   Q4   2013   Earnings   Call   (Mar.   11,   2014),   *available   at*   http://seekingalpha.com/article/2082603-caesars-entertainments-ceo-discusses-q4-2013-results-earnings-call-transcript

[3] Marc Rowan, Senior Managing Director at Apollo and a board member at CEC and CEOC, was recently quoted in *Fortune* as having said in late 2013 that "we had done everything we could to help the company and preserve value," but that the time had come for a "complete fix." William D. Cohan, *A Private Equity Gamble in Vegas Gone Wrong*, Fortune, June 5, 2015, *available at* http://fortune.com/2015/06/05/caesars-losing-las-vegas/?xid=timehp-category.

[4] A more extensive recounting of many aspects of this overall scheme has been put before the Court in complaints filed by other entities in actions related hereto.

Properties."[5]  Mr. Loveman failed to state the obvious, however – that such transactions had obliterated the value of CEOC, leaving little for its creditors.

5.      Notwithstanding the transfers of value from CEOC by which CEC was enriched, CEC and its Sponsors still had one major issue – CEC remained liable as a Guarantor on CEOC's roughly $18 billion in debt.  The elimination of CEC's obligations under the Guarantee of the First Lien Notes and other debt guarantees it had provided was thus a critical element of the restructuring scheme to enhance CEC's equity value, with no concern for the fact that doing so would decimate the value available to CEOC's creditors.  Thus, CEC embarked on a series of machinations in an attempt to relieve itself of its guarantee liabilities – these machinations amounted to, and were part of, a completely non-consensual, out-of-court restructuring of CEOC's debt.

6.      In early May of 2014, CEC filed an 8-K announcing that it was no longer bound as Guarantor of CEOC's First Lien Notes.  CEC premised this disclaimer of more than $6.3 billion of guarantee liability to the First Lien Notes (not to mention its other guarantee liabilities) on its sale of 68.1 shares of CEOC to CEC insiders for $6.15 million as part of its efforts to restructure its first lien bank debt.[6]  According to CEC, this sale of shares rendered CEOC no

_____

[5] CEC  Q1  2014  Earnings  Call  (May  7,  2014),  *available  at*  http:// seekingalpha.com/article/2200603-caesars-entertainments-czr-ceo-garyloveman-on-q1-2014-results-earnings-call-transcript.

[6] As was subsequently revealed in CEOC's bankruptcy filings, this equity was purchased by three entities, at least two of whom were also equity owners of CEC as of June 30, 2014 and would clearly benefit from the removal of massive liabilities at CEC.  *See* Chapter 11 Petition at 26, Case No. 15-1145 (Bankr. N.D. Ill.) [Dkt. No. 1] (listing Paulson, Scoggin and Chatham entities as equity holders); Paulson & Co. Inc. Form 13F for Quarter Ended June 30, 2014 (showing holdings of 13,693,700 shares, or 9.5%, of CEC equity); Scoggin LLC Form 13F for Quarter Ended June 30, 2014 (showing holdings of 393,281 shares, or 0.3%, of CEC equity).

The $6.15 million sale price implied that CEOC's total equity was worth $123 million; clearly CEOC's equity was worth nothing at this time, given its $19 billion debt load.  A $123 million equity value would represent only 0.7% of the combined value of CEOC's debt and equity.

longer a *wholly owned* subsidiary and, according to CEC's tortured and self-serving interpretations of the Indentures, thereby released CEC from its obligations as Guarantor.[7]

7.      This restructuring scheme continued into June of 2014 with CEOC's announcement that it had "elected" to effect the release of CEC's Guarantee of the First Lien Notes "for the additional reason" that the guarantee of other, unsecured notes had been released, also as a result of CEOC's purportedly ceasing to by "wholly owned" by CEC.  *See* CEOC Form 8-K dated June 27, 2014.  CEOC remained under the control of CEC when it made this "election" to relieve CEC of liability to its creditors.

8.      Finally, in August of 2014, CEC made *still another* effort to affirm the purported release of the Guarantee as part of its overall restructuring by colluding with certain of its unsecured noteholders to supplement their indentures, such that CEC's guarantees under those indentures allegedly ceased to be in effect.  CEC announced on August 22 that, "in connection with the effectiveness of the supplemental indentures . . . that removed provisions relating to CEC's guarantee of such notes," CEOC had notified the Indenture Trustee that, consistent with its prior assertions, the Guarantee of the First Lien Notes had been released as a result of the purported release of the unsecured notes' guarantee.  *See* CEC Form 8-K dated August 22, 2014.

9.      CEC's persistent efforts to "reaffirm" its absolution from guarantee liability demonstrate this lack of confidence that it had actually succeeded in this respect.  Moreover, these efforts to strip CEC's Guarantee of the First Lien Notes are all the more egregious given CEOC's dramatic and deepening insolvency throughout the relevant time periods discussed in

---

Given all this, it is clear the only purpose of the sale was to give CEC cover to argue that the Guarantee had been released, and that this was not a *bona fide* equity sale.

[7] On May 30, 2014, CEOC (while controlled by CEC) distributed additional CEOC shares, constituting 6% of equity, to directors, officers and other employees of CEOC, thus further reducing CEC's ownership of CEOC, as discussed further below.  As with the May stock sale, this had the effect of distributing worthless shares under an ostensible "incentive" plan.

this Complaint, which was not only apparent by a review of common market metrics but was in fact confirmed in CEC's public filings.  *See*, *e.g.*, CEC Form 8-K dated April 15, 2014, ex. 99.1 at 5 (disclosing that annual loss from operations had nearly tripled from $496 million in 2012 to $1.435 billion in 2013).

10.     Notwithstanding CEC's repeated contentions that the Guarantee was terminated as a result of its various restructuring activities from May to August of 2014, the language of the Indentures and the protections afforded under the TIA make clear that the Guarantee remains in full force and effect.  CEOC's insolvency, which led to its January 15, 2015 voluntary declaration of bankruptcy, coupled with CEC's disavowal of its Guarantee, materially impairs the ability of the Noteholders to collect on the obligations owed them, effectively robs the Noteholders of the benefit of their bargain under the First Lien Indentures and eviscerates their rights under the TIA.[8]

11.     Given the clear terms of the First Lien Indentures and the TIA, CEC's attempt to shed its obligations as Parent Guarantor without the consent of the First Lien Noteholders was not only ineffective and illegal under the TIA, but also a breach of the First Lien Indentures.

12.     The filing of the CEOC Bankruptcy, an Event of Default under section 6.01(e)(i) of the First Lien Indentures, caused the principal of, premium, if any, and interest on all the First Lien Notes to become automatically and immediately due and payable without notice by the Indenture Trustee.  First Lien Indentures § 6.02.  These amounts have not been paid by CEOC, and interest on the First Lien Notes continues to accrue.  The Indenture Trustee accordingly

---

[8] BOKF, N.A., as successor indenture trustee for CEOC's 12.75% Second Priority Senior Secured Notes due 2018, has alleged that the same series of sham transactions described herein was invoked by CEC to support its theory that its guarantee of these second priority notes – which is substantially similar, if not identical, to the Guarantee supporting the First Lien Notes – had likewise been released.  *See* Complaint for Recovery on Guarantee, Damages and Declaratory Relief, Case No. 15-cv-1561 (S.D.N.Y.) [Dkt. No. 1].

seeks a judgment awarding it damages against CEC pursuant to First Lien Indentures section 12.01(a) of such amounts, among other things.  The Indenture Trustee need not issue a demand to CEC for payment prior to bringing this action, as such demand would clearly be futile because CEC has publicly disavowed its Guarantee obligations, and CEC waived demand pursuant to First Lien Indentures section 12.01(b).

## PARTIES

13.     Plaintiff UMB Bank, N.A., acting solely in its capacity as Indenture Trustee is the successor indenture trustee under four First Lien Indentures that comprise approximately $6.3 billion of CEOC's recourse first lien bond debt (the "First Lien Bond Debt"). The First Lien Bond Debt is guaranteed by CEC. The Indenture Trustee maintains its principal offices in Missouri.

14.     Defendant CEC is a Delaware corporation, and, subject to the First Lien Indentures, the Parent Guarantor of the First Lien Bond Debt.

## JURISDICTION AND VENUE

15.     This Court has subject matter jurisdiction pursuant to Section 322(b) of the TIA, 15 U.S.C. § 77vvv(b), and Section 22(a) of the Securities Act of 1933, 15 U.S.C. § 77v(a), and 28 U.S.C. §§ 1331, 1361, 2201.  This controversy arises under federal law, involves claims herein so related to Plaintiff's federal claims that they form part of the same case or controversy, and Plaintiff seeks a declaration of its rights and those of the Noteholders its serves as trustee, irrespective of whether or not further relief is or could be sought.  This Court also has diversity jurisdiction pursuant to 28 U.S.C. § 1332, as the matter in controversy exceeds the sum of $75,000, and there exists complete diversity of citizenship between the parties.

16.     This Court has personal jurisdiction over CEC under New York's long arm jurisdiction statute, N.Y.C.P.L.R. § 302(a), because CEC has, at least, minimum contacts with the State of New York.  Among other things, CEC transacts business within the State, regularly does or solicits business or engages in other persistent courses of conduct in the State, expects or should reasonably expect its acts to have consequences in the State, and/or derives substantial revenue from interstate or international commerce.

17.     Venue is proper in this District pursuant to Section 322(b) of the TIA, 15 U.S.C. § 77vvv(b), and Section 22(a) of the Securities Act of 1933, 15 U.S.C. § 77v(a), and 28 U.S.C. §§ 1391(b) and (c).  Among other things, CEC is found or transacts business in this District, the offer or sale of the debt at issue took place at least in part in this District, and/or a substantial part of the events giving rise to the violations of law complained of herein occurred at least in part in this District.

## FACTUAL BACKGROUND

18.     CEC assumed liability as Guarantor pursuant to an Indenture, dated as of June 10, 2009 (as amended, modified, restated or supplemented from time-to-time, the "11.25% Indenture"), relating to CEOC's 11.25% Senior Secured Notes due 2017 issued in an original principal amount of  $1,375,000,000.  Pursuant to a Second Supplemental Indenture, dated as of September 11, 2009 (as amended, modified, restated or supplemented from time-to-time, the "11.25% Second Supplemental Indenture"), additional 11.25% Senior Secured Notes due 2017 were issued in the original principal amount of $720,000,000 (collectively, the "11.25% Notes").

19.     CEC also assumed liability as Guarantor pursuant to an Indenture, dated as of February 14, 2012 (as amended, modified, restated or supplemented from time-to-time, the

"8.50% Indenture"), relating to CEOC's 8.50% Senior Secured Notes due 2020 issued in an original principal amount of $1,250,000,000 (the "8.50% Notes").

20.     CEC assumed further liability as Guarantor pursuant to an Indenture, dated as of August 22, 2012 (as amended, modified, restated or supplemented from time-to-time, the "9.00% 2012 Indenture"), relating to CEOC's 9.00% Senior Secured Notes due 2020 issued in the original principal amount of $750,000,000.   Pursuant to an Additional Notes Supplemental Indenture, dated as of December 13, 2012 (as amended, modified, restated or supplemented from time-to-time, the "9.00% 2012 Supplemental Indenture"), additional 9.00% Senior Secured Notes due 2020 were issued in the original principal amount of $750,000,000 (collectively, the "9.00% 2012 Notes").

21.     CEC assumed liability as Guarantor pursuant to an Indenture, dated as of February 15, 2013 (as amended, modified, restated or supplemented from time-to-time, the "9.00% 2013 Indenture" and together with the 11.25% Indenture, the 11.25% Second Supplemental Indenture, the 8.50% Indenture, the 9.00% 2012 Indenture and the 9.00% 2012 Supplemental Indenture, collectively, the "First Lien Indentures")[9], relating to CEOC's 9.00% Senior Secured Notes due 2020 were issued in the original principal amount of $1,500,000,000 (the "9.00% 2013 Notes" and, together with the 11.25% Notes, the 8.50% Notes and the 9.00% 2012 Notes, the "First Lien Notes").

22.     The preamble to the First Lien Indentures defines CEC as the "Parent Guarantor." Section 1.01 of the First Lien Indentures states "'Guarantor' means the Parent Guarantor …."

23.     Section 12.01(a) of the First Lien Indentures establishes the responsibilities of each Guarantor:

---

[9] True and correct copies of the First Lien Indentures are attached hereto as Exhibits 1 through 4, respectively.

[E]ach Guarantor hereby jointly and severably, **irrevocably and unconditionally guarantees**, in the case of a guarantee by a Subsidiary Pledgor, on a first-priority secured basis, and in the case of each of (x) and (y) as a primary obligor and not merely as a surety, to each holder and to the Trustee and its successors and assigns (i) **the full and punctual payment when due, whether at Stated Maturity, by acceleration, by redemption or otherwise, of all obligations** of the Issuer under this Indenture (including obligations to the Trustee) and the [First Lien] Notes, whether for payment of principal of, premium, if any, or interest on in respect of the [First Lien] Notes and all other monetary obligations of the Issuer under this Indenture and the [First Lien] Notes and (ii) the full and punctual performance within applicable grace periods of all other obligations of the Issuer whether for fees, expenses, indemnification or otherwise under this Indenture and the [First Lien] Notes (all the foregoing being hereinafter collectively called the "Guaranteed Obligations").

First Lien Indentures § 12.01(a).

24.     This Guarantee liability is triggered on an accelerated basis pursuant to Section 6.02 of the First Lien Indentures upon an Event of Default that "occurs and is continuing." Where the Event of Default is "specified in Section 6.01(e)" – Section 6.01(e)(i) being when "the Issuer … commences a voluntary [bankruptcy] case" – "the principal of, premium, if any, and interest on all the Notes will become *immediately due and payable*."  (emphasis added.)  An Event of Default under Section 6.01(e)(i) occurred on January 15, 2015, when CEOC filed a voluntary petition for relief with the Bankruptcy Court in the Northern District of Illinois.  Since that date, CEC has been "a primary obligor" of "the full and punctual payment" which has come due.

### CEC'S IMPROPER AND INEFFECTIVE ATTEMPTS TO AVOID ITS OBLIGATIONS AS GUARANTOR

25.     By May of 2014, it was a matter of when, not if, CEOC would file for bankruptcy. To prepare for such an inevitability while protecting equity value for the Sponsors at all costs, CEC engaged in a series of machinations designed to eradicate, among other guarantee obligations, the Guarantee of the First Lien Notes under section 12.02(c) of the First Lien Indentures.  Its efforts to do so – both standing alone and as part of the larger scheme of

underlying debt transactions forming the basis for CEC's repeated insistence that the Guarantee had been released – constituted a non-consensual out-of-court restructuring in violation of both the TIA and the First Lien Indentures.

A.      The May Stock Transaction

26.      As the first step in its attempted scheme to eliminate the Guarantee, on May 6, 2014, CEC filed a Form 8-K with the SEC announcing that "[CEC's] guarantee of CEOC's outstanding secured and unsecured notes was automatically released" on May 5, 2014 by virtue of the sale of 68.1 shares (or 5%) of CEOC's common stock for a total of $6.15 million (the "5% Stock Sale"). *See* CEOC Form 8-K dated May 5, 2014. As CEOC has confirmed in its bankruptcy filings, this sale occurred "as part of" its restructuring of its first lien bank debt. *See*, *e.g.*, Chapter 11 Memo at 7 ("In May and June 2014, CEOC refinanced short-term maturities with $1.75 billion of new term loans (the 'B-7 Term Loan') and amended its first lien credit agreement to extend maturities and provide covenant relief. As part of the B-7 Refinancing, CEC sold five percent of its stock in CEOC to unaffiliated investors, which triggered a release of CEC's guarantee of certain first lien, second lien, and unsecured debt."); *see also* Debtors' Motion for Entry of an Order Appointing an Examiner at 5 [Bankr. Dkt. No. 363] (same).[10]

27.      This announcement was, in itself, an Event of Default under the First Lien Indentures. Section 6.01(h), which defines Events of Default, is triggered if "the Parent Guarantor denies or disaffirms its obligations under this Indenture or its Parent Guarantee," and that disavowal continues for at least ten days. Thus, CEC's denial and disaffirmance of its

---

[10] As described in note 5, *supra*, at least two of the three purchasers of this stock, as existing CEC equity holders, stood to benefit directly from the removal of guarantee liability from CEC that allegedly resulted from this stock sale and thus were anything but "unaffiliated investors."

obligations under its Guarantee in its May 6, 2014 Form 8-K matured into a non-curable Event of Default under the First Lien Indentures on May 16, 2014.

28.     The alleged release resulting from CEC's disposition of stock is drawn from Section 12.02(c) of the First Lien Indentures, which states:

> (c) The Parent Guarantee shall terminate and be of no further force or effect and the Parent Guarantor shall be deemed to be released from all obligations under this Article XII upon:
> (i) the Issuer ceasing to be a Wholly Owned Subsidiary of Caesars Entertainment;
> (ii) the Issuer's transfer of all or substantially all of its assets to, or merger with, an entity that is not a Wholly Owned Subsidiary of Caesars' Entertainment in accordance with Section 5.01 and such transferee entity assumes the Issuer's obligations under this Indenture; **and**
> (iii) the Issuer's exercise of its legal defeasance option or covenant defeasance option under Article VIII or if the Issuer's obligations under this Indenture are discharged in accordance with the terms of this Indenture." (Emphasis added.)

29.     Section 12.02(c) employs the term "and," rendering it a conjunctive condition and requiring each subclause to be met before effectuating the Parent Guarantor's release.[11]   CEC mistakenly relies solely on having met the single requirement of subclause (i) based on its unilateral sale of 68.1 shares of CEOC.  However, it cannot be disputed that neither of the other subclause conditions were satisfied.  CEOC has not transferred all of its assets to, nor merged with, an entity which has assumed CEOC's obligations per subclause (ii), nor has CEOC exercised its legal defeasance options, or discharged its obligations per subclause (iii).

30.     Section 12.02(c), when read fully and in its proper context only permits the termination of the Parent Guarantee in the event that "the Issuer's obligations under this Indenture are discharged in accordance with the terms of this Indenture." Section 12.01(c)(iii).  It is intended as a practical roadmap in the event of corporate transactions altering the borrowing

---

[11] Indeed, section 1.01(a) of the Indentures expressly addresses the construction of the word "or," but does not address the word "and."   "And" should accordingly be given its common, conjunctive meaning.

structure, and is not a mechanism for CEC to unilaterally withdraw its Guarantee without notice or consent.  Furthermore, even if CEC had abided by the terms of Section 12.02(c), which they did not, this transaction violated the TIA and other, similar provisions of the First Lien Indentures as a non-consensual restructuring that impaired First Lien Noteholders' right to receive payment under the First Lien Indentures.

B.     Additional Stock Dispositions and the Guarantee-Stripping "Election"

31.     Cognizant that CEC's "automatic release" was neither automatic, nor a release, on information and belief, CEC directed CEOC to take further steps to bolster CEC's claim that its Guarantee liability had been released after its May 5 announcement of the 5% Stock Sale.

32.     First, on or about May 30, 2014, CEOC (which was controlled by CEC) took steps to distribute additional shares of its stock in an apparent effort to bolster CEC's claim that its Guarantee liability had been automatically released.  CEOC ostensibly created a "performance incentive plan" ("PIP"), pursuant to which it granted new shares to directors, officers, and employees of CEOC.  Clearly, the PIP was simply another machination intended to substantiate CEC's claim to have released the Guarantee, as no CEC constituency would be "incentivized" by the distribution of equity in an insolvent CEOC.  Reflective of the fact that this stock had no value, upon information and belief, none of CEOC's other existing compensation arrangements were replaced or modified in any way as a result of the implementation of this new plan, consistent with the fact that there was no legitimate purpose for this transaction or value associated with the stock being distributed in connection therewith.

33.     In connection with the PIP, on June 27, 2014, CEOC announced:

On May 30, 2014, the members of the Human Resources Committee (the 'Committee') of the CEC Board authorized the CEOC Board to adopt the 2014 Performance Incentive Plan (the 'CEOC PIP'), and, also on such date, the CEOC Board adopted the CEOC PIP. Subject to adjustments in connection with certain

> changes in capitalization, the maximum number of shares of common stock of CEOC, par value $0.01 per share (the 'CEOC Common Stock'), that may be delivered by CEOC pursuant to awards under the CEOC PIP is 86,936 (the 'Share Limit'). On May 30, 2014, CEOC granted a number of fully vested, nonforfeitable shares of CEOC Common Stock to various individuals (including directors and officers of CEOC and various employees).

CEOC Form 8-K dated June 27, 2014, Item 8.01.

34.    This additional transaction appears to have been designed not only to substantiate CEC's position that CEOC was no longer a "Wholly Owned Subsidiary" for purposes of the First Lien Indentures, but to bolster CEC's grounds for contending that the guarantees of its *unsecured* notes had been released, which CEC in turn used to support a second theory by which it attempted to disclaim liability under the Guarantee.

35.    Unlike the First Lien Indentures, which define "Wholly Owned Subsidiary" as one for which the parent owns 100% of capital stock, certain of the unsecured notes indentures use that term "as defined in Rule 1-02(z) of the Regulation S-X promulgated by the SEC," and provide that CEC's guarantee under such indentures may be released if CEOC ceases to be a wholly owned subsidiary according to this separate standard.  *See*, *e.g.*, Indenture dated as of June 9, 2006, governing the issuance of Senior Secured 6.5% Notes due 2016, § 1503(3).  In contrast to the 100% ownership standard set forth in the First Lien Indentures, Regulation S-X defines "wholly owned subsidiary" as a subsidiary "substantially all of whose outstanding shares are owned by its parent . . . ."  SEC Reg. S-X Rule 1.02(z).

36.    CEOC's distribution of additional CEOC shares to CEOC directors and employees as announced in the June 27 8-K, combined with the 5% Stock Sale, has caused CEC to hold approximately 89% of CEOC's outstanding capital stock.  Chapter 11 Memo at 15-16. While CEC has maintained that the 5% Stock Sale was alone sufficient to nullify CEOC's status as a wholly owned subsidiary under all of its indentures, CEOC's subsequent actions to reduce

further CEC's ownership interest in CEOC (while preserving CEC's control of CEOC) was clearly part of CEC's strategy to more plausibly meet the "wholly owned" threshold contained in its unsecured indentures.[12]

37.    CEOC announced in this same June 27 8-K that it had notified the Indenture Trustee that it had "elected to effect" a release of the First Lien Notes Guarantee "for the additional reason that CEC's guarantee of other notes specified in the applicable indentures had been released."  CEOC June 27 8-K, Item 8.01.  This appears to have been a reference to a provision of section 12.02(c) of the First Lien Indentures, which provides that:

> [T]he Parent Guarantee will be automatically released upon the election of the Issuer and Notice and Notice to the Trustee if the guarantee by [CEC] of the . . . Existing Notes . . . has been released or discharged.

Indentures § 12.02(c); *see also id.* § 1.01 ("Existing Notes" defined to include CEOC's unsecured note issuances).

38.    Thus, by June of 2014, CEC was taking a belt-and-suspender approach to the restructuring of the obligations owed under the First Lien Indentures and the release of the Guarantee – alleging that the release had been triggered both by the disposition of CEOC shares standing alone *and* by CEOC's giving notice that guarantees of other, unsecured note issuances had been released.

39.    As with the purported release of the Guarantee resulting from the disposition of stock, however, section 12.02(c) of the First Lien Indentures, when read in context, clearly renders CEC's attempts to effectuate a release of CEC's "irrevocable and unconditional" obligations through a self-serving, CEC-directed "election" incomplete and thus ineffective.[13]

---

[12] The *MeehanCombs* and *Danner* plaintiffs have contended that this threshold has not been met.

[13] Even if CEOC's June 2014 election and notice was not rendered ineffective by the language of the Indenture or as a violation of the TIA, which it was, it would have been too little, too late.

Moreover, to the extent CEC's guarantee of any of CEOC's unsecured "Existing Notes" was not validly released – by operation of Regulation S-X, the TIA or otherwise – the requirements governing the release of the First Lien Notes Guarantee under section 12.02(c) were not met for that additional reason.[14]

C.      The August Notes Transaction

40.      In spite of its prior declarations that the Guarantee had been released both on account of CEOC's ceasing to be a "Wholly Owned Subsidiary" under the First Lien Indentures and the "election" by CEOC following the purported release of the unsecured notes guarantees, CEC – apparently, and understandably, still not confident that it had actually succeeded in releasing the Guarantee – attempted yet again, in August of 2014, to disclaim liability thereunder.

41.      On August 22, CEC filed a Form 8-K announcing the consummation of an additional debt restructuring transaction (the "August Notes Transaction") pursuant to which, among other things, CEOC purchased at a premium and retired certain of its senior unsecured notes due 2016 and 2017, thus reducing its near-term unsecured indebtedness while leaving other Noteholders with claims against an insolvent debtor.  CEC Form 8-K dated August 22, 2014, Item 1.01.

42.      As part of the August Notes Transaction, the holders who were party to the transaction authorized their respective indenture trustees to enter into supplemental indentures

---

An Event of Default under the First Lien Indentures had already taken place when CEC's May 6, 2014 disclaimer of its Guarantee continued for 10 days, and payment of all obligations to the First Lien Noteholders was then due and owing.  CEOC's subsequent attempts to invoke section 12.02  could not relieve CEC of its already existing obligations to the First Lien Noteholders that resulted from the Event of Default.

[14] The *MeehanCombs* and *Danner* plaintiffs have provided ample support for the theory that Existing Notes guarantees were not validly released.

that would "remove provisions relating to CEC's guarantee of the Notes" from the applicable indentures and provide that such holders "will be deemed to consent to any restructuring of the Notes" under certain conditions. *Id.*

43.     Thus, also on August 22, CEC announced in a separate Form 8-K that:

> [I]n connection with the effectiveness of the supplemental indentures to the indentures governing CEOC's 6.50% Senior Notes due 2016 and 5.75% Senior Notes due 2017 that removed provisions relating to CEC's guarantee of such notes . . . CEOC provided notice to the trustees of its outstanding first-priority senior secured notes . . . reaffirming CEOC's prior notices issued in June 2014 regarding the automatic release of CEC's guarantee of all of CEOC's first-priority senior secured notes . . . as a result of the guarantee of CEOC's unsecured senior notes being released.

CEC Form 8-K dated August 22, 2014, Item 8.01.

44.     In other words, CEC, not content that the purported release of the unsecured notes' guarantees by virtue of its "wholly owned subsidiary" theory had succeeded in causing the consequent release of the First Lien Notes Guarantee, amended its unsecured indentures in an effort to combat residual concerns that the underlying unsecured notes guarantee had not been effectively released.

45.     This, again, appears to be a reference to section 12.02(c) of the First Lien Indentures, which provides that the Guarantee will be "automatically released upon the election of the Issuer and Notice to the Trustee" if CEC's guarantee of CEOC's unsecured notes issuances is released. *See*, First Lien Indentures § 12.02(c).

46.     As with CEOC's previous "election" to release the First Lien Notes Guarantee, the election that followed the August Notes Transaction was inconsistent with the terms of the First Lien Notes Indentures and the TIA.  Moreover, to the extent CEC's guarantee of any of CEOC's unsecured Existing Notes was not validly released in connection with the August Notes

Transaction, the requirements governing the release of the First Lien Notes Guarantee under section 12.02(c) were not met for that additional reason.[15]

D.   The Guarantee Release Violated Both the First Lien Indentures and the TIA

47.   As set forth above, CEC's obligations under the Guarantee of the First Lien Notes are irrevocable and unconditional, and CEC is a primary obligor under the First Lien Indentures. *See*, First Lien Indentures § 12.01(a).  These obligations "remain in full force and effect until payment in full of all the Guaranteed Obligations."  *Id.* § 12.01(g).  The CEC Guarantee was essential to the consideration received by the First Lien Noteholders in agreeing to extend credit under the First Lien Indentures, and no consideration was given to (nor consent solicited from) the First Lien Noteholders in connection with the transactions that purportedly gave rise to the Guarantee's release.

48.   The purported release of CEC's Guarantee of the First Lien Notes is premised on numerous transactions that constitute part of a comprehensive out-of-court restructuring of CEOC's debt and CEC's related obligations.  This is not only impermissible pursuant to express language of the First Lien Indentures, but is also a violation of Section 316(b) of the TIA.[16]  The TIA includes as a mandatory provision that "the right of any holder of any indenture security to receive payment of the principal of and interest on such indenture security . . . shall not be impaired or affected without the consent of such holder."  15 U.S.C. § 77ppp(b).  This provision

---

[15] Upon information and belief, the Noteholder consents that CEC alleged it received to effectuate its Guarantee release were not effective until closing, at which point the notes were owned by CEC – rendering the consent given by CEC and not the original Noteholders.  BOKF, N.A.'s Complaint contains further detail explaining how the "consents" obtained by CEC in August were ineffective in obtaining CEC's release.  See BOKF, N.A. Complaint, Case No. 15-cv-1561 at ¶¶ 151-155.

[16] Section 13.01 of the First Lien Indentures specifies that the TIA controls in the event any provision of the First Lien Indentures "limits, qualifies or conflicts with the duties imposed by TIA Section 318(c)," which TIA section in turn applies TIA sections 310 through 317 to the First Lien Indentures.  First Lien Indentures § 13.01; TIA § 318(a), (c).

ensures that "a company cannot – outside of bankruptcy – alter its obligation to pay bonds **without the consent of each bondholder**." *MeehanCombs Global Credit Opportunities Funds, LP et. al. v. Caesar's Entertainment Corp. et. al.*, No. 14-cv-7091, January 15, 2015 Opinion and Order at pp. 10-11 (Scheindlin, J.) (emphasis added).  Neither CEC nor CEOC had declared bankruptcy when the series of transactions underlying the purported Guarantee release(s) took place, nor did they obtain the consent of the First Lien Noteholders to such transactions; therefore they cannot revoke the Guarantee and materially impair the First Lien Noteholders' right to recover the principal and interest due on their notes against the Parent Guarantor.

49.    Liability for the payment of principal and interest under the First Lien Notes has been accelerated, both by CEC's ineffective disavowal of its Guarantee liability (see supra ¶ 26), and by CEOC's voluntary declaration of bankruptcy (see supra ¶ 24).  As a result, the moneys owing under the First Lien Indentures are now due and owing from CEC as primary obligor.

50.    No written demand is required to bring suit to enforce the Guarantee.  While the First Lien Indentures contemplate that "each Guarantor hereby promises to and shall, upon receipt of written demand by the Trustee, forthwith pay…"  (§ 12.01(h)), such demand would clearly be futile in this case, as CEC has repeatedly disclaimed its Guarantee liability in its publicly disclosed securities filings.  Moreover, this notice provision is adopted "not in limitation of any other right which any holder or the Trustee has" (*id*.), and CEC as Guarantor expressly waived notice in section 12.01(b):

> "Each Guarantor waives notice of any default under the Notes or the Guaranteed Obligations. The obligations of each Guarantor hereunder shall not be affected by (i) the failure of any holder or the Trustee to assert any claim or demand or to enforce any right or remedy against the Issuer or any other Person under this Indenture, the Notes or any other agreement or otherwise…."

Thus CEC cannot defend its failure to pay by arguing that it has not yet received written notice.

## COUNT ONE

### (Declaratory Judgment That Guarantees Are In Full Force And Effect)

51.     Plaintiff incorporates by reference each of the prior paragraphs of the Complaint as if fully set forth herein.

52.     CEC's sale of 68.1 shares of CEOC, and distribution of additional shares pursuant to a so-called "Performance Incentive Plan," were ineffective as a means of releasing CEC from its obligations as Parent Guarantor, which obligations it assumed under Section 12.01(a) of the First Lien Indentures.

53.     The Plaintiff, solely in its capacity as Indenture Trustee for the First Lien Noteholders, seeks a declaration that (i) none of the 5% Stock Sale, the CEOC PIP share distribution, the August Notes Transaction, or CEOC's "elections" to release the Guarantee effectuated a release of the CEC Guarantee and any such release is void, (ii) CEC's May 6, 2014 contention that the CEC Guarantee had been released constitutes a breach of the First Lien Indentures, and CEC is in default on account thereof, and (iii) CEC remains liable on account of the CEC Guarantee.

## COUNT TWO

### (Violations of the Trust Indenture Act, 15 U.S.C. §§ 77aaa, *et seq.*)

54.     Plaintiff incorporates by reference each of the prior paragraphs of the Complaint as if fully set forth herein.

55.     The TIA regulates corporate debt securities offered for sale which have been qualified by the SEC, including the First Lien Indentures.  Section 316(b) of the TIA mandates

that "the right of any holder of any indenture security to receive payment of the principal of and interest on such indenture security … or to institute suit for the enforcement of any such payment … shall not be impaired or affected without the consent of such holder …."

56.     Contrary to this statutory mandate, CEC has denied the First Lien Noteholders the right to receive payment of the principal and interest of the outstanding notes pursuant to CEC's Guarantee, without the consent of the First Lien Noteholders.

57.     The Indenture Trustee, and the First Lien Noteholders have been damaged by the failure of CEC to make full and punctual payments of the Issuer under the First Lien Indentures and First Lien Notes.

58.     The Plaintiff, solely in its capacity as Indenture Trustee for the First Lien Noteholders, seeks a declaration that (i) none of the 5% Stock Sale, the CEOC PIP share distribution, the August Notes Transaction, or CEOC's "elections" to release the Guarantee effectuated a release of the CEC Guarantee as such actions violated the TIA, (ii) the CEC disclaimer of its obligations as Parent Guarantor is void as violating the TIA and (ii) CEC remains liable on account of the CEC Guarantee.

## COUNT THREE

### (Breach of Contract: Disavowal of Guarantee)

59.     Plaintiff incorporates by reference each of the prior paragraphs of the Complaint as if fully set forth herein.

60.     CEC assumed responsibilities as Parent Guarantor pursuant to the First Lien Indentures for due consideration – i.e. the extension of $6.3 billion of debt to CEOC.

61.     The First Lien Noteholders fully performed their obligations in extending the debt to CEOC in full.

62.     Section 6.01(h) of the First Lien Indentures provides that an Event of Default shall occur if "the Note Guarantee of the Parent Guarantor [CEC] . . . ceases to be in full force and effect (except as contemplated by the terms thereof) **or the Parent Guarantor denies or disaffirms its obligations under this Indenture or its Parent Guarantee and such Default continues for 10 days**." (emphasis added)

63.     CEC's May 6, 2014 contention that the CEC Guarantee was released constituted a denial or disaffirmance of CEC's obligations under the First Lien Indentures and its CEC Guarantee.

64.     CEC has not withdrawn its denial and disaffirmance of its obligations under the First Lien Indentures and the CEC Guarantee, and such default has continued for more than 10 days. Thus, an Event of Default occurred and is continuing.

65.     The First Lien Noteholders were damaged by this breach.

<u>**COUNT FOUR**</u>

**(Breach of Contract: Failure to Pay Upon Event of Default)**

66.     Plaintiff incorporates by reference each of the prior paragraphs of the Complaint as if fully set forth herein.

67.     CEC assumed liability as Parent Guarantor pursuant to the First Lien Indentures for due consideration – i.e. the extension of more than $6.3 billion loaned to CEOC.

68.     The First Lien Noteholders fully performed their obligations in extending credit to CEOC in full.

69.     CEOC's voluntary declaration of bankruptcy triggered CEC's obligations as Parent Guarantor under Section 12.01(a) on an accelerated basis pursuant to Section 6.02 of the

First Lien Indentures, which rendered "the principal of, premium, if any, and interest on all the Notes … immediately due and payable" by CEC pursuant to the Guarantee.

70.     CEC has not paid these amounts as required under the First Lien Indentures.

71.     The First Lien Noteholders were damaged by this breach.

## COUNT FIVE

### (Breach of Contract: Payment on Guarantee)

72.     Plaintiff incorporates by reference each of the prior paragraphs of the Complaint as if fully set forth herein.

73.     By its Guarantee, CEC is a primary obligor for all amounts immediately due and payable to the First Lien Noteholders under the First Lien Indentures.

74.     CEC is accordingly required to pay the First Lien Noteholders an amount no less than the principal and accrued interest on all outstanding First Lien Notes.

75.     CEC has not paid this amount.

76.     CEC's failure to satisfy its payment obligations as a primary obligor is a breach of the First Lien Indentures.

## COUNT SIX

### (Breach of the Implied Duty of Good Faith and Fair Dealing)

77.     Plaintiff incorporates by reference each of the prior paragraphs of the Complaint as if fully set forth herein.

78.     CEC has breached its implied duty of good faith and fair dealing by engaging in the improper disavowal of its Guarantee described above, in an attempt to avoid its obligations pursuant to its Guarantee.  CEC's actions have deprived the First Lien Noteholders of the right to receive the benefits to which they are entitled under the First Lien Indenture.

79.     The First Lien Noteholders were damaged by this breach.

## COUNT SEVEN

### (Payment of Costs and Expenses)

80.     Plaintiff incorporates by reference each of the prior paragraphs of the Complaint as if fully set forth herein.

81.     The First Lien Indentures include a provision that "[e]ach Guarantor also agrees to pay any and all costs and expenses (including reasonable attorneys' fees and expenses) incurred by the Trustee or any holder in enforcing any rights under this Section 12.01."  First Lien Indentures section 12.01(j).

82.     This is an action to enforce First Lien Noteholders' rights under section 12.01 of the First Lien Indentures.

83.     CEC is accordingly liable for the costs and expenses (including reasonable attorneys' fees and expenses) incurred by the Indenture Trustee in connection with this action.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff requests that this Court enter judgment against Defendant CEC and enter an Order:

(a) Declaring that the Guarantees are in full force and effect;

(b) Awarding Plaintiff, on behalf of First Lien Noteholders, all amounts due and owing under the First Lien Indentures, including but not limited to unpaid principal and interest due under the First Lien Indentures and/or the Guarantees, and directing that CEC pay such amounts;

(c) Awarding Plaintiff additional damages in an amount to be determined at trial;

(d) Awarding Plaintiff its attorneys' fees, costs and expenses incurred in bringing this action; and

(e) Awarding such other and further relief as the Court may deem proper.

Plaintiff hereby demands a trial by jury.

Dated:  June 15, 2015                        Respectfully Submitted,

                                             KATTEN MUCHIN ROSENMAN LLP


                                             By: _____
                                                  Craig A. Barbarosh
                                                  David A. Crichlow
                                                  Karen B. Dine
                                                  Rebecca Kinburn
                                                  575 Madison Avenue
                                                  New York, New York 10022
                                                  Telephone: (212) 940-8941
                                                  Fax:        (212) 940-8776

                                                  craig.barbarosh@kattenlaw.com
                                                  david.crichlow@kattenlaw.com
                                                  karen.dine@kattenlaw.com
                                                  rebecca.kinburn@kattenlaw.com

                                                  *Attorneys for Plaintiff*