UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UMB BANK, N.A., solely in its capacity as Indenture Trustee under those certain indentures, dated as of June 10, 2009, governing Caesars Entertainment Operating Company, Inc.'s 11.25% Notes due 2017; dated as of February 14, 2012, governing Caesars Entertainment Operating Company, Inc.'s 8.5% Senior Secured Notes due 2020; dated August 22, 2012, governing Caesars Entertainment Operating Company, Inc.'s 9% Senior Secured Notes due 2020; dated February 15, 2013, governing Caesars Entertainment Operating Company, Inc.'s 9% Senior Secured Notes due 2020, <br><br>　　　　　Plaintiff, <br><br>　　v. <br><br> CAESARS ENTERTAINMENT CORPORATION, <br><br>　　　　　Defendant. | Case No. 15-cv-04634 (SAS) <br><br> Related Case Nos.: <br> 15-cv-01561 (SAS) <br> 14-cv-7091(SAS) <br> 14-cv-7973(SAS) |

**PLAINTIFF UMB BANK, N.A.'S STATEMENT OF UNDISPUTED
MATERIAL FACTS PURSUANT TO LOCAL CIVIL RULE 56.1
IN SUPPORT OF ITS MOTION FOR PARTIAL SUMMARY JUDGMENT**

Pursuant to Rule 56 of the Federal Rules of Civil Procedure and Rule 56.1 of the Local Civil Rules of the United States District Court for the Southern District of New York, UMB Bank, N.A., solely in its capacity as Indenture Trustee ("UMB" or the "Indenture Trustee") under those certain First Lien Indentures (defined below), dated as of June 10, 2009, governing Caesars Entertainment Operating Company, Inc.'s 11.25% Notes due 2017; dated as of February 14, 2012, governing Caesars Entertainment Operating Company, Inc.'s 8.5% Senior Secured Notes due 2020; dated August 22, 2012, governing Caesars Entertainment Operating Company, Inc.'s 9% Senior Secured Notes due 2020; dated February 15, 2013, governing Caesars Entertainment Operating Company, Inc.'s 9% Senior Secured Notes due 2020 (collectively the "First Lien Notes," as described more fully below), respectfully submits that the following

material facts are undisputed.[1]

## I. PARTIES

1. Plaintiff UMB Bank, N.A., acting solely in its capacity as Indenture Trustee on behalf of the <u>First Lien Noteholders</u>, is the successor indenture trustee under four First Lien Indentures that comprise approximately $6,345,000,000 of CEOC's recourse first lien bond debt (the "<u>First Lien Bond Debt</u>"). The First Lien Bond Debt is guaranteed by CEC. ECF 1 (Complaint) ¶ 13. The Indenture Trustee maintains its principal offices in Missouri.

2. Defendant CEC is a Delaware corporation, and, subject to the First Lien Indentures, the Guarantor of the First Lien Bond Debt. ECF 1 (Complaint) ¶ 14.

## II. CEC'S OBLIGATIONS UNDER THE FIRST LIEN INDENTURES

3. CEC assumed liability as Guarantor pursuant to an indenture, dated as of June 10, 2009 (as amended, modified, restated or supplemented from time-to-time, the "<u>11.25% Indenture</u>"), relating to CEOC's 11.25% Senior Secured Notes due 2017 issued in an original principal amount of $1,375,000,000. ECF 1 (Complaint) ¶ 18; ECF 1-1 (11.25% Indenture). Pursuant to a Second Supplemental Indenture, dated as of September 11, 2009 (as amended, modified, restated or supplemented from time-to-time, the "<u>11.25% Second Supplemental</u>

---

[1] In order to streamline the motion, certain undisputed facts track BOKF's Rule 56.1 Statement of Material Facts verbatim. To the extent that any facts parallel BOKF's Statement of Material Facts, such facts are explicitly cross-referenced.

Citations herein are formatted as follows:

- Documents in this Court's ECF docket will be cited by ECF number with a short description in parentheses; *e.g.* ECF 1 (Complaint) ¶ 1 or BOKF ECF 1 (Complaint). An attachment to an ECF document will be cited by docket and attachment number, with a description of the attachment: *e.g.*, Attachment two to ECF 1 would be cited as ECF 1-1 (11.25% Indenture) § 1.01 at __.

- Other documents will be cited by the Exhibit Number to the Declaration of David A. Crichlow ("<u>Crichlow Decl.</u>"), with a short description of the Exhibit as defined in the Crichlow Decl. in parentheses; *e.g.*, Crichlow Decl. Ex. A (FDM) at __.

2

Indenture"), additional 11.25% Senior Secured Notes due 2017 were issued in the original principal amount of $720,000,000 (collectively, the "11.25% Notes").  *Id.*

4. CEC also assumed liability as Guarantor pursuant to an Indenture, dated as of February 14, 2012 (as amended, modified, restated or supplemented from time-to-time, the "8.50% Indenture"), relating to CEOC's 8.50% Senior Secured Notes due 2020 issued in an original principal amount of $1,250,000,000 (the "8.50% Notes").  ECF 1 (Complaint) ¶ 19; ECF 1-2 (8.50% Notes).

5. CEC assumed further liability as Guarantor pursuant to an Indenture, dated as of August 22, 2012 (as amended, modified, restated or supplemented from time-to-time, the "9.00% 2012 Indenture"), relating to CEOC's 9.00% Senior Secured Notes due 2020 issued in the original principal amount of $750,000,000.  ECF 1 (Complaint) ¶ 20; ECF 1-3 (9.00% 2012 Notes).  Pursuant to an Additional Notes Supplemental Indenture, dated as of December 13, 2012 (as amended, modified, restated or supplemented from time-to-time, the "9.00% 2012 Supplemental Indenture"), additional 9.00% Senior Secured Notes due 2020 were issued in the original principal amount of $750,000,000 (collectively, the "9.00% 2012 Notes").  *Id.*

6. CEC assumed liability as Guarantor pursuant to an Indenture, dated as of February 15, 2013 (as amended, modified, restated or supplemented from time-to-time, the "9.00% 2013 Indenture" and together with the 11.25% Indenture, the 11.25% Second Supplemental Indenture, the 8.50% Indenture, the 9.00% 2012 Indenture and the 9.00% 2012 Supplemental Indenture, collectively, the "First Lien Indentures"), relating to CEOC's 9.00% Senior Secured Notes due 2020 were issued in the original principal amount of $1,500,000,000 (the "9.00% 2013 Notes" and, together with the 11.25% Notes, the 8.50% Notes and the 9.00% 2012 Notes, the "First Lien Notes").  ECF 1 (Complaint) ¶ 21; ECF 1-4 (9.00% 2013 Indenture).

7. The preamble to the First Lien Indentures defines CEC as the "Parent Guarantor." Compl. ¶ 22. Section 1.01 of the First Lien Indentures states "'Guarantor' means the Parent Guarantor …." ECF 1 (Complaint) ¶ 21; ECF 1-1 to 1-4 (First Lien Indentures) § 1.01.

8. Section 12.01(a) of the First Lien Indentures (the "<u>Guarantee</u>") establishes the responsibilities of each Guarantor:

> [E]ach Guarantor hereby jointly and severally, **irrevocably and unconditionally guarantees**, in the case of a guarantee by a Subsidiary Pledgor, on a first-priority secured basis, and in the case of each of (x) and (y) as a primary obligor and not merely as a surety, to each holder and to the Trustee and its successors and assigns (i) **the full and punctual payment when due, whether at Stated Maturity, by acceleration, by redemption or otherwise, of all obligations of the Issuer under this Indenture (including obligations to the Trustee) and the [First Lien] Notes, whether for payment of principal of, premium, if any, or interest on in respect of the [First Lien] Notes and all other monetary obligations of the Issuer under this Indenture and the [First Lien] Notes** and (ii) the full and punctual performance within applicable grace periods of all other obligations of the Issuer whether for fees, expenses, indemnification or otherwise under this Indenture and the [First Lien] Notes (all the foregoing being hereinafter collectively called the "Guaranteed Obligations").

*Id.* § 12.01(a) (emphasis added)

9. Section 12.01(b) of the First Lien Indentures established that the Guarantors waived "presentation to, demand of payment from and protest to the Issuer of any of the Guaranteed Obligations…" *Id.* § 12.01(b).

10. Section 12.01(g) of the First Lien Indentures provides, in relevant part, "[E]ach Guarantor agrees that its Note Guarantee shall remain in full force and effect until payment in full of all the Guaranteed Obligations." *Id*. § 12.01(g).

11. Section 6.07 of the First Lien Indentures provides as follows:

> <u>Rights of the Holders to Receive Payment</u>.  Notwithstanding any other provision of this Indenture, *the right of any holder to receive payment of principal of and interest on the Notes held by such holder, on or after the respective due dates expressed or provided for in the Notes*, or to bring suit for the enforcement of any such payment on or after such respective dates, *shall not be impaired or affected without the consent of such holder*.

*Id*. § 6.07.

12. The First Lien Indentures are qualified under the Trust Indenture Act (the "TIA") by filing with the Securities and Exchange Commission (the "SEC"). See CEC & CEOC, Form S-4 Registration Statements, available at:

> http://www.sec.gov/Archives/edgar/data/858339/000119312509196724/ds4.htm (Filed Sept. 24, 2009, the 11.25% Indenture);
> http://www.sec.gov/Archives/edgar/data/858339/000119312509242513/ds4a.htm (S-4 Amendment, filed November 25, 2009, the 11.25% Indenture);
> http://www.sec.gov/Archives/edgar/data/858339/000119312512428845/d425064ds4.htm (Filed October 19, 2012, the 8.5% Indenture);
> http://www.sec.gov/Archives/edgar/data/858339/000119312513246726/d547184ds4.htm (Filed June 4, 2013, the 9% 2012 Indenture);
> http://www.sec.gov/Archives/edgar/data/858339/000119312513272954/d547184ds4a.htm (Filed June 27, 2013; the 9% 2013 Indenture).

13. Section 13.01 of the First Lien Indentures provides, "[i]f…any provision of this Indenture limits, qualifies or conflicts with the duties imposed by [the TIA]," the TIA "shall control."  ECF 1-1 to 1-4 (First Lien Indentures) § 13.01.

14. Guarantee liability is triggered on an accelerated basis pursuant to Section 6.02 of the First Lien Indentures upon an Event of Default that "occurs and is continuing."  Where the Event of Default is "specified in Section 6.01(e)"—Section 6.01(e)(i) being when "the Issuer … commences a voluntary [bankruptcy] case"—"the principal of, premium, if any, and interest on all the Notes will become immediately due and payable."  (emphasis added.)  *Id*. §§ 6.01, 6.02. An Event of Default under Section 6.01(e)(i) occurred on January 15, 2015, when CEOC filed a voluntary petition for relief with the Bankruptcy Court in the Northern District of Illinois.  ECF 1 (Complaint) ¶ 24.  Under Section 6.01(h), an additional event of default occurs where "the Note Guarantee of the Parent Guarantor or a Significant Subsidiary…ceases to be in full force and effect…or the Parent Guarantor denies or disaffirms its obligations under this Indenture or its

Parent Guarantee and such Default continues for 10 days." ECF 1-1 to 1-4 (First Lien Indentures) § 6.01(h).

15. Section 12.02(c) of the First Lien Indentures addresses the termination of the Guarantee:

> (c) The Parent Guarantee shall terminate and be of no further force or effect and the Parent Guarantor shall be deemed to be released from all obligations under this Article XII upon:
> (i) the Issuer ceasing to be a Wholly Owned Subsidiary…
> (ii) the Issuer's transfer of all or substantially all of its assets to, or merger with, an entity that is not a Wholly Owned Subsidiary…in accordance with Section 5.01 and such transferee entity assumes the Issuer's obligations under this Indenture; and
> (iii) the Issuer's exercise of its legal defeasance option or covenant defeasance option under Article VIII or if the Issuer's obligations under this Indenture are discharged in accordance with the terms of this Indenture.

ECF 1-1 to 1-4 (First Lien Indentures) § 12.02(c).

16. Section 12.02(c) of the First Lien Indentures provides that CEOC can elect—but is not required—to release the Parent Guarantee of the obligations under the Indenture once CEC's guarantee of the Credit Agreement or Existing Notes has been released or discharged:

> In addition, the Parent Guarantee will be automatically released upon the election of the Issuer and Notice to the Trustee if the [Guarantee] of the Credit Agreement, the [Existing] Notes or any Indebtedness which resulted in the obligation to guarantee the Notes has been released or discharged.

ECF 1-1 to 1-4 (First Lien Indentures) § 12.02(c).

17. Indenture Section 12.02(c) originally used the defined term "Retained Notes," but pursuant to the Second Supplemental Indenture, "Retained Notes" was replaced with "Existing Notes," a defined term under the Indenture that includes the four Retained Notes. The Retained Notes are: (i) 5.500% Senior Notes due 2010; (ii) 8% Senior Notes due 2011; (iii) 5.375% Senior Notes due 2013; and (iv) 8.125% Senior Subordinated Notes due 2011. The "Existing Notes" are the four Retained Notes as well as the (vi) 5.625% Senior Notes due 2015; (vi)

6

6.500% Senior Notes due 2016; (vii) 5.75% Senior Notes due 2017; (viii) 10.75% Senior Notes due 2016; and (ix) 10.75%/11.50% Senior Toggle Notes due 2018.  ECF 1-1 (11.25% Indenture) at 205; ECF 1-2 (8.5% Indenture) at 181; ECF 1-3 (9% 2012 Indenture) at 193; ECF (9% 2013 Indenture) at 171.

### III.   RELEVANT BACKGROUND

18.   On January 28, 2008, Apollo Global Management, LLC and TPG Global, LLC and their respective affiliates and co-investors (collectively, the "Sponsors") acquired CEC in a $30.7 billion leveraged buyout transaction.  Crichlow Decl. Ex. A (First Day Memorandum or "FDM") at 4; BOKF ECF 33 (Statement of Material Facts or "SMF") at ¶ 17 (citing BOKF ECF 1 (Complaint) ¶ 48; BOKF ECF 10 (Answer) ¶ 48).

19.   The Sponsors contributed approximately $6.1 billion to the leveraged buyout transaction, and the remainder was funded through the issuance of approximately $24 billion in debt, approximately $19.7 billion of which was secured by liens on substantially all of CEOC's assets.  Crichlow Decl. Ex. A (FDM) at 4; BOKF ECF 33 (SMF) at ¶ 18.

20.   As of December 31, 2013, the Sponsors owned or controlled approximately 64% of CEC's common stock, had the power to elect all of the company's board of directors and had voting control of the company.  Crichlow Decl. Ex. B (2013 Annual Report) at 14; BOKF ECF 33 (SMF) at ¶ 20.

21.   As of December 31, 2013, CEOC had approximately $19.589 billion in face value of outstanding indebtedness and debt service obligations in the amount of approximately $1.967 billion, including estimated interest payments of approximately $1.854 billion due in 2014.  *Id*. at 10; BOKF ECF 33 (SMF) at ¶ 21.

22. In its 2013 Annual Report, CEC stated that "[w]e do not expect that cash flow from operations will be sufficient to repay CEOC's indebtedness in the long-term and we will have to ultimately seek a restructuring, amendment or refinancing of our debt, or if necessary, pursue additional debt or equity offerings." *Id*. at 46; BOKF ECF 33 (SMF) at ¶ 22.

23. Based on CEC's 2014 Annual Report, the Sponsors currently own approximately 61% of CEC stock, elect all of the members of the company's board of directors and have voting control of the company. Crichlow Decl. Ex. C (2014 Annual Report) at 26; BOKF ECF 33 (SMF) at ¶ 23.

24. Prior to the 5% Stock Sale (defined below at ¶ 42) executed on May 5, 2014, CEC owned 100% of CEOC's equity. BOKF ECF 33 (SMF) at ¶ 24 (citing BOKF ECF 1 (Complaint) ¶ 31; BOKF ECF 10 (Answer) ¶ 31).

25. CEOC's 2014 EBITDA was estimated to be less than $1 billion compared with over $18 billion in outstanding indebtedness. Crichlow Decl. Ex. A (FDM) at 7-8; BOKF ECF 33 (SMF) at ¶ 25.

### IV. OUT-OF-COURT RESTRUCTURING TRANSACTIONS

26. Over the past several years, Caesars (defined to expressly include CEOC and CEC in the FDM has undertaken numerous transactions, including over 45 asset sales and capital market transactions, in efforts to restructure and manage its debt. *Id*. at 31; BOKF ECF 33 (SMF) at ¶ 26.

27. CEOC's FDM describes these transactions in a section entitled "Out-of-Court Transactions" and expressly states that "Caesars has executed" the transactions "in an effort to restructure and manage its debt." *Id*. at 31; BOKF ECF 33 (SMF) at ¶ 27.

28. Two of the Guarantee Transactions (defined below at ¶ 60) were among the transactions referenced and described in that specific section of the First Day Memorandum. *Id*. at 35-38; BOKF ECF 33 (SMF) at ¶ 28.

29. On March 28, 2014, CEC hired Blackstone Advisory Partners L.P. ("Blackstone"), the restructuring advisory business of Blackstone Group L.P., to provide advice regarding certain financial and strategic alternatives for the company. Crichlow Decl. Ex. D (First Blackstone Engagement Letter) at 1, 3–4; BOKF ECF 33 (SMF) at ¶ 29.

30. Pursuant to a second engagement letter dated August 12, 2014, but *effective May 7, 2014*, Blackstone agreed to provide financial advisory services to CEC and its affiliates in connection with a "possible restructuring of certain liabilities" and to assist in "analyzing, structuring, negotiating, and effecting the Restructuring." Crichlow Decl. Ex. E (Second Blackstone Engagement Letter) at 1; BOKF ECF 33 (SMF) at ¶ 30.

**B.    CAESARS FORMS NEW AFFILIATES**

31. In October 2013, CEC formed Caesars Entertainment Resort Properties LLC ("CERP") subsidiary of CEC. Crichlow Decl. Ex. C (2014 Annual Report) at 2; Crichlow Decl. Ex. A (FDM) at 32-33; BOKF ECF 33 (SMF) at ¶ 31 (citing BOKF ECF 1 (Complaint) ¶ 76; BOKF ECF 10 (Answer) ¶ 76).

32. Also in October 2013, CEC and the Sponsors formed Caesars Acquisition Company ("CAC"), a public company. BOKF ECF 33 (SMF) at ¶ 32 (citing BOKF ECF 1 (Complaint) ¶ 33; BOKF ECF 10 (Answer) ¶ 33).

33. Caesars Growth Partners LLC ("CGP") was formed in October 2013 as a direct subsidiary of CAC for the purpose of acquiring certain businesses and assets of Caesars. Crichlow Decl. Ex B (2013 Annual Report) at 7; BOKF ECF 33 (SMF) at ¶ 33.

34. CEC obtained approximately 58% ownership interest and no voting interest in CGP, and CAC obtained approximately 42% ownership interest and 100% of the voting rights. Crichlow Decl. Ex. C (2014 Annual Report) at 2; BOKF ECF 33 (SMF) at ¶ 34.

35. In October 2013, CEC contributed its interests in Caesars Interactive Entertainment Inc. ("CIE") to CGP. BOKF ECF 35 (SMF) at ¶ 20 (citing BOKF ECF 1 (Complaint) ¶ 86; BOKF ECF 10 (Answer) ¶ 86).

36. In April 2014, Caesars Enterprise Services, LLC ("CES") was created as a joint venture by and among CEOC, CERP and Caesars Growth Properties Holdings LLC ("CGPH"), a subsidiary of CGP. Crichlow Decl. Ex. C (2014 Annual Report) at 2; BOKF ECF 33 (SMF) at ¶ 36 (citing BOKF ECF 1 (Complaint) ¶ 35; BOKF ECF 10 (Answer) ¶ 35).

37. CEOC contributed to CES its rights to certain intellectual property, including a non-exclusive, irrevocable, world-wide royalty-free license related to its Total Rewards program, the industry's first and best-known loyalty program. Crichlow Decl. Ex. C (2014 Annual Report) at 5; BOKF ECF 33 (SMF) at ¶ 37 (citing BOKF ECF 1 (Complaint) ¶ 104; BOKF ECF 10 (Answer) ¶ 104.)

38. In one of the out-of-court transactions where CEOC transferred certain resort, casino and other properties to CGP, the governing transaction agreements expressly provided that the "Caesars Parties will effectuate a restructuring." Crichlow Decl. Ex. F (May 2014 8-K) at Ex. 2.1 thereto, at 1; BOKF ECF 33 (SMF) at ¶ 38.

39. As a result of these out-of-court transactions, certain assets owned and operated by CEOC before 2011 are now owned by CERP, CAC, CGP, CES and CIE or their subsidiaries. BOKF ECF 33 (SMF) at ¶ 39 (citing BOKF ECF 1 (Complaint) ¶ 65; BOKF ECF 10 (Answer) ¶ 65).

40. In its 2014 Annual Report, CEC identified key entities and subsidiaries resulting from these transactions as follows:



(1) On January 15, 2015, CEOC filed for bankruptcy protection under Chapter 11 of the US Bankruptcy Code. See Note 23, "Subsequent Events - CEOC Bankruptcy and Deconsolidation."
(2) CAC is party to the series of transactions that formed CGP LLC, and owns 100% of the voting membership units in CGP LLC. CEC owns 100% of the non-voting membership units in CGP LLC and consolidates CGP LLC as a variable interest entity. See Note 2, "Basis of Presentation and Principles of Consolidation." See information about CEC's announced merger with CAC in Note 1, "Description of Business."
(3) CES is a services joint venture formed by CEOC, CERP, and CGPH. See Note 2, "Basis of Presentation and Principles of Consolidation."
(4) CGPH and CBIC and their subsidiaries together represent the primary operations of Caesars Growth Partners Casino Properties and Developments ("CGP LLC Casinos").

Crichlow Decl. ¶ C (2014 Annual Report) at 2; BOKF ECF 33 (SMF) at ¶ 40 (citing BOKF ECF 1 (Complaint) ¶ 65; BOKF ECF 10 (Answer) ¶ 65).

11

41. CEC reported in its 2014 Annual Report that in order to respond to the recent changes in CEC's corporate entity, including the formation and capitalization of CGP and the formation and separate management and internal control structures for CEOC, CERP and CES, CEC was designing and implementing controls over its financial reporting. Crichlow Decl. Ex. C (2014 Annual Report) at 128; BOKF ECF 33 (SMF) at ¶ 41.

### C. GUARANTEE TRANSACTIONS

#### i. *May 2014 Transaction*

42. On May 6, 2014, CEC announced a proposed refinancing of CEOC's existing first lien debt (the "B-7 Refinancing") under the credit agreement (the "Credit Agreement") whereby CEOC sought to issue $1.75 billion in new "B-7" term loans, use the net cash proceeds to refinance existing indebtedness maturing in 2015 and existing term loans, and launch an amendment to the Credit Agreement to modify CEC's guarantee of CEOC's indebtedness. Crichlow Decl. Ex. F (May 2014 8-K) at Item 7.01 and Ex. 99.3 attached thereto; Crichlow Decl. Ex. A (FDM) at 35–36; BOKF ECF 33 (SMF) at ¶ 42.

43. Also on May 6, 2014, CEC announced that in connection with the B-7 Refinancing, CEC, on May 5, 2014, sold 68.1 shares, or five percent (5%) of CEOC's common stock, to certain institutional investors for $6.15 million (the "5% Stock Sale," and together with the B-7 Refinancing, the "May 2014 Transaction"). Crichlow Decl. Ex. F (May 2014 8-K) at Item 1.02; Crichlow Decl. Ex. G (Caesars NY Complaint) ¶ 89(a)-(c); Crichlow Decl. Ex. A (FDM) at 35-36; BOKF ECF 33 (SMF) at ¶ 43.

44. CEC has asserted that the 5% Stock Sale automatically terminated the Parent Guarantee under Section 12.02(c)(i) of the First Lien Indentures because CEOC was no longer a wholly owned subsidiary of CEC. Crichlow Decl. Ex. F (May 2014 8-K) at Item 1.02; Crichlow Decl. Ex. A (FDM) at 35-36.

45. CEC contends that the lenders providing the $1.75 billion in new capital would only agree to do so if CEC's parent guarantees of other CEOC debt (including the Parent Guarantee of the First Lien Notes) were terminated so that any CEC guarantee would be limited to the bank debt held by lenders consenting to the amendment to the Credit Agreement and up to no more than $2.9 billion of additional indebtedness. Crichlow Decl. Ex. F (May 2014 8-K) at Ex. 99.3 attached thereto; Crichlow Decl. Ex. G (Caesars NY Complaint) ¶ 89(b); BOKF ECF 19 (CEC Letter to the Court) at 2; BOKF ECF 33 (SMF) at ¶ 45.

46. According to CEC, termination of the Parent Guarantee provided enhanced credit support for the new $1.75 billion loan. Crichlow Decl. Ex. G (Caesars NY Complaint) ¶ 89(b); BOKF ECF 33 (SMF) at ¶ 46.

47. By July 2014, as part of the B-7 Refinancing, CEC, CEOC, the lenders and the administrative agent amended the Credit Agreement to: (i) relax certain financial covenants; (ii) make CEC's guarantees of the Credit Agreement obligations guarantees of collection rather than of payment; and (iii) limit that guarantee to debt held by consenting first lien lenders and up to approximately $2.9 billion of additional indebtedness. Crichlow Decl. Ex. A (FDM) at 35–36; Crichlow Decl. Ex. G (Caesars NY Complaint) at ¶ 89(c); BOKF ECF 33 (SMF) at ¶ 47.

48. The B-7 Refinancing was subject to certain conditions including regulatory approvals and approval from the requisite lenders under the Credit Agreement. Crichlow Decl. Ex. F (May 2014 8-K) at Item 7.01; BOKF ECF 33 (SMF) at ¶ 48.

49. The amendment to the Credit Agreement was consented to by at least the amount of consenting lenders required under the Credit Agreement. Crichlow Decl. Ex. H (July 28, 2014 8-K) at Item 1.01 and Ex. 10.1 attached thereto, at 2-3; BOKF ECF 33 (SMF) at ¶ 49.

50. Consenting lenders holding a revolving facility commitment received a consent fee of 2% of the aggregate principal amount of such consenting lender's revolving facility commitment, and consenting lenders holding term loans (excluding the initial B-7 term loans) received a consent fee in the aggregate of $50 million, which amount was payable to each consenting lender holding term loans on a pro rata basis based on the aggregate principal amount of term loans held by such consenting lender. *Id*. at Ex. 10.1 attached thereto, at 4; BOKF ECF 33 (SMF) at ¶ 50.

51. Upon closing the B-7 Refinancing in July 2014, proceeds from the B-7 Refinancing were used to repay CEOC term loans in the aggregate principal amount of $794 million held by consenting lenders. Crichlow Decl. Ex. C (2014 Annual Report) at 89; BOKF ECF 33 (SMF) at ¶ 51.

52. In addition, as part of a cash tender offer and a note purchase agreement finalized in July, 2014, proceeds of the B-7 refinancing were used to retire early CEOC's debt maturing in 2015, including:

- 99.1% of the $792 million in aggregate principal amount of 5.625% Senior Notes due 2015; and
- 98% of the $214.8 million in aggregate principal amount of 10% Second-Priority Senior Secured Notes due 2015.

Crichlow Decl. Ex. A (FDM) at 35-36; Crichlow Decl. Ex. I (July 29, 2014 8-K) at Ex. 99.1 attached thereto; BOKF ECF 33 (SMF) at ¶ 52.

53. Specifically, pursuant to the note purchase agreement, CEOC purchased from a subsidiary of CGP and an undisclosed third party holder: (i) $740.5 million in aggregate principal amount of the 5.625% Senior Notes due 2015 for a price of $1,048.75 per $1,000 principal amount; and (ii) $106.6 million in aggregate principal amount of the 10% Second-Priority Senior Secured Notes due 2015 for a price of $1,022.50 per $1,000 principal amount.

Crichlow Decl. Ex. I (July 29, 2014 8-K) at Ex. 99.1 attached thereto; BOKF ECF 33 (SMF) at ¶ 53.

54. CGP received approximately $451.9 million of consideration (including accrued and unpaid interest) as part of the note purchase transaction. *Id*. at Item 7.01; BOKF ECF 33 (SMF) at ¶ 54.

55. Further, upon completion of CEOC's tender offer in July 2014, CEOC agreed to purchase the following notes validly tendered: (i) $44.345 million aggregate principal of 5.625% Senior Notes due 2015 for total consideration of $1,048.75 per $1,000 principal amount; and (ii) $103.016 million in aggregate principal amount of the 10% Second-Priority Senior Secured Notes due 2015 for total consideration of $1,022.50 per $1,000 principal amount. *Id*. at Ex. 99.1 attached thereto; BOKF ECF 33 (SMF) at ¶ 55.

    ***ii. 6% Stock Transfer***

56. On May 30, 2014, CEC authorized the CEOC Board to adopt a 2014 stock "performance incentive plan" ("PIP"), which was adopted by the CEOC Board on the same date. Crichlow Decl. Ex. J (June 2014 8-K) at Item 8.01; BOKF ECF 33 (SMF) at ¶ 56.

57. Pursuant to the PIP, CEOC granted 86,936 shares of its common stock to various individuals including directors and officers of CEOC (the "6% Stock Transfer"). Crichlow Decl. Ex. J (June 2014 8-K) at Item 8.01; BOKF ECF 33 (SMF) at ¶ 57.

58. The 6% Stock Transfer was announced by CEC on June 27, 2014. Crichlow Decl. Ex. J (June 2014 8-K) at Item 8.01; BOKF ECF 33 (SMF) at ¶ 58.

59. CEOC announced in this same June 27 8-K that it had notified the Indenture Trustee that it had "elected to effect" a release of the First Lien Notes Guarantee "for the additional reason that CEC's guarantee of other notes specified in the applicable indentures had been released." Crichlow Decl. Ex. J (June 2014 8-K) at Item 8.01.

60.     CEC and CEOC do not expressly contend in their filings with the SEC that the 6% Stock Transfer was a basis for purportedly terminating or releasing the CEC Parent Guarantee.  Crichlow Decl. Ex. J (June 2014 8-K); BOKF ECF 33 (SMF) at ¶ 61.

### *iii.     August Unsecured Notes Transaction*

61.     On August 12, 2014, CEC announced a private refinancing transaction with certain holders of CEOC's outstanding 6.5% Senior Notes due 2016 (the "<u>2016 Notes</u>") and 5.75% Senior Notes due 2017 (the "<u>2017 Notes</u>") to purchase such holders' 2016 and 2017 Notes (the "<u>August Unsecured Notes Transaction</u>," and together with the May 2014 Transaction and the 6% Stock Transfer, the "<u>Guarantee Transactions</u>").  Crichlow Decl. Ex. A (FDM) at 36–37; Crichlow Decl. Ex. K (August 12, 2014 8-K) at Item 1.01; BOKF ECF 33 (SMF) at ¶ 62.

62.     As part of the August Unsecured Notes Transaction, with the consent of holders representing a majority of each of the 2016 and 2017 Notes, the indentures governing the 2016 and 2017 Notes would be amended to include: (a) a consent to the removal and acknowledgement of the termination of the CEC guarantee under the indentures; and (b) a modification of the covenant restricting disposition of "substantially all" of CEOC's assets to measure future asset sales based on CEOC's assets as of the date of the amendment.  Crichlow Decl. Ex. K (August 12, 2014 8-K) at Item 1.01; Crichlow Decl. Ex. A (FDM) at 36-37; BOKF ECF 33 (SMF) at ¶ 63.

63.     On August 22, 2014, CEC announced the consummation of the August Unsecured Notes Transaction.  CEC announced in a separate Form 8-K that:

> [I]n connection with the effectiveness of the supplemental indentures to the indentures governing CEOC's 6.50% Senior Notes due 2016 and 5.75% Senior Notes due 2017 that removed provisions relating to CEC's guarantee of such notes . . . CEOC provided notice to the trustees of its outstanding first-priority senior secured notes . . . reaffirming CEOC's prior notices issued in June 2014 regarding the automatic release of CEC's

> guarantee of all of CEOC's first-priority senior secured notes . . . as a result of the guarantee of CEOC's unsecured senior notes being released.

Crichlow Decl. Ex. L (August 22, 2014 8-K) at Item 8.01.

64. No consideration was given to (nor consent solicited from) the First Lien Noteholders in connection with the transactions that purportedly gave rise to the Guarantee's release. ECF 1 (Complaint) at ¶ 47.

65. Despite the numerous out-of-court restructuring transactions, CEOC remained overleveraged and realized an even more comprehensive restructuring was necessary. Crichlow Decl. Ex. A (FDM) at 7–8.

## V. CEOC FILES BANKRUPTCY

66. On January 12, 2015, three holders of second-priority senior secured notes issued by CEOC filed an involuntary bankruptcy petition against CEOC in the United States Bankruptcy Court for the District of Delaware, Case No. 15-10047 (KG), pursuant to Section 303 of title 11 of the United States Code (the "Bankruptcy Code"). BOKF ECF 33 (SMF) at ¶ 70 (citing BOKF ECF 1 (Complaint) ¶ 22; BOKF ECF 10 (Answer) ¶ 22).

67. On January 15, 2015, CEOC and 172 of its subsidiaries filed voluntary Chapter 11 cases in the United States Bankruptcy Court for the Northern District of Illinois, captioned *In re Caesars Entertainment Operating Company, Inc., et al.*, Case No. 15-01145 (ABG) (the "IL Voluntary Bankruptcy Cases"). BOKF ECF 33 (SMF) at ¶ 58 (citing BOKF ECF 1 (Complaint) ¶ 23; BOKF ECF 10 (Answer) ¶ 23); Crichlow Decl. Ex. M (Chapter 11 Petition)).

68. All or substantially all of the affiliated debtors in the IL Voluntary Bankruptcy Cases are subsidiary guarantors under the First Lien Indentures. Crichlow Decl. Ex. M (Chapter 11 Petition).

69. As of the date of filing of the IL Voluntary Bankruptcy Cases, CEOC had outstanding funded debt obligations of approximately $18.4 billion comprising:
- four tranches of first lien bank debt totaling approximately $5.35 billion notional principal amount;
- three series of outstanding first lien notes totaling approximately $6.35 billion notional principal amount;
- three series of outstanding second lien notes totaling approximately $5.24 billion notional principal amount;
- one series of subsidiary-guaranteed unsecured debt of approximately $479 million notional principal amount; and
- two series of senior unsecured notes totaling approximately $530 million.

Crichlow Decl. Ex. A (FDM) at 4; BOKF ECF 33 (SMF) at ¶ 73.

70. The filing of the IL Voluntary Bankruptcy Cases is an immediate Event of Default under Section 6.01 of the First Lien Indentures. ECF 1-1 to 1-4 (First Lien Indentures) § 6.01(e).

71. Upon the occurrence of an Event of Default under the 2010 Indenture, CEC and CEOC's obligations under the First Lien Notes become due and owing. *Id*. § 6.02.

72. On February 23, 2015, CEC announced its position that CEC is not subject to the Parent Guarantee. Crichlow Decl. Ex. N (February 23, 2015 8-K) at Item 7.01.

73. On March 2, 2015, CEOC and its affiliated debtors filed their Joint Plan of Reorganization Pursuant to Chapter 11 of the Bankruptcy Code (the "Plan"), which Plan is based upon CEC's Restructuring Support Agreement (the "RSA"). Crichlow Decl. Ex. O (Plan); BOKF ECF 33 (SMF) at ¶ 78.

74. Under the terms of the RSA and CEOC's proposed plan, the First Lien Noteholders do not receive payment in full and are impaired. Crichlow Decl. Ex. O (Plan).

**Dated:  June 26, 2015**
      **New York, New York**

                                        Respectfully Submitted,

                                        KATTEN MUCHIN ROSENMAN LLP


                                        By:   /s/ David A. Crichlow_____
                                                  David A. Crichlow
                                                  Craig A. Barbarosh
                                                  Karen B. Dine
                                                  Rebecca Kinburn
                                                  575 Madison Avenue
                                                  New York, New York 10022
                                                  Telephone: (212) 940-8941
                                                  Fax:          (212) 940-8776

                                                  craig.barbarosh@kattenlaw.com
                                                  david.crichlow@kattenlaw.com
                                                  karen.dine@kattenlaw.com
                                                  rebecca.kinburn@kattenlaw.com

                                                  *Attorneys for Plaintiff*