# IN THE UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UMB BANK, N.A., solely in its capacity as Indenture Trustee under those certain indentures, dated as of June 10, 2009, governing Caesars Entertainment Operating Company, Inc.'s 11.25% Notes due 2017; dated as of February 14, 2012, governing Caesars Entertainment Operating Company, Inc.'s 8.5% Senior Secured Notes due 2020; dated August 22, 2012, governing Caesars Entertainment Operating Company, Inc.'s 9% Senior Secured Notes due 2020; dated February 15, 2013, governing Caesars Entertainment Operating Company, Inc.'s 9% Senior Secured Notes due 2020, <br><br>              Plaintiff, <br><br>    v. <br><br> CAESARS ENTERTAINMENT CORPORATION, <br><br>              Defendant. | **Case No. 15-cv-04634 (SAS)** <br><br> Related Case Nos.: <br> 15-cv-01561 (SAS) <br> 14-cv-7091 (SAS) <br> 14-cv-7973 (SAS) |

**MEMORANDUM OF LAW OF PLAINTIFF UMB BANK, N.A. IN SUPPORT OF ITS MOTION FOR PARTIAL SUMMARY JUDGMENT AND JOINDER OF BOKF N.A.'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

**TABLE OF CONTENTS**

Page

PRELIMINARY STATEMENT ......................................................................................... 2

STATEMENT OF FACTS .............................................................................................. 5

ARGUMENT ................................................................................................................ 9

I.       STANDARD OF REVIEW ................................................................................ 9

II.      THE FIRST LIEN NOTEHOLDERS' RIGHTS UNDER THE TIA. ............................. 10

III.     TERMINATION OR RELEASE OF CEC'S GUARANTEE WOULD IMPAIR
         THE FIRST LIEN NOTEHOLDERS' RIGHT TO RECEIVE PAYMENT ................... 13

CONCLUSION ........................................................................................................... 18

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Adickes v. S.H. Kress & Co.*,
    398 U.S. 144 (1970)..................................................................................................10

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242 (1986)..................................................................................................10

*Buttry v. Gen. Signal Corp.*,
    68 F.3d 1488 (2d Cir. 1995)........................................................................................9

*Celotex Corp. v. Catrett*,
    477 U.S. 317 (1986)....................................................................................................9

*Delaware & Hudson Ry. Co. v. Consol. Rail Corp.*,
    902 F.2d 174 (2d Cir. 1990)......................................................................................10

*Ecuador v. Chevron Texaco Corp.*,
    499 F. Supp. 2d 452 (S.D.N.Y. 2007)........................................................................9

*Federated Strategic Income Fund v. Mechala Grp. Jamaica Ltd.*,
    No. 99 CIV 10517 HB, 1999 WL 993648 (S.D.N.Y. Nov. 2, 1999) ...............13, 15

*Ling Nan Zheng v. Liberty Apparel Co.*,
    556 F. Supp. 2d 284 (S.D.N.Y. 2008)......................................................................10

*Marblegate Asset Mgmt. v. Educ. Mgmt. Corp.*,
    No. 14 CIV. 8584 KPF, 2014 WL 7399041 (S.D.N.Y. Dec. 30, 2014) .........*passim*

*Marblegate Asset Mgmt. LLC v. Educ. Mgmt. Corp.*,
    No. 14-civ-8584 (KPF), 2015 WL 3867643 (S.D.N.Y. June 23, 2015)......11, 12, 16

*MeehanCombs Global Credit Opportunities Fund, LP v. Caesars Entm't Corp.*,
    No. 14 CV 7091 (SAS), 2015 WL 221055 (S.D.N.Y. Jan. 15, 2015)...........*passim*

*Niagara Mohawk Power Corp. v. Jones Chern., Inc.*,
    315 F.3d 171 (2d Cir. 2003)......................................................................................10

*Wright v. Goldman Sachs & Co.*,
    387 F. Supp. 2d 314 (S.D.N.Y. 2005), *aff'd*, 2008 WL 4507422 (2d Cir. 2008).....9

**Statutes**

15 U.S.C. § 77aaa ...........................................................................................................2

15 U.S.C. § 77bbb ...............................................................................................2

15 U.S.C. § 77eee ............................................................................................10

15 U.S.C. § 77ggg ...................................................................................2, 13, 15

15 U.S.C. § 77ppp(b) ................................................................................. *passim*

**Rules**

Fed. R. Civ. P. 56 ...............................................................................................9

Fed. R. Civ. P. 56(e) ........................................................................................10

**Other Authorities**

10A C. Wright, A. Miller, & M. Kane, *Federal Practice and Procedure* § 2727
     (3d ed. 1998) ...........................................................................................10

John A. Bauman, *A Rationale for Summary Judgment,* 33 Ind. L. J. 484 (1958) ........................10

Plaintiff UMB BANK, N.A., solely in its capacity as successor Indenture Trustee ("UMB" or the "Indenture Trustee") under those certain First Lien Indentures,[1] dated as of June 10, 2009, governing Caesars Entertainment Operating Company, Inc.'s 11.25% Notes due 2017; dated as of February 14, 2012, governing Caesars Entertainment Operating Company, Inc.'s 8.5% Senior Secured Notes due 2020; dated August 22, 2012, governing Caesars Entertainment Operating Company, Inc.'s 9% Senior Secured Notes due 2020; dated February 15, 2013, governing Caesars Entertainment Operating Company, Inc.'s 9% Senior Secured Notes due 2020 (collectively the "First Lien Notes," as described more fully below), respectfully submits this memorandum of law in support of its Motion, pursuant to Rule 56 of the Federal Rules of Civil Procedure and the local and individual rules of this Court, for Summary Judgment on Count II of its complaint (the "Complaint") against Defendant Caesars Entertainment Corporation ("CEC").

The Indenture Trustee joins in and incorporates by reference, as if fully set forth herein, all of the legal arguments, except those that relate specifically to the Second Lien Notes, set forth in BOKF N.A.'s Motion for Partial Summary Judgment (BOKF ECF Nos. 30–33), dated June 25, 2015, submitted in support of its motion for Summary Judgment on Count V of BOKF N.A.'s Complaint against CEC.[2]

---

[1] True and correct copies of the First Lien Indentures are attached as Exhibits 1–4 to the Indenture Trustee's Complaint (ECF 1–1 to 1–4), and cited herein as the "First Lien Indentures, § __."

[2] On June 17, 2015, UMB's action was deemed related to *MeehanCombs Global Credit Opportunities Fund, LP v. Caesars Entm't Corp.*, Case No. 14 CV 7091 (SAS), which is related in turn to *BOKF N.A. v. Caesars Entm't Corp.*, Case No. 15-cv-01561 (SAS), as well as *Danner v. Caesars Entm't Corp.*, Case No. 14-cv-07973 (SAS).

## PRELIMINARY STATEMENT

The Indenture Trustee, on behalf of the holders of the First Lien Notes[3] (the "First Lien Noteholders") in the principal amount of not less than $6,345,000,000, filed this action seeking a declaratory judgment that CEC's self-declared, completely non-consensual purported "release" of its obligations as Parent Guarantor under the First Lien Indentures is void under both the Trust Indenture Act of 1939 ("TIA") and the express terms of the First Lien Indentures themselves, and also seeking immediate payment of the obligations subject to the Guarantee. Plaintiff now moves for summary judgment on Count II of its Complaint, which seeks a declaration that the purported release of CEC's Guarantee of the First Lien Notes is ineffective, as it violates Section 316(b)[4] of the TIA.[5] Count II raises issues of statutory construction and implicates only a narrow set of facts that are not subject to a genuine dispute, therefore, Count II may be determined as a matter of law by the Court. For the reasons that follow, this Court should enter summary judgment on Count II in favor of the Indenture Trustee.

At the beginning of May 2014, CEC's balance sheet reflected more than $18 billion in liabilities in its capacity as the irrevocable and unconditional guarantor of payment of CEOC debt—liabilities that indisputably rendered CEC insolvent. CEC then embarked on a series of transactions that purportedly eradicated all of that liability, replacing it with an inferior $5 billion "guarantee of collection" on a single tranche of CEOC bank debt. By any definition, these transactions constituted a massive out-of-court restructuring. This restructuring was

---

[3] Capitalized terms not otherwise defined herein shall have the meaning ascribed to them in the Indenture Trustee's Local Rule 56.1 Statement of Undisputed Material Facts Pursuant to Local Civil Rule 56.1 in Support of its Motion for Partial Summary Judgment (the "SMF"), filed contemporaneously herewith and incorporated by reference.

[4] 15 U.S.C. § 77ppp(b). References to TIA Section 316(b) will be to "Section 316(b)."

[5] 15 U.S.C. §§ 77aaa to 77bbb.

implemented without the consent of CEOC's First Lien Noteholders and, if countenanced by this Court, would unquestionably impair their rights to receive payment under their indentures. In January 2015, CEOC filed for bankruptcy, rendering all principal and interest under the First Lien Indentures immediately due and payable. By purportedly removing itself as Guarantor, CEC has sought not merely to impair, but to completely eliminate, the right provided to the First Lien Noteholders under their indentures to receive immediate payment of these amounts from CEC. As this Court and others have held, such nonconsensual impairment is squarely prohibited by Section 316(b). The undisputed facts further show that the First Lien Noteholders did not consent to the purported release of the Guarantee.[6]

CEC's concerted efforts to strip CEOC of nearly all of its profitable assets and shed its own guarantor obligations—leaving CEOC's creditors with a depleted company without the means to repay even its most senior secured debts in full—constitutes impermissible out-of-court "restructuring," in violation of the TIA. (*See* CEOC's First Day Memorandum in Support of CEOC's and its affiliated debtors' Chapter 11 Petitions (the "FDM") at p. 31, describing CEOC's "attempts to extend their debt maturities and deleverage their balance sheets through various asset sales and capital markets transactions.") CEC began by stripping CEOC of its valuable online gaming asset, Caesars Interactive Entertainment, in 2011, and continued to move many of CEOC's most valuable and growth-oriented casino and resort properties to its affiliates—and out of the reach of CEOC's creditors (including the First Lien Noteholders)—

---

[6] Even under the terms of the RSA and CEOC's proposed plan, the First Lien Noteholders do not receive payment in full and are impaired. *See* Crichlow Decl. Ex. O (Debtors Joint Plan of Reorganization) at 29-30. Under the terms of the Indenture, CEC expressly waives any obligation of the First Lien Noteholders to seek payment from CEOC in the first instance. See First Lien Indentures, §12.01(b). The Guarantee is one for payment, not merely collection, and thus the First Lien Noteholders' right to payment is materially impaired because they are prevented from seeking payment on the matured debt.

through 2014.

As CEOC's financial stability spiraled downward, CEC undertook a series of restructurings to relieve itself of its guarantees of $18 billion of debt that was left at what remained of CEOC. Such actions have been publicly documented by CEOC in its bankruptcy proceeding, and various public statements and filings, and cannot be disputed in this action. *See, e.g.,* CEOC's FDM at p. 31. The transactions initiated by CEC included the May 2014 transfer of 68.1 shares (or five percent (5%) of CEOC's common stock) to CEC insiders. Based on this transaction, CEC filed an 8-K asserting that it was no longer bound as Guarantor of the First Lien Notes because CEOC was no longer a wholly-owned subsidiary. Additionally, CEC bases its release from the Guarantee on CEOC's "election" to release CEOC's guarantor obligations in June 2014 (while CEOC's board was under the control of CEC) and CEC's issuance of supplemental indentures for certain unsecured noteholders in August 2014 (referred to as the "August Unsecured Notes Transaction"). This Court recently addressed a nearly identical issue against the very same Defendant in *MeehanCombs*, stemming from the purported removal of CEC's guarantee of CEOC's obligations through the August Unsecured Notes Transaction and concluded that "*removal of the Guarantees through the August Unsecured Notes Transaction is an impermissible out-of-court restructuring achieved through collective action. This is exactly what TIA section 316(b) is designed to prevent.*" *MeehanCombs Global Credit Opportunities Funds, LP et. al. v. Caesars Entm't Corp. et. al.*, No. 14-cv-7973(SAS), 2015 WL 221055, at *5 (S.D.N.Y. Jan. 15, 2015) (Scheindlin, J.). For the same reasons, this Court should grant the Indenture Trustee's Motion for Summary Judgment.

UMB is the Indenture Trustee under those certain First Lien Indentures in the principal amount of not less than $6,345,000,000. SMF ¶¶ 1. CEC, the parent company of CEOC, is a signatory to the First Lien Indentures as Parent Guarantor and irrevocably and unconditionally guaranteed the obligations arising under the First Lien Indentures until payment in full of all of the Guaranteed Obligations, whether at maturity, by acceleration, by redemption, or otherwise. *See id.* ¶¶ 1, 3–8. The First Lien Indentures are qualified under and governed by the TIA; they provide that "the right of any holder to receive payment of principal of and interest on the Notes held by such holder, on or after the respective due dates expressed or provided in the Notes . . . shall not be impaired or affected without the consent of such holder." *Id.* ¶¶ 11–12. To the extent that any provision in the First Lien Indentures "limits, qualifies or conflicts with the duties imposed by [the TIA], the TIA "shall control." *Id.* ¶ 13.

In January 2008, Apollo Global Management, LLC, TPG Global, LLC, and their respective affiliates and co-investors (collectively, the "Sponsors") acquired CEC in a leveraged buyout transaction for $30.7 billion funded through the issuance of approximately $24 billion in debt (the "LBO"); approximately $19.7 billion of that debt was secured by liens on substantially all of CEOC's assets. *Id.* ¶¶ 18–19.

By 2013, CEC acknowledged that CEOC's highly leveraged debt structure was unsustainable, and expressly stated in its 2013 Annual Report, "we do not expect cash flow from operations will be sufficient to pay CEOC's indebtedness in the long-term and we will ultimately

---

[7] A more complete statement of all material undisputed facts is set forth in UMB's Rule 56.1 Statement of Material Facts ("SMF"). In order to streamline consideration of this motion, certain undisputed facts track those set forth in BOKF's Rule 56.1 Statement of Material Facts. The brief statement of facts set forth herein contains only a portion of those facts, which may be useful to the Court to help frame the legal arguments relating to the Trustee's claims.

have to seek a restructuring, amendment or refinancing of our debt, or if necessary pursue additional debt or equity offerings." *Id*. ¶ 22. Over the course of several years, Caesars – defined more fully in the FDM to expressly include CEOC and CEC – undertook numerous transactions, including over 45 asset sales and capital market transactions, to restructure and manage its debt. *Id*. ¶¶ 26–27.

As part of these transactions, Caesars moved certain CEOC assets – including casino and resort properties, online gaming assets and licenses to intellectual property such as the Total Rewards program – to Caesars affiliates formed in 2013 and in early 2014. *See, e.g., id*. ¶¶ 31–40. For example, the transactions led to the creation of Caesars Growth Partners LLC ("CGP") in October 2013, an entity formed for the purpose of acquiring certain businesses and assets of Caesars, and of Caesars Enterprise Services LLC ("CES") in April 2014, a new joint venture that received a non-exclusive, irrevocable worldwide royalty-free license related to CEOC's Total Rewards program. *Id*. ¶ 33–37. Indeed, transaction documents implementing the transfer of assets to newly formed entities refer to the transaction as "effectuat[ing] a restructuring." *Id.* at ¶ 38.

In March 2014, CEC hired Blackstone Advisory Partners L.P. ("Blackstone"), the restructuring advisory business of the Blackstone Group L.P. to provide advice on certain strategic alternatives. *Id*. ¶ 29. Through an engagement letter dated August 12, 2014, but made effective as of May 7, 2014, Blackstone agreed to provide financial advisory services to CEC and its affiliates in connection with a "possible restructuring of certain liabilities" and to assist in "analyzing, structuring, negotiating, and effecting the Restructuring." *Id*. ¶ 30.

On May 6, 2014, CEC announced that CEOC planned to issue $1.75 billion in new "B-7" term loans (the "B-7 Refinancing") under the first lien credit agreement (the "Credit

Agreement") and to use the net proceeds to refinance existing indebtedness maturing in 2015, and existing term loans. *Id.* ¶¶ 42, 45–52. CEC simultaneously asserted that CEC sold five percent of CEOC common stock to certain institutional investors for $6.15 million (the "5% Stock Sale," and together with the B-7 Refinancing, the "May 2014 Transaction"). *Id.* ¶ 43. According to CEC, because CEOC was no longer a wholly owned subsidiary, the Guarantee was automatically terminated under Section 12.02(c)(i) of the First Lien Indentures. *Id.* ¶ 44. As part of the B-7 Refinancing, lenders under the Credit Agreement provided their consent to certain amendments of the Credit Agreement and in exchange, received a $50 million consent fee. *Id.* ¶ 50. Additionally, according to CEC, the lenders under the Credit Agreement required the release of the Guarantee as well as other guarantees of indebtedness made by CEC, as part of the B-7 Refinancing. *See* Transcript of Pre-Motion Conference *at 18-19, BOKF, N.A. v. Caesars Entm't Corp.*, 15 Civ. 1561 (SAS), 14 Civ. 7091 (SAS), 14 Civ. 7973 (SAS) (S.D.N.Y. May 26, 2015) (Dkt. No. 22.).

On June 27, 2014, CEC also announced that on May 30, 2014, CEC authorized the CEOC Board to adopt a stock performance incentive plan ("PIP") which would enable CEOC to issue shares of CEOC stock to its directors and officers (the "6% Stock Transfer"). *Id.* ¶¶ 56–58. Following the 5% Stock Sale and the 6% Stock Transfer, CEC owned approximately 89% of CEOC stock. *Id.* ¶ 40. CEOC announced in this same June 27 8-K that it had notified the Indenture Trustee that it had "elected to effect" a release of the Guarantee "for the additional reason that CEC's guarantee of other notes specified in the applicable indentures had been released." *Id.* ¶ 59.

On August 12, 2014, CEC announced a private refinancing transaction with certain holders of CEOC's 2016 and 2017 Notes whereby CEOC purchased the holders' notes and the

holders agreed to amend the First Lien Indentures governing the 2016 and 2017 Notes to include (a) a consent to the removal and acknowledgement of the termination of the Guarantee within the First Lien Indentures and (b) a modification of the covenant restricting disposition of "substantially all" of CEOC's assets to measure future asset sales based on CEOC's assets as of the date of the amendment (the August Unsecured Notes Transaction). *Id*. ¶¶ 61–62. Thereafter, on August 22, 2014, after the August Unsecured Notes Transaction closed, CEC announced in a separate form 8-K:

> "[I]n connection with the effectiveness of the supplemental indentures to the indentures governing CEOC's 6.50% Senior Notes due 2016 and 5.75% Senior Notes due 2017 that removed provisions relating to CEC's guarantee of such notes . . . CEOC provided notice to the trustees of its outstanding first-priority senior secured notes . . . reaffirming CEOC's prior notices issued in June 2014 regarding the automatic release of CEC's guarantee of all of CEOC's first-priority senior secured notes . . . as a result of the guarantee of CEOC's unsecured senior notes being released." *Id*. ¶ 63.

The First Lien Noteholders did not consent, and were not afforded the opportunity to consent, to the May 2014 Transaction, the 6% Stock Transfer or the August Unsecured Notes Transaction. *Id*. ¶ 64.

On January 15, 2015, CEOC, along with 172 subsidiaries, filed voluntary petitions under chapter 11 of the Bankruptcy Code. *Id*. ¶ 67. CEOC's own valuation under its proposed plan and pre-petition Restructuring Support Agreement (the "RSA") was that the value of CEOC's assets was far less than the amount of its $18.4 billion debt. *Id*. ¶ 69, 73–74. CEOC filed a proposed plan and disclosure statement based on the RSA but has not taken any steps towards confirmation of that proposed plan. However, even under that proposed plan, the First Lien Noteholders will not receive payment in full of the obligations. SMF ¶ 74; *see* Crichlow Decl. Ex. O (Plan). Thus, the First Lien Noteholders are expected to receive less than the full payment and interest to which they are entitled. SMF ¶ 74.

The filing of CEOC's bankruptcy case was an immediate Event of Default under Section 6.01 of the First Lien Indentures and as a result, CEC and CEOC's obligations under the Notes became immediately due and owing. *Id.* ¶¶ 14, 70–71. Under the terms of the First Lien Indentures, the Indenture Trustee, on behalf of the First Lien Noteholders, is entitled to seek immediate payment of those amounts from CEC as Guarantor. *Id.* ¶¶ 8–9. Under the terms of the Guarantee, CEC expressly waives any requirement that the First Lien Noteholders first seek recovery from CEOC. *Id.* ¶ 9.

## ARGUMENT

I.  **STANDARD OF REVIEW**

Summary judgment shall be granted where, as here, the record shows that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986); *Buttry v. Gen. Signal Corp.*, 68 F.3d 1488, 1492 (2d Cir. 1995); *Ecuador v. ChevronTexaco Corp.*, 499 F. Supp. 2d 452, 468 (S.D.N.Y. 2007); *Wright v. Goldman Sachs & Co.*, 387 F. Supp. 2d 314, 322 (S.D.N.Y. 2005), *aff'd*, 2008 WL 4507422 (2d Cir. Oct. 7, 2008). The moving party bears the initial burden of informing the court of the basis for the motion and identifying materials in the record that demonstrate the absence of any genuine dispute as to a material fact. Fed. R. Civ. P. 56(c); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 331 (1986).

If the moving party meets its initial burden, the non-moving party may not rest upon unsupported denials, but must come forward with specific material facts showing that there is a genuine issue for trial. *See* Fed. R. Civ. Proc. 56(e); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *see also Ling Nan Zheng v. Liberty Apparel Co.*, 556 F. Supp. 2d 284, 287-88 (S.D.N.Y. 2008). "[I]f the proof in support of the motion is largely documentary and has a high

degree of credibility[,] the opponent must produce convincing proof attacking the documents in order to sustain his burden." 10A C. Wright, A. Miller, & M. Kane, *Federal Practice and Procedure* § 2727, p. 486 (3d ed. 1998) (quoting John A. Bauman, *A Rationale for Summary Judgment,* 33 Ind. L. J. 467, 483-84 (1958)). Although all justifiable inferences are to be drawn in favor of the non-moving party, *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158-59 (1970), "[c]onclusory allegations, conjecture and speculation…are insufficient to create a genuine issue of fact." *Niagara Mohawk Power Corp. v. Jones Chern., Inc.*, 315 F.3d 171, 175 (2d Cir. 2003); *Delaware & Hudson Ry. Co. v. Consol. Rail Corp.*, 902 F.2d 174, 178 (2d Cir. 1990). This is because "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

## II. THE FIRST LIEN NOTEHOLDERS' RIGHTS UNDER THE TIA.

The TIA, passed in 1939 to supplement the Securities Act of 1933, provides that the instruments to which it applies must be issued under indentures qualified by the Securities and Exchange Commission ("SEC")—a requirement "designed to vindicate a federal policy of protecting investors." *See* 15 U.S.C. §§ 77eee-77ggg; *MeehanCombs Global Credit Opportunities Funds, LP et. al. v. Caesars Entm't Corp. et. al.*, No. 14-cv-7091, 2015 WL 221055, at *2 (S.D.N.Y. Jan. 15, 2015) (Scheindlin, J.) (internal citation omitted).

A key provision of the TIA is Section 316(b), which provides:

> "Notwithstanding any other provision of the indenture to be qualified, the right of any holder of any indenture security to receive payment of the principal of and interest on such indenture security, on or after the respective due dates expressed in such indenture security, or to institute suit for the enforcement of any such payment on or after such respective dates, shall not be impaired or affected without the consent of such holder...." 15 U.S.C. § 77ppp(b).

This provision ensures that "a company cannot – outside of bankruptcy – alter its obligation to

pay bonds without the consent of each bondholder." *MeehanCombs,* 2015 WL 221055, at *3.

Section 316(b) prohibits impairment of a noteholder's right to receive payment on its notes, not merely its bare legal right to sue. "[T]o interpret Section 316(b) as protecting merely the right to sue for payment, and not any substantive right to *receive* such payment, would be unfaithful to the text and the drafting history." *Marblegate Asset Mgmt. LLC v. Educ. Mgmt. Corp.* ("<u>Marblegate II</u>"), No. 14-civ-8584 (KPF), 2015 WL 3867643, at *11 (S.D.N.Y. June 23, 2015) (emphasis in original). Statutory interpretation requires that the disjunctive "or" between "the right of any holder…to receive payment" and "to institute suit" be given effect. *Id.* ("[o]rdinary principles of statutory interpretation suggest that the first clause [of Section 316(b)] cannot be repetitive of the second, lest the disjunctive 'or' be disregarded.") (*citing Loughrin v. United States*, 134 S. Ct. 2384, 2390 (2014)). In this case, Section 316(b) prohibits impairment of a noteholder's "right to receive payment" separately and apart from its prohibition on impairment of a noteholder's right to "institute suit for the enforcement." [8]

Section 316(b) does not simply protect "formal, explicit modification of the legal right to receive payment" while allowing "a sufficiently clever issuer to gut the Act's protections" through transactions intended to strip an issuer of its assets or a guarantor of its guarantee liability. *MeehanCombs* at *4 (*quoting Marblegate Asset Mgmt. v. Educ. Mgmt. Corp.* ("<u>Marblegate I</u>"), No. 14 civ 8584 (KPF), 2014 WL 7399041, at *18 (S.D.N.Y. Dec. 30, 2014).) This provision was intended to address "prior practice" whereby parties "controlled by insiders" took action to impair the rights of bondholders, a situation reflected in the instant case as CEOC, which is controlled by CEC, purported to release CEC's guarantee. *Id.* (citing *Upic & Co. v.*

---

[8] An examination of the TIA's legislative history confirms that this more generous interpretation reflects the "broader worries" of the SEC and Congress about "bondholders [being] forced to relinquish claims outside of the formal mechanisms of debt restructuring." *Marblegate II* at 12.

*Kinder-Care Learning Centers*, 793 F. Supp. 448, 452 (S.D.N.Y 1992) (noting that section 316(b) was motivated by the SEC's concerns "about the motivation of insiders and quasi-insiders to destroy a bond issue through insider control.").) As Judge Failla held earlier this week:

> "[T]here is no reason to think that the Trust Indenture Act was targeted only at a particular method of restructuring — straightforward amendment — as opposed to an undesirable result: allowing a majority to force a non-assenting security holder to accept a reduction or postponement of his claim…by protecting the individual's right to 'receive' the bargained-for principal and interest, [the TIA] is broad enough to prevent that result, whether carried out straightforwardly or circuitously. Accordingly, courts should give effect to the purpose of the Act, and not allow minority bondholders to be forced to relinquish claims outside of the formal mechanisms of debt restructuring."

*Marblegate II*, 2015 WL 3867643, at *12.[9]

Where a guarantee provides the holders' practical recourse, removal of that guarantee is necessarily "an impermissible out-of-court debt restructuring." *See, e.g., MeehanCombs Global Credit Opportunities Funds, LP*, 2015 WL 221055 at *5. A transaction is "the type of debt reorganization that the Trust Indenture Act is designed to preclude" if it "operates, *in context*" to impair a noteholder's right to receive payment. *Marblegate I*, 2014 WL 7399041, at *19–20.

By its unambiguous terms, Section 316(b) focuses on the *effect* an issuer or guarantor's actions might have on a security holder's right to receive payment or institute a suit. *See*

---

[9] In *Marblegate I*, Judge Failla held that, even if explicit modifications of "core terms" of the legal obligation to pay are not involved, transactions that affect the right to payment of principal and interest violate Section 316(b) where they "effect an involuntary debt *restructuring*." 2014 WL 7399041, at *19 (emphasis added). While the Indenture Trustee does not believe, and other jurisprudence related to Section 316(b) does not suggest, that it is necessary to prove that the challenged transactions are a restructuring in order to succeed on its TIA claim, the instant action unquestionably clears the *Marblegate I* requirement because: (i) the entirety of the Guarantor's Guarantee is at issue just as the successful plaintiffs' guarantee in *Marblegate II* was; (ii) CEC and CEOC have publicly acknowledged that their actions were taken as part of a restructuring of CEC and CEOC's obligations; and (iii) CEC stated publicly that the release of the Guarantee itself was required as part of the transactions they engaged in with the lenders under the senior credit agreement, which resulted in those lenders obtaining a new guarantee from CEC to the exclusion of the First Lien Noteholders. SMF ¶¶ 22, 42, 44-46, 59, 63, 72.

15 U.S.C. §77ppp(b); *see Federated Strategic Income Fund v. Mechala Grp. Jamaica Ltd.*, No. 99 CIV 10517 HB, 1999 WL 993648 at *7 (S.D.N.Y. Nov. 2, 1999) (prohibition of Section 316(b) extends to transaction "that impairs or affects, *by its effect* and not necessarily by its terms, a holder's right to sue and recover payment") (emphasis added).  In analyzing noteholders' rights under the TIA, most courts—including several recent decisions of the Southern District of New York—have found that a defendant's termination or release of a guarantee underlying the debt of an insolvent issuer constitutes an improper impairment.  *See MeehanCombs,* 2015 WL 221055; *Federated Strategic Income Fund*, 1999 WL 993648; *Marblegate I,* 2014 WL 7399041.  These cases deemed impairment to have occurred when an act impaired a holder's practical ability to recover in full when the debt matures, even if that right is impaired *prior* to the time payment is due.  *See Federated Strategic Income Fund*, 1999 WL 993648, at *7 (analyzing holders' ability to receive payment of principal and interest for the purposes of Section 316(b) as of the "date of maturity"); *see also MeehanCombs Global Credit Opportunities Funds, LP*, 2015 WL 221055, at *4 ("[I]t is possible for a right to receive payment to be impaired prior to the time payment is due."); *Marblegate I*, 2014 WL 7399041, at *18 (Section 316(b) protects the substantive right to payment against *ex ante* impairment).  For the reasons discussed below, the Indenture Trustee's motion should be granted, as termination or release of CEC's Guarantee would impermissibly impair the First Lien Noteholders' right to receive immediate and full payment under the First Lien Indentures.

III.  **TERMINATION OR RELEASE OF CEC'S GUARANTEE WOULD IMPAIR THE FIRST LIEN NOTEHOLDERS' RIGHT TO RECEIVE PAYMENT.**

It is undisputed that CEC irrevocably and unconditionally assumed the liability of a primary obligor as the Parent Guarantor under the First Lien Indentures.  *See* SMF ¶ 8.  These obligations "remain in full force and effect until payment in full of all the Guaranteed

Obligations." *Id.* ¶ 10.  Nor can it be disputed that CEOC's bankruptcy accelerated the maturity of the First Lien Notes and made the entire principal and interest immediately due and owing.[10] *Id.* ¶¶ 14, 67, 70–71.  The Guarantee expressly waived "presentation to, demand of payment from and protest to the Issuer of any of the Guaranteed Obligations." *Id.* ¶ 9.  Therefore, at the very latest on January 15, 2015, the date on which CEOC filed for bankruptcy, the entire $6.345 billion face value of the First Lien Notes, plus interest, was due to the First Lien Noteholders.  *Id.* ¶ 14, 67, 70–71.  It is undisputed that the Guaranteed Obligations have not been paid.  CEC's purported termination or release of the Guarantee would incontrovertibly deprive the First Lien Noteholders of their right to receive that $6.345 billion payment of principal plus interest from CEC[11], who is a primary obligor.[12]  *Id.* ¶¶ 1, 3–8.

It is also undisputed that CEC neither received nor even solicited consent from the First Lien Noteholders in connection with the Guarantee's purported release.  *Id.* ¶ 64.  Indeed, it appears from CEC's statements to this Court in the BOKF action that the purported removal of the Guarantee was done as part of a restructuring agreed with certain senior lenders in connection with the B-7 transaction.  *Id.* ¶¶ 42-47; *see* Transcript of Pre-Motion Conference *at 18-19, BOKF, N.A. v. Caesars Entm't Corp.*, 15 Civ. 1561 (SAS), 14 Civ. 7091 (SAS), 14 Civ.

---

[10] Liability for the payment of principal and interest under the First Lien Notes has also been accelerated by CEC's purported disavowal of its Guarantee liability.  *Id.* ¶ 14.

[11] No written demand is required to bring suit to enforce the Guarantee.  *Id.* ¶ 9.  While the First Lien Indentures contemplate that "each Guarantor hereby promises to and shall, upon receipt of written demand by the Trustee, forthwith pay…"  (First Lien Indentures, § 12.01(h)), such demand would clearly be futile in this case, as CEC has repeatedly disclaimed its Guarantee liability in its publicly disclosed securities filings.  Moreover, this notice provision is adopted "not in limitation of any other right which any holder or the Trustee has" (*id.*), and CEC as Guarantor expressly waived notice in section 12.01(b).

[12] A key provision of the Indenture provides that the First Lien Noteholders are not required to seek satisfaction from CEOC first, but have the right in first instance to seek payment from CEC. SMF ¶¶ 8–9.

7973 (SAS) (S.D.N.Y. May 26, 2015) (Dkt. No. 22). Because this purported termination and release of the Guarantee was without the consent of the First Lien Noteholders, and would deny the First Lien Noteholders a material and immediate source of recovery of obligations that are now due and owing as a matter of law, the First Lien Noteholders' right to receive payment under the Notes "on or after the respective due dates expressed in" the First Lien Indentures has been impaired in violation of the TIA. 15 U.S.C. § 77ppp(b); SMF ¶ 11. Moreover, CEC has not filed for bankruptcy, and as such, is not afforded the protection of the Bankruptcy Code, which permits Debtors to restructure without the consent of Noteholders. "A company cannot – **outside of bankruptcy** – alter its obligation to pay bonds without the consent of each bondholder." *MeehanCombs*, 2015 WL 21055, at *3 (emphasis added).

In deciding *MeehanCombs*, this Court addressed a nearly identical issue against the very same Defendant, stemming from the purported removal of CEC's guarantees of CEOC's obligations through the August Unsecured Notes Transaction, a transaction challenged in both actions. *See MeehanCombs,* 2015 WL 221055. In *MeehanCombs*, as here, the "crux of plaintiffs' allegations [was] that the release of the Guarantees…affected plaintiffs' practical ability to recover payment in violation of section 316 of the TIA." *Id.* at *1.

Along the same lines, and as this Court discussed in *MeehanCombs,* in *Federated Strategic Income Fund,* Judge Baer enjoined a proposed indenture amendment that would have permitted the transfer of assets away from the issuer and removal of the parent company's guarantee obligations. *Federated Strategic Income Fund*, 1999 WL 993648, at *6. Even though the bondholders would have technically retained the "legal right" to pursue the issuer for payment of principal and interest, defendant's actions eliminated the holder's "safety net." *Id.* at *7.

A third case, decided June 23, *Marblegate II,* found that guarantee-stripping in the context of an insolvent issuer violated the TIA. 2015 WL 3867643, at *13. Judge Failla found that the noteholder, who held debt in an insolvent entity, was being improperly deprived of the parent guarantee "without resort to the reorganization machinery provided by law." *Marblegate II* at 13. These cases track closely the facts of this instant action—an attempt to strip a debtor of assets and deprive First Lien Noteholders of potential recovery under their Guarantees, after the First Lien Noteholders have already been stripped of their ability to recover in full under the Indentures by virtue of the Issuer's insolvency.

Even though the First Lien Noteholders may be entitled to some recovery through CEOC's bankruptcy, the stripping of the Guarantee would nonetheless materially impair the rights of the First Lien Noteholders to receive payment. *First*, even under the Plan currently proposed, the First Lien Noteholders do not receive a full recovery with respect to the First Lien Notes. SMF ¶ 74. *Second,* there is no certainty what recoveries may ultimately be available to the First Lien Noteholders under any plan of reorganization or in any liquidation. *Third*, and of critical importance, the timing of any such recoveries is very uncertain. *Finally,* and most important, under the bargained for rights of the First Lien Noteholders under the Indentures and Guarantee, the First Lien Noteholders are entitled to demand payment on the Guarantee without first seeking recovery from CEOC. SMF ¶ 8–9. Thus, to the extent that removal of the Guarantee would require the First Lien Noteholders to wait to see the outcome of CEOC's bankruptcy itself, it would clearly materially and significantly impair the rights of the First Lien Noteholders who are entitled to payment immediately pursuant to the Guarantee. SMF ¶ 70–71.

As stated above, in *MeehanCombs*, this very Court has already examined at least one of the precise transactions challenged here, specifically the August Unsecured Notes Transaction,

and concluded that "*removal of the Guarantees through the August Unsecured Notes Transaction is an impermissible out-of-court debt restructuring achieved through collective action. This is exactly what TIA section 316(b) is designed to prevent.*" *MeehanCombs*, 2015 WL 221055, at *5 (emphasis added).

Finally, it is irrelevant whether the terms of an Indenture may have a mechanism that permits a guarantor to shed its guarantee, because if that mechanism runs counter to the requirements of the TIA, the provisions cannot be sustained. *See Marblegate I,* 2014 WL 7399041, at *18 (rejecting defendants' argument that the terms of the indenture may limit the right to payment because "if the [TIA] protects only those rights that are enshrined in an indenture…the statute would prohibit nothing more than violations of the indenture contract, rendering it superfluous"). Thus, the Guarantor's actions are always circumscribed by the TIA. Indeed, in *Marblegate I,* the indentures at issue provided for the automatic release of the parent guarantee with the acquiescence of another class of creditors or by a majority vote of the impacted noteholders. *Marblegate I*, 2014 WL 739904, at *7 n.6. The court found that the transactions involved in that case, which purportedly released the guarantors pursuant to the terms of the applicable indenture, constituted an impermissible restructuring under the TIA. The court reasoned that, "*[g]iven the overall design of the Intercompany Sale, the Court does not find it material which of the two clauses is utilized to impair the rights of nonconsenting Noteholders.*" *Id.,* at *20 n. 17 (emphasis added). Any argument that the First Lien Indentures provided multiple mechanisms to terminate or release the Guarantee, therefore, must fail for the same reasons stated in *Marblegate I.* CEC should not be permitted to undertake calculated steps to circumvent its Guarantee obligations, in violation of the TIA.

## CONCLUSION

The undisputed facts establish that the purported release of the Guarantee amounts to non-consensual impairment of the First Lien Noteholders' right to payment and is, therefore, prohibited by Section 316(b) of the TIA. For the foregoing reasons, the Indenture Trustee respectfully requests that the Court grant its motion for summary judgment on Count II of the Complaint and issue a declaratory judgment that CEC's disclaimer of its Guarantee is null and void, and award such other and further relief as the Court deems proper.

**Dated:  June 26, 2015**
**       New York, New York**

                          Respectfully Submitted,

                          KATTEN MUCHIN ROSENMAN LLP


                          By: _/s/ David A. Crichlow_____
                                Craig A. Barbarosh
                                David A. Crichlow
                                Karen B. Dine
                                Rebecca Kinburn
                                575 Madison Avenue
                                New York, New York 10022
                                Telephone: (212) 940-8941
                                Fax:        (212) 940-8776

                                craig.barbarosh@kattenlaw.com
                                david.crichlow@kattenlaw.com
                                karen.dine@kattenlaw.com
                                rebecca.kinburn@kattenlaw.com

                                *Attorneys for Plaintiff*