F7NVUMBA

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UMB BANK, N.A.,

                    Plaintiff,

              v.                            15 CV 4634 (SAS)

CAESARS ENTERTAINMENT
CORPORATION,
                                            ARGUMENT
                    Defendant.

------------------------------x
                                            New York, N.Y.
                                            July 23, 2015
                                            11:07 a.m.

Before:

                    HON. SHIRA A. SCHEINDLIN,

                                            District Judge

                              APPEARANCES

KATTEN MUCHIN ROSENMAN
      Attorneys for Plaintiff
BY:   DAVID A. CRICHLOW

CLARICK GUERON REISBAUM
      Attorneys for Defendant
BY:   NICOLE GUERON
      AARON H. CROWELL

KRAMER LEVIN NAFTALIS & FRANKEL
      Attorneys for Nonparties Brigade Capital Management, LP,
       Elliott Management Corporation, Franklin Advisers, Inc.,
      J.P. Morgan Investment Management Inc.,
       and Pacific Investment Management Company LLC
BY:   NATAN HAMERMAN
      DANIEL EGGERMANN
      SAMANTHA V. ETTARI

F7NVUMBA

1          THE COURT:  Mr. Eggermann.

2          MR. EGGERMANN:  Yes.

3          THE COURT:  Oh, Mr. Hamerman.

4          MR. HAMERMAN:  That's me, your Honor.

5          THE COURT:  And Ms. Ettari.

6          MS. ETTARI:  Yes.

7          THE COURT:  And --

8          MR. CRICHLOW:  I'm Mr. Crichlow, your Honor.

9          THE COURT:  Mr. Crichlow.  Okay.

10         Ms. Gueron.

11         MS. GUERON:  Yes.

12         THE COURT:  Mr. Crowell.

13         MR. CROWELL:  Yes.

14         THE COURT:  Okay.  I have two letters here:  A July

15    13th letter from Mr. Hamerman, who's here.  And he would like

16    permission to file a motion to quash subpoenas that have been

17    issued on his clients and, he says, and/or for a protective

18    order.  His clients are nonparties to this matter.  He refers

19    to them in the letter correctly as collectively the first

20    lienholders.

21         And the subpoenas that have been served are served by

22    CEC, which is Caesars Entertainment Corp., a defendant in the

23    UMB action, which is the action we are here on.  And

24    Mr. Hamerman says these subpoenas, which call for documents and

25    depositions, are overly broad, they don't seek relevant

F7NVUMBA

1    information, and if both of those arguments were to fail, he

2    then says you shouldn't allow it now until you decide the

3    pending summary judgment motion.

4            Then I have a letter dated July 16th in response from

5    Mr. Gueron, representing CEC.  And she says you should allow

6    the subpoenas as issued; they do seek relevant information;

7    they are not overbroad.  The first lien noteholders are the

8    real party in interest here.  We have no other way of really

9    getting at the discovery.  It's a very tight discovery

10   schedule.

11           Our response to the pending brief is due tomorrow,

12   Friday, July 24th.  Discovery is set to close August 31st; so a

13   stay doesn't do any good because the discovery deadline will

14   occur.  We are prejudiced if you don't allow it.  And most of

15   all, the Delaware chancery court had an identical motion to

16   quash virtually identical subpoenas.  And under Delaware law --

17   which tracks pretty much Rule 26(b)(1) of the federal rules --

18   the Court declined to quash the subpoena.

19           So I think that's a fair summary of the two letters.

20           I would also note that in addition to the materials

21   that the parties submitted, which included the order of the

22   Delaware court and included the subpoenas, yesterday the

23   bankruptcy judge in the Northern District of Illinois declined

24   to stay the actions that are pending before me, I think there

25   are five of them, and the Delaware action in the Delaware

F7NVUMBA

1    chancery court.  So we have to go forward with this application

2    today.

3              I am prepared to make an oral ruling, which I intend

4    to follow up with a written ruling, but I'm happy to hear from

5    the parties before I do that, if you wish.

6              So since it is your proposed motion, Mr. Hamerman, if

7    you wish to be heard, that's fine.

8              MR. HAMERMAN:  Thank you, your Honor.  I do.

9              Good morning, your Honor.  Natan Hamerman from Kramer,

10   Levin, Naftalis & Frankel for the five subpoenaed nonparties.

11             We requested this conference, as your Honor mentioned,

12   to seek permission to move to quash and make a motion for a

13   protective order.  And the Court has obviously read the letter,

14   so I'll try to be as concise as possible.

15             I'd like to address three things.  First, I'll take

16   hopefully no more than 90 seconds to summarize our position on

17   the proposed motions.

18             THE COURT:  Don't bother if it repeats exactly what I

19   just said.

20             MR. HAMERMAN:  No problem, your Honor.  I'll skip

21   ahead then.

22             THE COURT:  Unless it has something different in

23   summary.

24             MR. HAMERMAN:  It is clear your Honor has reviewed it;

25   I'm happy to --

F7NVUMBA

| 1 | THE COURT:  I did.  I was interested in the issue; I'm |

1  THE COURT:  I did.  I was interested in the issue; I'm

2 interested in the problem; I'm interested in these cases.  So I

3 did take the time to review it, including reading yesterday's

4 interesting order of the bankruptcy court.  So I think I'm up

5 to speed, but I'm happy to hear the argument.

6  MR. HAMERMAN:  Very good.

7  I'm going to then talk about two things.

8  I'll scratch the intro.

9  THE COURT:  Okay.

10  MR. HAMERMAN:  The second thing I was going to talk

11 about -- now the first -- was the burden on the nonparties,

12 which I'll address.  And the next topic I'll address is

13 responding to some of the points raised in CEC --

14  THE COURT:  Both of those will be helpful.

15  MR. HAMERMAN:  Of course, your Honor, if you have

16 questions throughout, I'll answer them, or I'll do my best,

17 anyway, to answer them or answer them at the end.

18  So let me just skip right over to burden.

19  It is obviously our position that the subpoenas seek

20 irrelevant information and, therefore, any burden would be too

21 much.  But, your Honor, that's not just a minimalist approach;

22 in fact, the subpoenas are very burdensome, and that reinforces

23 why they should be quashed.

24  Since the time we filed our letter, we've spoken with

25 our clients about the burden that would be imposed by the

F7NVUMBA

1    subpoenas.  We tried to get estimates from them concerning the

2    universe of documents that would need to be collected and

3    reviewed in response to the subpoenas.  We asked in particular

4    for estimates with respect to emails of the top one or two

5    custodians at each client, the people who likely would have

6    sent, received, or been copied on the bulk of the documents.

7            Although it is difficult to estimate, in the absence

8    of agreed-upon parameters and search terms, we preliminarily

9    estimate that if these nonparty subpoenas are not quashed or

10   substantially modified, it will be necessary to review upwards

11   of 200,000 emails.

12           Now, this doesn't include attachments to the emails,

13   and it also does not include non-email documents, both of which

14   will move the actual number higher.  And it also does not

15   include any documents responsive to Request No. 12, which we

16   mentioned in our letter.  That one seeks all documents and

17   communications concerning the release, termination, expiration,

18   effectiveness or enforceability of any guaranty on any

19   corporate debt security.  That request is not limited to

20   Caesars' first lien bonds at all; and, frankly, some of our

21   corporate bond trading clients were simply awestruck at the

22   expansiveness of that request, which cuts across so many of

23   their positions.

24           Just to put this in perspective, your Honor, my

25   understanding, both from experience and from speaking with

F7NVUMBA

1    others, is that a document reviewer typically reviews roughly

2    500 to 1,000 documents a day.  That means to review roughly

3    200,000 emails takes between 200 to 400 attorney workdays.

4    That's what, roughly speaking --

5              THE COURT:  Why wouldn't you use technology-assisted

6    review these days?

7              MR. HAMERMAN:  We would certainly use as much

8    technology as we could, your Honor.  Our clients would

9    certainly expect -- particularly because of the privilege

10   issue, which I'm about to discuss, that we would take our time

11   to review these documents.  But we would certainly employ

12   whatever technologies we could to reduce the burden.

13             As I mentioned, it is not a precise estimate; the

14   numbers would likely go up and they would likely go down

15   because of search terms, technologies, additional documents,

16   and all of the like.  It gives you a rough sense of magnitude.

17   Obviously if you add Request No. 12, we would be talking about

18   orders of magnitude higher.

19             Two other points on burden.  One, the privilege issue,

20   which I was just mentioning.

21             Our clients have been working very closely with us and

22   with other counsel during most or all of the time period

23   covered by the subpoena.  Therefore, we expect that a large

24   portion of these emails and other documents will be privileged.

25             And the necessary privilege --

F7NVUMBA

1          THE COURT:  I'm sorry, what privilege?

2          MR. HAMERMAN:  Attorney-client privilege, attorney

3     work product privilege or immunity.  Of course, we have some

4     common interest issues.  So those would be the privilege that

5     we would be thinking about most notably.

6          Many of the documents are also proprietary, calling

7     for confidential information.  I'm sure there's a

8     confidentiality order; I think it was entered yesterday.  But,

9     nonetheless, that requires additional review and careful

10    consideration of how to label documents and things of that

11    nature.

12         THE COURT:  Let me ask you an unorthodox question.

13         MR. HAMERMAN:  Yes, your Honor.

14         THE COURT:  Very unorthodox.

15         If you were CEC and you were seeking the documents,

16    how could you draft this narrowly and cut your search

17    enormously and give them the minimal amount of what they really

18    need to see?  In other words, it is very unorthodox, because

19    clearly I'm asking you to switch roles, but your argument is,

20    at least initially, quash everything; don't allow any

21    discovery.

22         I'm wondering if there's a kernel, a narrow portion,

23    that even you think maybe they are entitled to; and if it were

24    structured that way, you might be able to get at.  They say you

25    are the real party in interest.  They say.

F7NVUMBA

1          Certainly you have a great interest, and with it the

2     guaranties were vacated, amended in some way that's appropriate

3     or inappropriate; and you may have correspondence regarding the

4     initial thoughts on those guaranties, even though you say you

5     weren't there for the negotiations.  There may be documents

6     that show how you understood them, how you didn't understand

7     them, what you thought of them, which I know you argue is

8     subjective and irrelevant anyway.  But I'm just saying, what's

9     the kernel of all of this?  K

10          THE WITNESS:  Some of the requests, No. 12, for

11     example, seem terribly out of line, I agree with you already.

12     But there might be something here that they really are entitled

13     to.  What might that be?  Very unorthodox question, but tell us

14     what might that be.

15          MR. HAMERMAN:  It's a perfectly reasonable question;

16     in fact, it's a question we talked about in our

17     meet-and-confer.  And we offered them before we knew, for

18     example, that our clients had not been involved in

19     negotiations.  We said to them, If there is evidence of

20     negotiations --

21          THE COURT:  That you say there's not.  So now we're

22     back to zero.  So what is there?

23          MR. HAMERMAN:  Well, we are not back to zero.

24          That's a legitimate request.  Negotiations, we don't

25     have it.  That's an answer; that's not, We're not going to give

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

F7NVUMBA

1    you anything.  We don't have it.

2              THE COURT:  I don't want to talk over you because it

3    makes it hard for the reporter.

4              You don't have any because you say you weren't

5    involved in the negotiation.  So that doesn't help me know what

6    you might have that might be relevant.

7              MR. HAMERMAN:  Okay.

8              So beyond the negotiations, the other topic that could

9    be pertinent is if we had been involved in the transactions,

10   which we were not, so there again is a zero.

11             And then finally, I think, if there were

12   communications with the parties to the indenture, that limited

13   universe could potentially show parol evidence or other

14   evidence relating to the transactions, for example, that could

15   potentially be relevant or lead to relevant evidence.

16             Now, with respect to that, we are aware that CEC has

17   already subpoenaed UMB to provide that information.

18             THE COURT:  UMB seems to have next to nothing because

19   of their role; what they are is as a successor.

20             What might you have in the subject area you just

21   described?  How could you search for it, how burdensome would

22   that be, how fast can you come up with it, and if there was a

23   deposition, who would be the deponent?

24             MR. HAMERMAN:  I think we are talking about

25   communications with UMB, which UMB doesn't say they have

F7NVUMBA

1   nothing; they say they have not a lot.  And that's the same

2   universe of documents that we are talking about.  I don't know

3   of any others, for example, with the draftsmen of the

4   indenture.  We are under the impression that we don't have any

5   of those.  Had there been, that's what we would be looking for,

6   and that would be potentially appropriate here.

7           THE COURT:  And if there was a deponent, who would

8   that be?

9           MR. HAMERMAN:  It would be the person who had the

10  communications with UMB, I guess.  That would be for the

11  purposes of talk about UMB's position.  They are the party.

12  They are the party and, therefore, potentially their

13  admissions, their statements might be pertinent here.

14          And let me answer then also, your Honor, the issue of

15  the real parties in interest, because that was a position that

16  your Honor seems to have taken an interest in and, of course,

17  CEC mentioned.

18          Our view is that that is a nice turn of phrase, but

19  it's really all it is.  We are not parties in any legally

20  significantly way; we are not parties to the litigation.  Our

21  statements that CEC wants in discovery are not party

22  admissions.  We are not parties to the indenture; we are not

23  parties to the negotiation of the indenture; we are not parties

24  to the transactions at issue in the litigation; we are not

25  party to the negotiation of those transactions.

F7NVUMBA

1            We are not a typical third party like an auditor who

2       audited financial information of a party who's accused of

3       financial shenanigans.  That's not what we have here.

4            We are outsiders.  We do hold an economic interest,

5       that's certainly true, your Honor; but so do thousands of other

6       noteholders.  And that we have an economic interest doesn't

7       make our --

8            THE COURT:  You have a huge economic interest.  You

9       stand to benefit enormously, depending on the outcome of this

10      litigation.

11           MR. HAMERMAN:  There is no doubt that we do have a

12      significant economic interest, your Honor.  But that doesn't

13      mean that our --

14           THE COURT:  That would turn, to some extent, on the

15      outcome of these litigations.

16           MR. HAMERMAN:  That's true.  We have an economic

17      interest in the outcome of the litigation.  That doesn't make

18      us parties.

19           THE COURT:  Let's not set up straw men and knock them

20      down.  You're not parties, I get that.  I didn't start the job

21      yesterday.  I know you're not a party.  I can read a caption.

22      You're nonparties.

23           Rule 45, of course, permits discovery of nonparties if

24      they have relevant information, of course.  Telling me over and

25      over again you're not a party is not helpful.  I get that.

F7NVUMBA

```
 1              But do you have information that is relevant to the
 2     issues that need to be resolved in this case and, if so, what
 3     is it; and, if so, when does it need to be produced.  That's
 4     the way to look at it.
 5              MR. HAMERMAN:  Okay.  We don't think we have
 6     information relevant for the reasons I've mentioned.  And if we
 7     do, it's extremely limited.  It's, in our view, already being
 8     produced by UMB.
 9              THE COURT:  That's sort of late in the game, isn't it?
10     When UMB arrives, isn't that late in the storyline here?
11     Wouldn't you have material that predates that about the
12     guaranties themselves and negotiating the guaranties and then
13     the effort to withdraw the guaranties?  Aren't you part of some
14     of those activities that predate UMB?
15              MR. HAMERMAN:  Let me try to break that down into
16     pieces.
17              THE COURT:  Okay.
18              MR. HAMERMAN:  First, there is the time period in
19     which the indentures were actually negotiated, right.  And in
20     particular, the first indenture here was negotiated in 2009 or
21     was entered into in 2009; it may have been negotiated in 2008.
22              THE COURT:  Right.
23              MR. HAMERMAN:  And those are the key communications,
24     if there are any.
25              THE COURT:  Right.  You don't have them.
```

F7NVUMBA

```
1              MR. HAMERMAN:  We were not involved, and so we don't
2     have those communications.
3              THE COURT:  Okay.  But that all predates UMB.
4              When did UMB come into the picture?
5              MR. HAMERMAN:  In 2014.
6              THE COURT:  That's what I thought.
7              MR. HAMERMAN:  So you're right, those communications,
8     which predate UMB's involvement, could potentially, I agree --
9     because we don't know yet whether the contract is clear or
10    ambiguous, those communications would be legit for discovery.
11             THE COURT:  But you say you don't have any.
12             MR. HAMERMAN:  Correct.
13             THE COURT:  When did you become a noteholder?
14             MR. HAMERMAN:  Our clients became noteholders on
15    different dates.  I don't have all of those dates at our
16    fingertips.
17             THE COURT:  No, but you know the range.
18             MR. HAMERMAN:  From the beginning through today.
19             THE COURT:  So from 2009 through '14.
20             MR. HAMERMAN:  Certainly.
21             Nonetheless, not every noteholder is involved in
22    negotiating the indenture or is involved in structuring the
23    indenture.
24             THE COURT:  I didn't say everyone was.  But if any of
25    the five are, any of the five had correspondence regarding
```

F7NVUMBA

1    guaranties and the purpose of the guaranties and the scope of

2    the guaranties, the ability to undo the guaranties, it's all

3    about the guaranties.

4                MR. HAMERMAN:  I agree, your Honor.

5                If our clients had that information, that's the type

6    of information that would be discussed in the negotiation of

7    the indenture.  And if our clients had been involved in that,

8    that could be a pertinent area that would potentially at least

9    lead to admissible evidence.

10               THE COURT:  Well, then the sale later of the five

11   percent that leads to undoing the guaranties, where are your

12   clients in all of that?

13               MR. HAMERMAN:  So our clients are observers of that,

14   but we were not involved in those transactions; and, therefore,

15   their opinions about those transactions are really just

16   opinions.  They are not facts.  They are opinions.

17               THE COURT:  I understand that.  They are subjective.

18   I get that.

19               MR. HAMERMAN:  Right.

20               So they are layperson opinions.

21               If we had been involved -- we weren't the auditors, we

22   were the lawyers -- we would agree that that information should

23   be produced.  But we are not.  And we don't have that.  We only

24   have our observations and our assessments of those

25   transactions.

F7NVUMBA

| | |
|---|---|
| 1 | THE COURT:  How about the decision to invest in the |
| 2 | first place?  Was it dependent on the guaranties?  Was that a |
| 3 | motivation for investing in the first place?  Are there records |
| 4 | that would show something along those lines? |
| 5 | MR. HAMERMAN:  I think that that information -- |
| 6 | there's certainly information the clients have about why they |
| 7 | made certain -- typically there's information about why clients |
| 8 | make investments, but that doesn't go, in our view, to the |
| 9 | issues in the case. |
| 10 | The issues in the case are was there a breach of the |
| 11 | indenture.  That turns on the language of the indenture and, |
| 12 | therefore, the parties' intent in negotiating the indenture. |
| 13 | And it goes on what happened in the transactions. |
| 14 | Our clients' subjective assessments of why they made |
| 15 | investments don't go to either of those two things.  And that's |
| 16 | highly proprietary information for our clients that we are |
| 17 | deeply concerned about having to review, produce, and share the |
| 18 | crown jewels of many of these entities. |
| 19 | Let me talk for a moment, your Honor, about some of |
| 20 | the other objective evidence that they have mentioned, things |
| 21 | like market analyst reports.  This is information that's not |
| 22 | proprietary to us, although we may have contracts keeping them |
| 23 | confidential and things of that nature.  But, again, we don't |
| 24 | think this is really objective evidence.  These are not facts |
| 25 | about the transactions.  These are third-party assessments of |

F7NVUMBA

1    what occurred.  And, therefore, we don't think that would be

2    fair game either.

3              We think it's also improper to burden five nonparties

4    with trying to go and find publicly-available analyst reports.

5    That does not seem to us like an appropriate use of Rule 45 or

6    even 26.  That's another category of objective data that they

7    mention.

8              Let me talk for a moment about Delaware.

9              Look, respectfully, we think that Vice Chancellor

10   Glasscock got it wrong, but I'll add another couple of points.

11             The transcript of that argument was annexed to the

12   letter by CEC.  And I couldn't help but remark how, frankly,

13   different our position was.  The majority of the argument by

14   the two L's in Delaware focused on trying to get the Court to

15   decide that day that the contract was clear and unambiguous.

16             I don't think that your Honor is going to do that, and

17   so I'm not even going to ask.  But we don't think that matters.

18   We don't think it matters if the contract is clear, if the

19   contract is ambiguous, or that the discovery is relevant to

20   determining whether or not the contract is ambiguous.  And

21   therefore, our position is different from theirs.

22             Because we've already confirmed, for example, that --

23             THE COURT:  I'm sorry, "theirs."  Who is "theirs"?

24             MR. HAMERMAN:  The two L's in Delaware.

25             THE COURT:  Two L's.

F7NVUMBA

1          MR. HAMERMAN:  The proponents of the motion to quash

2    in Delaware.

3          THE COURT:  What is two L's?

4          MR. HAMERMAN:  Second lean noteholders.  I'm sorry.

5          THE COURT:  Oh, you have a shorthand.

6          MR. HAMERMAN:  I have a shorthand.  I'm sorry.

7          THE COURT:  Maybe I should have known that already,

8    but I didn't.

9          MR. HAMERMAN:  So in Delaware, the second lien

10   noteholders made a motion to quash.  And their position was

11   that the Court should decide right there and then that the

12   contract was clear and unambiguous.

13          Our position is different than that.  We recognize

14   that that's not likely to occur, and we don't think it needs to

15   occur for purposes of adjudicating our application.

16          And in particular, because we already confirmed that

17   we weren't involved in the negotiations of the indenture or

18   involved in the 2014 transactions, we think that the potential

19   scope of relevant information or information that could lead to

20   relevant evidence, we just don't have it.

21          In Delaware, the second lien attorneys apparently

22   couldn't say anything or didn't say anything about burden.

23   Here, we've now talked about that.

24          In Delaware, they didn't have anything to say about

25   specific requests; it was an all-or-nothing approach.  Here, we

F7NVUMBA

1    do have concerns about specific requests; we do have concerns

2    about legal communications and proprietary communications.  So

3    we've addressed that, as well.

4              And, of course, the summary judgment application,

5    which you mentioned, your Honor, in Delaware, the court was

6    concerned that it would not be able to rule on anything for

7    some time.  Here, there is at least a possibility that your

8    Honor is going to be ruling on this soon and, therefore, all of

9    this effort may be for naught.

10             Although I didn't see it in the letter here, in the

11   Delaware oral argument, CEC took a position about subjective

12   evidence.

13             THE COURT:  About subject --

14             MR. HAMERMAN:  Subjective opinions of parties.

15             THE COURT:  That's in the letters here.

16             MR. HAMERMAN:  If it is, I hadn't noticed it.

17             THE COURT:  It's all over.

18             MR. HAMERMAN:  Our letter addresses subjective

19   evidence.

20             THE COURT:  Yes.  I'm sorry.

21             MR. HAMERMAN:  But in CEC's letter I didn't see a

22   response to that.

23             THE COURT:  Fair enough.

24             I know I read about it.  It was your cases that said

25   subjective.  The comments are irrelevant anyway.  Custom and

F7NVUMBA

1    practice has to be fixed; it has to be the established

2    practice, not subjective.  So I knew I read about that issue.

3           MR. HAMERMAN:  As I was saying, CEC took the position

4    in Delaware that there are certain circumstances when

5    subjective evidence can be admissible or can be relevant.  For

6    example, although it's not evidence used to interpret

7    ambiguity, it could be used, for example, to impeach a witness,

8    or it could be used, for example, to illuminate a witness's

9    objective communications back and forth about the intent of the

10   parties.

11          What that's about is not applicable here.  What those

12   cases are saying is that if you are trying to discern the

13   intent of the parties to the contract, there are certain

14   circumstances when this subjective evidence might come into

15   play.  Since we were not involved, and since we are not

16   parties, and we are not parties to the indenture, and we are

17   not involved in the negotiation, we do not think that even

18   those limited unique circumstances could be applicable here.

19          All that's being asked for here, in our view, is not

20   really the intent of the parties to the contract; it's the

21   after-the-fact subjective opinion of noncontracting parties.

22          (Pause)

23          THE COURT:  Maybe you've covered all your points.

24          MR. HAMERMAN:  Maybe.

25          THE COURT:  Okay.  Do you think so?

F7NVUMBA

1              You're checking your notes.

2              MR. HAMERMAN:  I'm just checking my notes.

3              THE COURT:  Right.

4              MR. HAMERMAN:  A couple of other minor points, and

5      I'll try to go through them as quickly as I can.

6              THE COURT:  Well, you will go through them quickly

7      because I think enough time has been spent.

8              What are the minor points?

9              MR. HAMERMAN:  There is an argument that UMB in their

10     complaint says the guarantee remains in full force and effect

11     and, therefore, they need discovery of the noteholders about

12     that.

13             We think the statement that the guarantee remains in

14     full force and effect is a legal conclusion ultimately that

15     your Honor is going to have to decide.  Our opinion on that

16     subject simply does not matter.

17             And unless your Honor has other questions, I'll let it

18     go.

19             THE COURT:  No.  I'm done.

20             MR. HAMERMAN:  Thank you.

21             THE COURT:  Ms. Gueron.

22             MS. GUERON:  Thank you, your Honor.

23             Where we'd like to start is with the complaint in this

24     case, because that seems like the place to start.

25             The relief that the first lien noteholders are asking

F7NVUMBA

1      for and the process they are asking the Court to engage in is

2      really backwards.  So they are saying, Prejudge the legal

3      issues; deem these documents inadmissible and, therefore, we

4      won't have to produce them.

5              But let's look at the complaint.

6              As your Honor pointed out already, the parent

7      guaranties and the release of the parent guaranties are central

8      to this case.

9              What does the complaint say?

10             The complaint says at paragraph 47:  "The CEC

11     guarantee was essential to the consideration received by the

12     first lien noteholders in agreeing to extend credit under the

13     first lien indentures."

14             The complaint says at paragraph 10:  "CEC's release of

15     that guarantee has effectively robbed the noteholders of the

16     benefit of their bargain."

17             THE COURT:  Referring to the first lien noteholders?

18             MS. GUERON:  Yes.

19             THE COURT:  But their point is maybe they were robbed,

20     maybe they weren't robbed, but they weren't any part of the

21     negotiation of that release.  He said, We are out of it.  We

22     had nothing to do with that.

23             First half of what you said, first thing you quoted,

24     would you quote that again.

25             MS. GUERON:  Certainly.

F7NVUMBA

1          It's paragraph 47, and it says:  "The CEC parent

2     guarantee was essential to the consideration."

3          THE COURT:  Okay.  Stop.  Stop.

4          So that I talked to them about.  Why did you invest in

5     this in the first place; were the guaranties essential; do you

6     have correspondence about those guaranties.

7          I understand that that allegation is in the complaint

8     and that, therefore, they may have relevant evidence about

9     that, but I don't know if that's the issue now, why they

10    invested then, the guaranties were important to them then.  UMB

11    can put it in the complaint; that doesn't make it an issue

12    that's really something to be adjudicated in this case.  The

13    release, yes, the release, but they say they have nothing to do

14    with that.  That's what they said.  We weren't part of those

15    negotiations.  If we had those documents, Mr. Hamerman said, we

16    would concede that that would be something that you'd be

17    entitled to.  But we don't have them.  We weren't part of any

18    negotiations.

19          MS. GUERON:  Well, your Honor, the idea that they have

20    no documents relating to the meaning --

21          THE COURT:  I didn't say that.  To the release of the

22    guaranties.  The second paragraph in the complaint that you

23    quoted.  You quoted two parts so far.

24          MS. GUERON:  Yes.

25          THE COURT:  First was getting into the deal, and the

F7NVUMBA

1    second was the release.

2           MS. GUERON:  If I might quote some more about the

3    release.

4           The complaint also alleges:  The parent guaranty

5    remains in full force and effect.

6           THE COURT:  That's what UMB says, yes.

7           MS. GUERON:  Right.  And so again, the subpoenas are

8    seeking in the familiar formula all documents about the parent

9    guaranty, all documents about the release.  And this is

10   relevant because, your Honor --

11          THE COURT:  Yes, but what do they have about the

12   release?  They may have an opinion about it.  They weren't part

13   of that release.  I asked them that during the questioning.  I

14   said, Were you part of that sale of the five percent?  CEC says

15   it's no longer on the hook.

16          He says, We're not a part of it.  We had no role in

17   that.  We had no part in that.  We didn't negotiate.  We may

18   have a view as to how it affects us; we may, in fact, agree

19   with this complaint.  But these guaranties were made in full

20   force and effect.  But so what?

21          MS. GUERON:  So what they may have -- and, of course,

22   we don't know, because there hasn't been discovery yet.

23          THE COURT:  Right.

24          MS. GUERON:  All the cases that they are citing are

25   post discovery, summary judgment or post trial, where we are

F7NVUMBA

1    dealing with admissibility, not producibility.

2          THE COURT:  Yeah, yeah, go on.

3          MS. GUERON:  But what they may well have, what they

4    surely do have, is the markets analysis objectively and their

5    internal analysis of what is the meaning of the parent

6    guarantee, what is the meaning of the release provisions.

7          THE COURT:  In the first place.  In the first place,

8    when they first entered into the transaction?

9          MS. GUERON:  Or when they decided not to sell.  When

10   they bought, held, decided not to sell, decided to sell.  Their

11   internal analyses and the market evidence that they have from

12   other --

13         THE COURT:  Wait.  Let's talk about those internal

14   analyses.

15         I'm struggling to understand how they are sort of

16   internal thoughts and correspondence within the company, which

17   is really their opinion.  Should we do this, should we do that,

18   we think the guaranties are in effect, we think they are not.

19   What evidence is that objectively that I'm interested in?

20         MS. GUERON:  Because, your Honor, the contracts -- it

21   is our position, and you have not ruled on this issue, the

22   contracts are ambiguous.

23         THE COURT:  There you go.  Now we get to the heart of

24   your subpoenas.

25         That's a motion that's pending before me.  It will be

F7NVUMBA

1    fully submitted shortly.  You'll get a ruling.

2          If I say it's clear to me there's no ambiguity here,

3    then I care even less than I might care otherwise about what

4    they think; objectively, subjectively, parol evidence, not

5    parol evidence, it's over.  If I were to rule -- and I've got a

6    motion pending, which Delaware did not, that's the biggest

7    difference.  The judge there says, This issue is not pending

8    before me yet; it has to be fully discovered; who knows; we are

9    not getting the motion; the motion will come.

10         In the meantime, you collect all the evidence, I've

11   taken a different position.  I say, You want to tee it up now?

12   It is up to you.  I'll take the motion; I'll decide the motion

13   as a matter of law.  So none of what you're seeking will be of

14   any interest to me if on these papers I can determine the

15   question of ambiguity.

16         Now, if the win is that I find it is ambiguous, that's

17   when these subpoenas maybe should be considered.

18         MS. GUERON:  Well, but, your Honor, there are a couple

19   of points to say in response to that.

20         First of all, that's exactly the question that was

21   facing Judge Glasscock.

22         THE COURT:  No, no, it wasn't.  I've got a motion

23   ready to decide.  It stays away.  Your brief is due -- not

24   yours, but CEC's brief is due tomorrow; reply brief, who knows.

25   Anybody here for plaintiff?

F7NVUMBA

1          MR. CRICHLOW:  August 6.

2          THE COURT:  August 6th?

3          MR. CRICHLOW:  Yes.

4          MS. GUERON:  But, your Honor --

5          THE COURT:  Well, hold on.

6          August 6.  It is fully submitted.  With some luck,

7    chambers are pretty fast chambers in deciding things, there

8    will be a decision.

9          As I said, if I find it unambiguous as a matter of

10   law, I don't know what you're seeking from them then, because

11   what you're interested in is any evidence that would be useful

12   should the Court determine that it is ambiguous and I may need

13   to consider further evidence, we call it parol evidence, but

14   evidence that is beyond the terms of the contract.  Then this

15   may be of interest.

16         You'll have my ruling shortly.

17         Now, you might say, But I'm up against an August 31st

18   deadline.  Yeah, but whose deadline is that?  And who has the

19   power to change that deadline?  So that's not a good argument.

20   Because if I were to decide ambiguity, since I set August 31st,

21   I can also unset it.  That's the power of an Article III judge.

22   She makes the date and then she can change the date.

23         MS. GUERON:  That is certainly true, your Honor.

24         But as parties, as defendants facing billions of

25   dollars in liability, we issue a subpoena because there's an

F7NVUMBA

1     August 31st discovery deadline.

2                THE COURT:  For sure.

3                But now the question is should I quash it, should I

4     stay it.  I know you issued it; that was the right thing to do;

5     that's what I would have done if I had your job.

6                Okay.  You issued it.  A little overbroad, I might

7     add, No. 12 really is -- what was the word?  Awestruck.  Your

8     clients were awestruck.  I don't like that word; it's like

9     creating the universe in seven days, it may have been an

10    awesome thing.  Okay.  That was a little bit of a reach.

11               But put it aside, you did your job, you issued a

12    subpoena.  That's not my issue there.  I'm not critical on your

13    issuing a subpoena.  The question is should I quash it or stay

14    it.

15               I'm about to decide ambiguity.  And as I said, if I

16    were to decide that it's unambiguous, what would be left of

17    your subpoena then, in your opinion?  That was kind of a tough

18    question I asked your adversary.  If the ruling is this is

19    unambiguous, then what?  What do you need their stuff for then?

20               MS. GUERON:  Your Honor, I go back to the language of

21    the complaint.  The allegation is that this information, this

22    guaranty, was essential to the consideration they received.

23               THE COURT:  So?

24               MS. GUERON:  Tell us why.  Should us the documents

25    demonstrating --

F7NVUMBA

```
1          THE COURT:  Why?  What is the relevance of that to
2     this lawsuit?  What issue will it resolve to know why they
3     invested?  Who will care?
4          If I were to determine -- and I'm far from knowing
5     that right now, don't take this hypothetical as a ruling, my
6     goodness.  But if I were to determine that it is unambiguous,
7     the term is unambiguous, the guaranty clause unambiguous, what
8     do you need any of this stuff?  What would be left relevant to
9     this lawsuit if I were to conclude that?
10          Let's not go down the other road, if I were to
11     conclude it is ambiguous, we'll come back, we'll be right back
12     in the room, and the day after the ruling, say, Okay,
13     ambiguous.  Now, let's narrow this thing.  Let's get to the
14     critical material.  What do they have; what do you need?
15          MS. GUERON:  There are issues of the meaning of the
16     guaranty.  If you say it's unambiguous, I suppose the
17     meaning -- we still don't know which way you are finding it
18     unambiguous.  Do you see what I'm saying?
19          THE COURT:  No.
20          MS. GUERON:  Does it mean that all three preconditions
21     are conjunctively required or not?
22          THE COURT:  That's what "unambiguous" would mean; that
23     "and" is and, not "or."
24          MS. GUERON:  It could be unambiguously the other way,
25     which is that if you read these three provisions, it is
```

F7NVUMBA

1    illogical to assume that each must be required.

2            THE COURT:  So you're saying I could also find this

3    unambiguous because it means "or."

4            MS. GUERON:  It cannot mean "and."

5            THE COURT:  Don't argue the merits to me.

6            MS. GUERON:  I'm not, your Honor.

7            THE COURT:  UMB is here, but not prepared to argue the

8    merits of the pending brief.

9            MS. GUERON:  Nor are we, your Honor.  Our briefing is

10   coming in shortly.  It is absolutely premature to speak to the

11   merits.

12           As to No. 12, I do think it is important to state on

13   the record that we have spoken and met and conferred and we

14   offered to withdraw No. 12 in an effort to narrow and get to

15   the kernel of the documents we wanted and need.

16           THE COURT:  Good.  I didn't know that.

17           MS. GUERON:  Yes, your Honor.  We offered to withdraw

18   No. 12; we offered to limit No. 9, so that it really got to the

19   key issues.  The documents and communications concerning the

20   parent guaranty and the release conditions --

21           THE COURT:  That's good.

22           MS. GUERON:  -- and the effect of the guaranty and its

23   termination, and the effect of the 2014 transactions which are

24   or are not deemed restructuring, was that related to the TIA,

25   we really had a meet-and-confer.  We said, If we can focus on

F7NVUMBA

1   these, that will be the start of our production, and we'll pull
2   No. 12.
3           They weren't interested in such a negotiation, I think
4   because they wanted to come here and quash the entire subpoena.
5           THE COURT:  I thought they were interested in a
6   narrowing.
7           Mr. Hamerman, were you not interested in a narrowed
8   subpoena?
9           MR. HAMERMAN:  We certainly were, your Honor.  The
10  issue was they were willing to withdraw No. 12, but only on
11  condition that we conceded everything else.  And since we think
12  there are other areas to narrow, as well --
13          THE COURT:  That's right.  I saw your footnote; your
14  footnote said that.
15          MR. HAMERMAN:  Correct.
16          THE COURT:  I did read that.
17          So he did concede that you were ready to withdraw No.
18  12.
19          MS. GUERON:  Yes, and to limit No. 9, and to defer all
20  of their deadlines.
21          Your Honor, as to the August 31st discovery deadline,
22  if your Honor were to push that deadline back --
23          THE COURT:  Not now.
24          MS. GUERON:  -- not just in this case --
25          THE COURT:  Not now.

F7NVUMBA

1          MS. GUERON:  Well, okay.  So if not now, we are in the

2     position where they have just expressed for the first time, not

3     in their letter, but for the first time stating here that there

4     is some kind of burden facing them.  It is a little bit rich,

5     both literally and figuratively --

6          THE COURT:  Well, they wrote burden in the letter,

7     they just didn't itemize it.

8          MS. GUERON:  Well, a conclusory reference to the

9     word --

10         THE COURT:  Hold on, hold on.

11         These are premotion letters.  I mean they are limited

12    to three pages, single-spaced.

13         MS. GUERON:  Indeed.

14         THE COURT:  As long as he raises the burden in the

15    letter, he's raised it; he's preserved it.  He doesn't have to

16    do it there.  He's just asking to make a motion.  I don't think

17    I need a briefing motion; I think I know where I'm heading

18    here.  But he did preserve the objection on burden, he just

19    didn't explain it.

20         MS. GUERON:  Well, saying the word "burden" without

21    explaining what the burden is --

22         THE COURT:  I understand, but in a three-page

23    premotion letter.  This is not a motion yet.

24         MS. GUERON:  I understand, your Honor.

25         THE COURT:  You requested permission to make a motion

F7NVUMBA

 1    to quash.  So I don't think he can be held to have waived

 2    anything.

 3              Okay.  Go ahead.

 4              MS. GUERON:  My only point is we didn't know what we

 5    were opposing, given no description of the burden.

 6              Hearing from noteholders that hold 2.2 billion in

 7    notes as of December -- we don't know the dollar number as of

 8    today -- it is a little bit rich, literally and figuratively,

 9    for them to say, Well, it is burdensome to search email.  Sure

10    it's an email search, and technology will assist.  And if they

11    are worried about privilege, they can do search terms that

12    preclude lawyers' names.  There's a million technological

13    solutions to that.  There's a lot of money at stake.  This is

14    not a small player coming in and waiting.

15              THE COURT:  This is not a small case.

16              MS. GUERON:  The burden arguments really do not seem

17    to be serious here, your Honor.

18              THE COURT:  But the burden argument is always

19    intertwined with the yield.  You don't go through a burden

20    of -- I'll make it up -- a million-dollar expenditure when

21    you're drilling in a dry well.  And so what he says is, Look,

22    what could we possibly have that's really going to help to

23    resolve any issue that is before the Court?  And that's a key

24    question.  We are not part of the negotiations as to the

25    release, that's for sure.  We may have views on it, we have our

F7NVUMBA

1    legal views, we think they are still in effect.  I get that.

2    That's what the case is about, whether these guaranties are

3    still in effect or not.

4          So I don't care about their opinion in the end; it's

5    really the Court's opinion and higher courts' that will resolve

6    that issue, not some lawyer's view or some party's view, right?

7    It's a legal issue before the courts.

8          MS. GUERON:  Well, it may be, your Honor, but, no,

9    this is not a fishing expedition.

10          THE COURT:  I didn't accuse you of fishing either.

11   I'm trying get to relevance, I really am.

12          MS. GUERON:  We have gotten, in the dribs and drabs of

13   discovery that have started to come in from other noteholders

14   in other parallel cases, evidence that the market did not view

15   the parent guaranties as providing credit support for these

16   notes, specific evidence on that point.  There's nothing in the

17   indentures that were strict CEC from later transactions.

18   Evidence like that shows that market participants did not see

19   these guaranties and did not read the termination provisions

20   the way the plaintiffs are urging the Court to.

21          Now, maybe your Honor will hear that.

22          THE COURT:  What other actions are there?  I thought I

23   had five, Delaware has one, and there's the bankruptcy.

24          MS. GUERON:  Yes, your Honor.  This is discovery

25   coming in from the cases that are in front of you.

F7NVUMBA

1          THE COURT:  Here, the five here?

2          MS. GUERON:  That's right.

3          THE COURT:  Okay.

4          MS. GUERON:  Yes.  So we are seeing evidence that the

5     interpretation of the contract proffered by the plaintiffs is

6     not the way the market viewed it.

7          Now, again, your Honor, of course, will be the one to

8     decide whether or not that information is ultimately

9     admissible.  But it is premature now.  We need to gather that

10    information, and then we can make the arguments about is it

11    admissible or not.

12         Cases on summary judgment or post-trial where a court

13    says, Okay, I've seen that evidence and I'm not going to look

14    at it, those come later; that decision comes later.  Right now

15    we are just saying, Allow us to gather the evidence, your

16    Honor, so we can evaluate and contest --

17         THE COURT:  Well, it's not the inadmissibility

18    argument that's of interest to me.  I understand that the Rule

19    26(b)(1) says that discovery need not be admissible in evidence

20    to be discoverable.  That language is there now and it's going

21    to be there on December 1st.  But what's not going to be there

22    on December 1st is "reasonably calculated."  You know that

23    26(b)(1) is changing.  You know that, right?

24         MS. GUERON:  I can't say that standing here this

25    moment I knew that.

1          THE COURT:  It's gone.  It's gone.

2          The "reasonably calculated" language that you cite all

3     over your letter and old cases, they are now old -- I've got a

4     letter in front of me -- you cite 2006, you cite 2004, you cite

5     older cases, I'm going to apply the new rule.  I'm going to

6     apply the December 1st rule.  The "reasonably calculated" is

7     gone.

8          MS. GUERON:  We think it's relevant straight out.

9          THE COURT:  I just want you to know that it's a narrow

10    definition now.  And there is new language in 26(b)(1) that's

11    going into effect on December 1 about proportionality.  And in

12    evaluating proportionality, the very first factor -- and they

13    were reordered as the new rule got written -- is the importance

14    of the discovery resolving the issue.

15         Now, you may say, That's fine with me because I think

16    I've satisfied that --

17         MS. GUERON:  It is, your Honor.

18         THE COURT:  -- factor 1.

19         Mr. Hamerman says just the opposite.

20         Our internal opinion is after the fact we weren't part

21    of this thing.  That will not resolve the issue, which is an

22    issue of law.  And I'm not the court of last resort.  It's the

23    district court, the circuit court, the highest court.  But the

24    courts will do it.  And what he thought or what the markets

25    thought may not be of interest if I determine that there's no

F7NVUMBA

1   ambiguity.  It says what it says.

2          As I said -- now I'm going to repeat it.  I don't like

3   repeating, but that's what it comes down to.  If it is

4   ambiguous and if there is a need for evidence outside the four

5   corners of the document, I will revisit this.  I would think to

6   start to require this now makes no sense in this case.

7          MS. GUERON:  Your Honor, just to speak to this, I

8   think we absolutely do satisfy whatever Rule 26 will one day

9   be.

10         THE COURT:  It's not one day; it's December 1st.

11         MS. GUERON:  Okay.  But it's July now.

12         THE COURT:  I understand that.

13         Many courts are starting to apply the new rule now

14   because it's inevitable; it's past all the hurdles.

15         MS. GUERON:  But, again, these requests are not

16   unmoored from the binding document here, which is the

17   complaint.  The complaint says that this consideration was

18   essential to these nonparties.  Subpoenaing these nonparties --

19         THE COURT:  No, wait, wait.

20         I understand it was essential it these nonparties.

21   Mr. Hamerman probably wouldn't deny that.  But even so, what

22   does that prove?  How does that proof resolve an issue in this

23   case that it was essential or important to their investment?

24   I'm sure it was.  I'm sure the guaranty was important to them.

25         MS. GUERON:  The point is it is premature now to rule

F7NVUMBA

1    this discovery unavailable, when we haven't --

2              THE COURT:  I'm not ruling it unavailable; it just

3    makes no sense now, when I'm going to rule on ambiguity.

4              Where I'm really confused is so there is this

5    allegation in the complaint that they didn't write.  And it

6    says -- that these nonparties didn't write.  And it says these

7    guaranties were important to them.

8              Let's say Mr. Hamerman were to stand and concede that,

9    Yup, the guaranties were important to us when we made our

10   investment decision.  So what?  Where would that help me in

11   resolving this lawsuit as to whether the release of them was

12   appropriate and legal and violated the contract or not?  How

13   does knowing that that was important to him when he invested in

14   2009 -- not him, but his clients, in 2009, '10, '11, that it

15   was an important consideration to them then, which I don't

16   doubt, by the way, regardless of whether he stands and says so,

17   I'm sure it was important to have that guaranty.  So what?

18   What does knowing that change my lawsuit or affect my lawsuit?

19             MS. GUERON:  No, your Honor.  To the contrary, it is

20   our position that as we are starting to see in some of the

21   documents produced, that allegation isn't so.

22             THE COURT:  You think it wasn't important.

23             MS. GUERON:  Right.

24             They say, because it was theoretically valuable, that

25   it was important.

F7NVUMBA

1          THE COURT:  Wait, okay.  Okay.

2          I want to take your hypothetical.  So now if you were

3   to stand and say, Okay, the guaranties weren't important to us,

4   that wasn't part of our strategy in investing at all, we could

5   care less, let's say he says that, okay, how does that affect?

6          MS. GUERON:  The reason that's relevant, your Honor,

7   is that the guaranties did not provide credit support.  In

8   other words, our understanding of what really happened here and

9   what the market knew was happening was that CEC provided what

10  is effectively a guaranty of convenience that permitted CEOC to

11  issue notes using their consolidated financial -- using, excuse

12  me, CEC's consolidated financial statements.

13         The guaranty was not thought of as some kind of

14  ultimate backstop.  That, as a matter of fact, objective fact

15  about what the market thought these guaranties meant, matters;

16  because it shows your Honor that the "and" interpretation of

17  Section 12.02 is illogical on its face and is not what the

18  market understood.  And so the practice and the understanding

19  of the market on this complicated termination clause is

20  relevant because --

21         THE COURT:  But now you're conflating the market with

22  the subjective documents of these five investors.  You talked

23  about custom and practice in your letter.  And he writes back,

24  That has to be not the subjective opinion of one or two or ten

25  of our employees, but it has to be a fixed and immutable

F7NVUMBA

1    practice in the industry.  That's what we are really talking

2    about.

3          Their view of whether this was an important part of

4    their decision to invest or not doesn't make it a custom and

5    practice in the industry.

6          MS. GUERON:  They characterize the subpoenas as

7    seeking subjective information.  That's not what these requests

8    are.  These requests follow the familiar formula of requesting

9    all documents concerning various topics drawn straight from the

10   complaint.  All documents.  So, in other words, what are the

11   market analyses that you are relying on.

12          THE COURT:  Okay.  Then he says, You want to get

13   analyst reports?  Go get them.  They are publicly-available.

14          MS. GUERON:  I don't think many of them are.

15          THE COURT:  Oh.

16          MS. GUERON:  I don't think that's accurate.

17          THE COURT:  Oh, okay.

18          Mr. Hamerman, why did you tell me they were

19   publicly-available?

20          MR. HAMERMAN:  I believe that they are.

21          THE COURT:  Well, she believes they are not.  Can you

22   talk to each other?

23          MR. HAMERMAN:  We certainly can, your Honor.  If it

24   comes to that, we will certainly discuss it.

25          THE COURT:  All right.  Go ahead.

F7NVUMBA

1          MS. GUERON:  So, your Honor, there's nothing

2     inherently subjective about the documents called for.  Some of

3     the documents that we're asking for --

4          THE COURT:  Yes, there is.  You said "all."  So in

5     requesting all, that would include internal communications

6     where one desk says to the other desk, Well, I don't think this

7     is important or, Oh, I think this is very important.  "All"

8     would include that.  So of course it includes subjective.

9          MS. GUERON:  Right.  I'm just saying they characterize

10    the subpoena as calling for solely subjective.  It calls for

11    objective and subjective.

12          But the internal investment thesis of these

13    noteholders is what the complaint says is the proof that the

14    parent guaranty --

15          THE COURT:  I lost you.  The internal what?

16          MS. GUERON:  Investment thesis.

17          THE COURT:  I know.  I'm missing a word.  Internal

18    investment.

19          MS. GUERON:  Thesis.

20          THE COURT:  Thesis?

21          MS. GUERON:  Reason.  Logic.  The internal logic of

22    why to invest or why to hold.

23          The plaintiffs say, That is going to prove how much

24    these noteholders relied on this guaranty.  It's a reliance

25    argument, fundamentally.

F7NVUMBA

1              And what we are saying is, to the contrary, what it

2      would show is everybody knew this guaranty could be terminated

3      in a variety of ways, some of which were easier than others.

4      That is the point of the argument.  And that's why the

5      information --

6              THE COURT:  Excuse me.  Go ahead.  Sorry.

7              MS. GUERON:  -- is important and goes directly to the

8      allegations of the complaint.  This is not the creation of the

9      defendants.  This is the complaint that we are responding to

10     and want to rebut.

11             THE COURT:  This is an interesting argument; I'm

12     certainly enjoying it, I don't know if you are, but --

13             MS. GUERON:  Very much.

14             THE COURT:  Is reliance an issue in this case?  I'm

15     not here on a 10b-5.  I'm not here on an investment case.  Do I

16     care whether they relied on the promise of a guaranty from CEC

17     to make this investment?  This is not a securities fraud case;

18     it's a contract case.  I don't know whether reliance is ever

19     going to be a triable issue.

20             So after I do this ambiguous/not ambiguous, let's go

21     back to the decision treatment.  Let's say I say that it's not

22     ambiguous, does that still leave the issue of reliance in this

23     case?

24             MS. GUERON:  Your Honor, honestly, to answer that I'd

25     have to be putting myself in the plaintiff's shoes to explain

F7NVUMBA

```
1    how they are going to plead and argue their case and then rebut
2    it.  I don't know.
3           I know that as a defendant, I am trying to defend
4    against a complaint that says that a guaranty that we believe
5    was a guaranty of convenience, was integral to decision-making.
6    And to rebut that, we are trying to show that it wasn't.
7           THE COURT:  Your argument has been very helpful.  I
8    understand now more of why we want this, to rebut an argument
9    or an allegation in the complaint.  But I guess I wondered
10   whether anything would be left of that argument if the terms of
11   the clause are not ambiguous.  Then I wonder if reliance isn't
12   left in the case.  But, okay, you say you shouldn't have.  The
13   answer to that, you're not the plaintiff.  Okay.
14          MS. GUERON:  And one thing, your Honor, that I would
15   like to speak to is you've made some mention to, well, perhaps
16   the discovery deadline is moved.
17          THE COURT:  Sure.  Depending on maybe the outcome of
18   this motion.
19          MS. GUERON:  That's right, your Honor.
20          I guess from the defendant's perspective what's
21   important is that there are many cases here, and they are
22   consolidated.  So moving one deadline does not help CEC; they
23   are all moving on track.
24          THE COURT:  Well, yes and no.  If I recall, some of
25   the other plaintiffs didn't want to have the motion; they
```

F7NVUMBA

 1   weren't ready to make the summary judgment motions.  One was,

 2   one wasn't.  So they are really not on the same time frame

 3   anymore anyway.  It sounds like that date may have to move.

 4            MS. GUERON:  One other point I would like to make.

 5            THE COURT:  I wasn't ready to do it today, but maybe I

 6   will after this argument.

 7            MS. GUERON:  Another point I'd like to make, your

 8   Honor, is that you've said, Well, I'm going to have in front of

 9   me a motion that will decide ambiguity.

10            Now, the summary judgment motion focuses on the Trust

11   Indenture Act.  So it is not construing the parent guaranty

12   clause; it is focusing on the 2014 transactions and whether

13   those impaired the noteholders.  So the motion is not addressed

14   to the contract claim, and your Honor may not be deciding

15   ambiguity on this summary judgment motion.

16            THE COURT:  I'm getting mixed up.  Whose motion?  It's

17   your motion?

18            MS. GUERON:  It is the plaintiff's motion.

19            MR. CRICHLOW:  Your Honor, it is our motion.

20            THE COURT:  Do you agree with that last argument?

21            MR. CRICHLOW:  She is correct.  The first summary

22   judgment motion is limited to whether the Trust Indenture Act

23   has been violated.

24            THE COURT:  True.  But in deciding that, do I have to

25   construe that clause and decide whether it is ambiguous or not?

F7NVUMBA

1          MR. CRICHLOW:  You do not necessarily have to to make

2     that ruling, your Honor, but you also could.

3          THE COURT:  The issue is briefed, isn't it?

4          MR. CRICHLOW:  Right.  We have not briefed the

5     "and/or" issue.  UMB has not.  I cannot recall what BLKF did in

6     theirs because I don't have their brief in front of me, but we

7     did not brief the "and/or" issue.

8          THE COURT:  But you don't know if BLKF did.

9          MR. CRICHLOW:  I can't recall.  I don't want to make a

10    representation either way.

11         THE COURT:  That's okay.

12         MS. GUERON:  My understanding from co-counsel is that

13    they did not brief that "and/or" issue.

14         So, your Honor, this puts us back closer to Judge

15    Glasscock saying it is premature to ask me to hold off and

16    quash subpoenas, when the "and/or" issue isn't before me.

17         Your Honor, you're closer to Judge Glasscock than I

18    think you originally described it, because the summary judgment

19    papers that are rolling in right tomorrow don't define that

20    issue.  And so, faced with the August 31st discovery deadline,

21    we must proceed and get these documents now.

22         THE COURT:  About to get what documents.  That's

23    another troubling part of your argument.  I must get these

24    documents.

25         What you've asked for is the universe.  You want

F7NVUMBA

1    everything they have.  I mean you did, at least when you wrote

2    No. 12, which is a problem because it's colored my view.

3            But even if we get back to this investment, what

4    documents really do you want?  You seem to want their initial

5    investment strategy in the sense of did they say something that

6    would show that these guaranty clauses were just irrelevant to

7    them, it wasn't part of their -- they didn't care.

8            MS. GUERON:  It's fundamental, your Honor.  The kernel

9    of what we want, there's a finite universe of internal

10   analytical documents that talk about the investment thesis or

11   the logic for buying Caesars notes.  It looks to external

12   documents and their internal documents, objective and

13   subjective.

14           THE COURT:  Why did they buy the notes?

15           MS. GUERON:  Why did they buy, why did they hold, why

16   did they sell.  And, in part, that would certainly be about the

17   financial health of the company and, in part, it will be --

18           THE COURT:  Did they particularly focus on this

19   guaranty one way or the other.

20           MS. GUERON:  Correct, your Honor.

21           THE COURT:  Okay.  I understand.

22           Okay.  I think I've understood your argument.  I'm

23   going to end up reserving.

24           Mr. Hamerman.

25           MR. HAMERMAN:  I'll try to be very short.

F7NVUMBA

1          Summary judgment, your Honor, if it's not on the

2     "and/or" issue, it's still dispositive of the entire case.

3     That's still out there, right.  So there's no need to decide

4     today, because the summary judgment motion will be dispositive

5     of the entire case.

6          Reliance.  This is not a fraud claim; this is not a

7     fraud case.  There is no element of reliance.

8          Our views, whenever we had them, do not inform whether

9     there was a breach of the contract or not, which is the issue,

10    or whether there was a violation of the Trust Indenture Act or

11    not.

12         THE COURT:  So you're saying now, taking this

13    hypothetical, you were to stand and say, Okay, we concede that

14    these guaranties, when we went in, were not important to us; it

15    was just not in consideration; we could care less.  We even

16    knew that they weren't there for all time.  You're saying even

17    if that's true, it doesn't matter.

18         MR. HAMERMAN:  That's what I'm saying, your Honor.

19         THE COURT:  That's what you're saying.

20         MR. HAMERMAN:  Yes.

21         THE COURT:  That it doesn't matter.

22         MR. HAMERMAN:  Correct.

23         THE COURT:  Because there is a contract and it says

24    what it says.

25         MR. HAMERMAN:  Right.

F7NVUMBA

 1              THE COURT:  But she says the motion is not even under
 2      the contract claim, and Mr. Crichlow agreed with them and said
 3      it's on the TIA.
 4              MR. HAMERMAN:  Either way, the motion is dispositive
 5      of the entire case.  As your Honor actually said, in granting
 6      permission to make the motion, this would be dispositive of the
 7      entire case; it would put this whole issue to bed.
 8              That's all I have, unless you have more questions.
 9              THE COURT:  No.  Probably back to Ms. Gueron for one
10      last question.
11              So if it's dispositive of the entire case, if summary
12      judgment is granted to UMB, I would think the next step is an
13      appeal, not discovery, but an appeal.
14              MS. GUERON:  Yes, if one loses, then yes.
15              THE COURT:  That's what I mean.  Seriously, it's over
16      in the district court.  There's no part of the case left, or is
17      there?  Is it a 54(b) problem, because only on the TIA claim
18      and the remaining claims -- the case still lives on the
19      remaining claims.  You have to take a 54(b) judgment to get up
20      there, I would think.  It's not dispositive of the entire case
21      if it only moves on one claim.
22              I'm just thinking out loud.
23              MS. GUERON:  First what I would say, your Honor, is,
24      again, right now we're living in a universe where we have a
25      discovery deadline in six weeks.

F7NVUMBA

1           THE COURT:  I know that.  I'm aware of that.

2           MS. GUERON:  We have to proceed with discovery now.

3           THE COURT:  I'm aware of that.

4           I'm still saying what's the response to his argument

5     that it's dispositive of the case?  If the plaintiff succeeds

6     in summary judgment, are there remaining claims open that have

7     to be dealt with in the district court or are they ready to

8     wrap it up and go to the circuit?

9           MS. GUERON:  I can't answer that.

10          THE COURT:  Do you have an answer for that,

11    Mr. Crichlow?

12          MR. CRICHLOW:  Your Honor, yes, I do.

13          As counsellor has rightfully pointed out to the Court,

14    the Court had noted itself and granted --

15          THE COURT:  Forget what I said.  I'm asking you.

16    Because I now see that it's only on the TIA claim.  There are

17    other claims in the case.  I don't know if you can just go up

18    or whether you need a 54(b), something that allows you -- not

19    you, but --

20          MR. CRICHLOW:  Your Honor, I think the decision, if it

21    were favorable to UMB, would be okay; it would render the other

22    counts moot.

23          THE COURT:  It would dismiss them to get a final

24    judgment?

25          MR. CRICHLOW:  We could.  Under the TIA count, if you

F7NVUMBA

1    agreed with us, the guaranty would be put back in place.

2            THE COURT:  You have to dismiss the other counts; you

3    have to have a final judgment.

4            MR. CRICHLOW:  I agree with that, your Honor.  I think

5    the other claims would be moot because it would just yield the

6    same result.

7            THE COURT:  As long as the party says so.  I can't do

8    that.  The party would have to say, We'll dismiss the remaining

9    claims to have a final judgment.

10           MR. CRICHLOW:  I'm sorry, your Honor.  I did not mean

11   to interrupt you.

12           Again, we would reserve all of our rights today,

13   because we are speaking in hypotheticals.  But I'm trying to be

14   as helpful as I can.

15           THE COURT:  I get it.  But you can't say that today,

16   what you would do if you won the TIA.

17           MR. CRICHLOW:  That's correct, I can't say

18   definitively.  But my personal view sitting here is that it

19   would render the other claim moot.

20           THE COURT:  I understand.  The plaintiffs would have

21   to say that to get a final judgment that could go up and there

22   wouldn't be any discovery.

23           MS. GUERON:  I do just want to make one other point,

24   your Honor, which is that we've been acting as the discovery

25   here could only relate to the contract claim, cannot be related

1    to the TIA claim.  And that's not exactly right, your Honor.  I

2    just want to point that out.

3         The question about whether the release of the parent

4    guaranty impairs the rights of the noteholders -- and "impairs"

5    is an important operative word in the TIA.

6         THE COURT:  No, right, it is, yes.

7         MS. GUERON:  It goes to this "and/or" question.

8    Because if the guaranty and the release provisions are as the

9    defendants believe they are, there has been no impairment under

10   the TIA.  And so it is an element of the TIA.

11        THE COURT:  True.  But, remember, they have nothing to

12   do on the release end.  As this hour has passed, yes, they have

13   documents as to why they initially went in, and you take that

14   past the investment, to the holding, to the selling or the not

15   selling, we get through the whole period.  But they are a part

16   of the negotiation as to the release itself.  So the impairment

17   and all that, they won't have records.

18        MS. GUERON:  I must disagree.  It is the same

19   calculus, which is what their internal analysis is as they

20   continue to hold these notes through these transactions.  It's

21   the same analysis.  Are these releases valid or are they saying

22   internally, Oh, no, these releases can't possibly be valid.

23        THE COURT:  What does it matter what they say?  These

24   are legal issues.  It is hard for me to accept.  It was one

25   thing when you said they might have relevant evidence as to how

F7NVUMBA

1    to interpret the clause.  But now you're going past that and

2    saying what they think about the releases matters.  Can't be.

3    That's got to be law.

4              MS. GUERON:  No, to the contrary, your Honor, whether

5    or not they are impaired, you have to know what the note gives

6    them before you understand whether or not something has been

7    taken away.

8              THE COURT:  That's right.

9              MS. GUERON:  So you have to interpret the note.  It

10   comes back to a contract analysis, but also in the TIA claim it

11   comes back to a contract analysis.

12             THE COURT:  It can't be on the release end; they

13   weren't part of it.  And what they think about it really is

14   like litigation strategy.  We know what the plaintiffs think of

15   it:  They sued.  When UMB sued, BLKF sued, we know what they

16   think of the release.

17             MS. GUERON:  Again, it is what the market -- how does

18   the market read this conduct.

19             THE COURT:  Who's the market now?  You've subpoenaed

20   five investors.  I don't believe what they individually think

21   about the release has any legal significance at all, I must

22   tell you.

23             Okay.  I think we've really gone over this issue very

24   thoroughly.  I want to think through a little more, but I have

25   grave doubts that I can enforce it as written right now.  So

F7NVUMBA

1    even orally now I'm inclined to say I'm partially granting the

2    motion to quash because it's overbroad.  But you know that

3    because you offered to rewrite it.

4            So maybe the next thing to do is speed the processes.

5    Please issue an amended subpoena with copy to me as fast as you

6    can, which is word processing; it's not so hard.  Take the one

7    you wrote, take into account today's oral argument and the

8    issues we've discussed, and make it as narrow as you can.  That

9    will help me write or issue a quicker ruling, if I can get the

10   amended subpoena language promptly, very promptly.  Because as

11   it stands, I have to quash it, at least in part.  So I'd rather

12   you rewrote it based on your own willingness to withdraw

13   certain ones and whatever you take away from this oral argument

14   as to how to tailor it.  That will help.

15           MS. GUERON:  Very well.

16           THE COURT:  Okay.

17           MR. HAMERMAN:  Should we then submit revised

18   objections, revised letters?

19           THE COURT:  I don't think so.  I think I need to just

20   see the revised subpoena and rule.

21           MR. HAMERMAN:  Thank you, your Honor.

22           THE COURT:  I don't think I need another letter.  I

23   know your view; you've expressed it.  You've had a lot of time.

24   I was generous with both sides.  I understand your point of

25   view.  And Ms. Gueron has heard it, too.  She's heard my

F7NVUMBA

1    reactions to it.  I think a revised subpoena would be really

2    the best next step before I make any final ruling.

3              So the current one is not in play and you don't have

4    to respond until you get the amended one.  And then I will

5    essentially say you move to quash it again, and I'll rule.

6              MR. HAMERMAN:  Thank you, your Honor.

7              THE COURT:  Or you move to quash it and/or to stay it,

8    and I will rule.

9              MR. HAMERMAN:  Or to further modify.

10             THE COURT:  Well, that would probably require another

11   letter.  That you move to quash the amended subpoena or stay

12   it, I will take it as a given.  But if you want to further

13   modify it and are prepared to respond to some of it, that would

14   be a somewhat new ballgame.  So that you can write about or

15   negotiate about once you see it.  You have several options once

16   you see it.

17             But I don't need you to reinstate we move to quash

18   and/or stay.  That I get.  Quash in full and/or stay, I

19   understand those two.  But if it's to modify or you want to

20   negotiate, great.

21             MR. HAMERMAN:  Here's my concern, your Honor:  I think

22   what we are going to get is a subpoena that takes away No. 12.

23             THE COURT:  Don't predict what you're going to get.

24   You're going to get what you get.

25             MR. HAMERMAN:  Okay.  But there's still this dispute

F7NVUMBA

1  between us as to market practice and our subjective views.

2          THE COURT:  Don't predict what you're going to get.

3  There has been an hour in court of argument.  I know there

4  probably will be a fast request for a transcript.  They are

5  going to amend that subpoena.  I don't know exactly how it will

6  be amended, neither do you.

7          So when you get it, you do not have to reinstate the

8  request to move to quash and/or stay.  But if you want to now

9  talk about modifying or you want to negotiate with the

10 adversary, those you're welcome to do.

11         MR. HAMERMAN:  Thank you.

12         MS. GUERON:  Your Honor, as a timing matter, we will

13 do this as expeditiously as you directed.  We would prefer not

14 to build in another two weeks as we would normally be required.

15         THE COURT:  No.  It rests in your hands at the moment.

16         MS. GUERON:  No, I mean that the response -- normally

17 in a two-way subpoena you must give the other side two weeks.

18 Theoretically then we could be waiting for two more weeks to

19 ever re-up this argument.

20         THE COURT:  That's not long.  What was the date on the

21 subpoena?

22         MS. GUERON:  July 10th was the date, your Honor.

23         It's only long because August 31st is the discovery

24 deadline.

25         THE COURT:  I understand.

F7NVUMBA

1        MR. HAMERMAN:  Here your Honor is envisioning no

2   response whatsoever.  What your Honor is saying is you'd still

3   take our letters as applicable to the new subpoena.

4        THE COURT:  Correct.

5        MR. HAMERMAN:  So there is no response.  They don't

6   have to wait two weeks; they don't have to do anything.

7        THE COURT:  No, no, that's not what she's saying.

8   She's saying the subpoena requires a response in two weeks.  Is

9   the trigger date for those two weeks from the date of the

10  amended subpoena, that was her question, that's her only

11  question, not letter-writing and all of that.

12        MR. HAMERMAN:  I understand.

13        But I think what your Honor was saying is our

14  objections are still interposed.

15        THE COURT:  Correct.

16        MR. HAMERMAN:  And our letter is still interposed.

17        THE COURT:  That's all true.

18        MR. HAMERMAN:  So we wouldn't have a response to the

19  subpoena.

20        THE COURT:  Response is production.  She's saying is

21  the production date two weeks after I give the Court the

22  amended subpoena or do I have to give them the same full 14

23  days.

24        MR. HAMERMAN:  Since your Honor is still treating the

25  motion to quash as applicable --

F7NVUMBA

1          THE COURT:  That's right.  So you're saying what was

2     pending you don't have it.

3          MR. HAMERMAN:  There is no production anyway, unless

4     we agree --

5          THE COURT:  Wait, wait.  Let me clarify.

6          Are you saying a motion to quash stays a nonparty's

7     obligation to respond to a subpoena, that by making a motion

8     the clock stops?  Is that what you're saying?

9          MR. HAMERMAN:  I think our objection, which says we

10     are not going to be providing documents --

11          THE COURT:  So the objection stops the clock until the

12     Court rules.

13          MR. HAMERMAN:  Correct.

14          THE COURT:  Okay.  My job is to rule.  Right.

15          So what he's saying is the amended subpoena, it's not

16     that it gives him another 14 days; it gives him until the Court

17     rules.  Do you understand, Ms. Gueron?

18          MS. GUERON:  Sort of.  But it's got to be a facially

19     valid subpoena, your Honor.  Therefore, it has to have a return

20     date.

21          THE COURT:  Okay.  Well, put anything you want.  Is

22     that one of those where the Court can shorten the date as it

23     chooses?

24          MS. GUERON:  I don't believe so under the rules.

25          What we would like to do is use the same July 10th

F7NVUMBA

1   date.  Call this an amended subpoena with the same July 10th

2   date.

3           THE COURT:  Okay.  But it's not going anywhere till I

4   rule.

5           MS. GUERON:  Certainly.  July 10th has passed.  But

6   it's a little bit of an artifice, but it allows us --

7           MR. HAMERMAN:  That's fine with us, Judge.

8           THE COURT:  That's fine.  Because nothing can happen

9   till I've ruled and I see the amended subpoena.

10           MR. HAMERMAN:  Okay.

11           THE COURT:  So when do you hope to get it without

12   holding you to it?  The hope.

13           MS. GUERON:  Today or tomorrow.

14           THE COURT:  Okay.

15           MS. GUERON:  Which means, just to be fair to us, we

16   probably will not have the benefit of the transcript, so we

17   will do our best to digest everything that we've heard.

18           THE COURT:  Okay.  And also, once he gets it in hand,

19   it may be that another meet-and-confer is a wise idea.  One

20   more when he gets the amended subpoena.  One more shot at

21   talking to each other in person or on the phone might be wise

22   before the Court has to rule.

23           MS. GUERON:  Yes, your Honor.

24           MR. HAMERMAN:  We agree.

25           THE COURT:  All right.  Good.  Thank you.

F7NVUMBA

1             MS. GUERON:  Thank you.

2             THE COURT:  Will you be ordering it, however, at the

3    fastest possible speed?  I don't know when you'll get it, but

4    will you order it at the highest --

5             MS. GUERON:  Yes, we will.

6             THE COURT:  Because it will be helpful to the Court,

7    too.

8             MS. GUERON:  Yes, we will.

9             THE COURT:  Okay.  Thank you.

10            MR. HAMERMAN:  Thank you, Judge.

11            MR. CRICHLOW:  Thank you, your Honor.

12            THE COURT:  You're all set.

13                            *    *    *

14

15

16

17

18

19

20

21

22

23

24

25