IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UMB BANK, N.A., solely in its capacity as UMB under those certain indentures, dated as of June 10, 2009, governing Caesars Entertainment Operating Company, Inc.'s 11.25% Notes due 2017; dated as of February 14, 2012, governing Caesars Entertainment Operating Company, Inc.'s 8.5% Senior Secured Notes due 2020; dated August 22, 2012, governing Caesars Entertainment Operating Company, Inc.'s 9% Senior Secured Notes due 2020; dated February 15, 2013, governing Caesars Entertainment Operating Company, Inc.'s 9% Senior Secured Notes due 2020,<br><br>     Plaintiff,<br><br>  v.<br><br>CAESARS ENTERTAINMENT CORPORATION,<br><br>     Defendant. | **Case No. 15-cv-04634 (SAS)**<br><br>Related Case Nos.:<br>15-cv-01561 (SAS)<br>14-cv-07091 (SAS)<br>14-cv-07973 (SAS) |

**PLAINTIFF UMB BANK, N.A.'S REPLY MEMORANDUM OF LAW IN
FURTHER SUPPORT OF ITS MOTION FOR PARTIAL SUMMARY JUDGMENT**

## **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................................... ii

PRELIMINARY STATEMENT ............................................................................................. 1

ARGUMENT ............................................................................................................................ 2

I.   CEC's Formalistic Interpretation of the TIA Is Wrong. ................................................. 2

    A.   Section 316(b) Protects Against Non-Consensual Impairments of the Right to Payment. ................................................................................................................ 3

    B.   The Challenged Transactions Violate Section 316(b) ........................................... 4

II.  CEC's Opposition Fails to Refute that Termination or Release of the Guarantee Would Impair the First Lien Noteholders' Right to Payment. ....................................... 6

    A.   Releasing the Guarantee Violated the TIA Irrespective of CEOC's Solvency. ..... 7

    B.   CEC Fails to Rebut UMB's Showing that the First Lien Noteholders' Right to Payment Is Impaired. .............................................................................................. 7

    C.   The TIA Prohibits Any Impairment of the Right to Payment. ............................... 9

III. No Additional Facts Are Necessary to Rule on UMB's Motion. ................................... 10

CONCLUSION ...................................................................................................................... 10

# TABLE OF AUTHORITIES

**Cases**

*Brady v. UBS Fin. Servs.*,
   538 F.3d 1319 (10th Cir. 2008) ...................................................................................10

*Federated Strategic Income Fund v. Mechala Grp.*,
   No. 99 CIV 10517 HB, 1999 WL 993648 (S.D.N.Y. Nov. 2. 1999).......................2, 3, 6, 9

*Greylock Global Opportunity Master Fund Ltd. v. Province of Mendoza*,
   No. 04-cv-7643 (HB), 2005 WL 289723 (S.D.N.Y. Feb. 8, 2005) ....................................10

*Greylock Global Opportunity Master Fund Ltd. v. Province of Mendoza*,
   162 F. App'x 85 (2d Cir. 2006) ........................................................................................10

*Marblegate Asset Mgmt., LLC v. Educ. Mgmt. Corp.* ("*Marblegate I*"),
   No. 14 Civ. 8584(KPF), 2014 WL 7399041 (S.D.N.Y. Dec. 30, 2014).................... *passim*

*Marblegate Asset Mgmt., LLC v. Educ. Mgmt. Corp.* ("*Marblegate II*"),
   No. 14 Civ. 8584(KPF), 2015 WL 3867643 (S.D.N.Y. June 23, 2015).......................2, 3, 9

*MeehanCombs Global Credit Opportunities Fund, L.P. v. Caesars Entm't Corp.*,
   Nos. 14-cv-7091 (SAS), 14-cv-7973 (SAS),
   2015 WL 221055 (S.D.N.Y. Jan. 15, 2015) ...........................................................2, 3, 6, 9

*In re Northwestern Corp.*,
   313 B.R. 595 (Bankr. D. Del. 2004) .................................................................................10

*Ret. Bd. of the Policemen's Annuity & Benefit Fund of the City of Chicago v.
   Bank of New York Mellon*,
   914 F. Supp. 2d 422 (S.D.N.Y. 2012)...............................................................................10

*YRC Worldwide Inc. v. Deutsche Bank Trust Co. Americas*,
   No. 10-2106-JWL, 2010 WL 2680336 (D. Kan. July 1, 2010) ........................................10

**Federal Statute**

15 U.S.C. § 77ppp(b) ............................................................................................ *passim*

**PRELIMINARY STATEMENT**

The TIA protects bondholders from clever issuers that engage in transactions that impair the rights of those holders without their consent.  In a transparent attempt to put form over substance, CEC's opposition advances a formulaic and narrow interpretation of the TIA repeatedly rejected by this Court and others within this District.[1]  CEC also endeavors to create factual disputes where none exist and that are irrelevant to a determination on the TIA claims.[2]  CEC's opposition rests primarily on three flawed arguments.

*First*, mischaracterizing the precedent in this District, CEC asserts, among other things, that Section 316(b) prohibits only *express* amendments to an indenture and *formal* restructurings of an issuer's debt that eliminate any prospect of repayment.  This Court has rejected similar formalistic arguments—arguments which are not supported by the text or purpose of the TIA, and that would eviscerate the statutory protections afforded to non-consenting noteholders.

*Second*, CEC manufactures three purported factual disputes it asserts must be addressed by the Court in determining whether the First Lien Noteholders' right to payment was impaired.  Whether (i) holders may be able to recover some unknown portion of their debt at some unknown time out of CEOC's bankruptcy estate, (ii) CEC would be unable to satisfy its Guarantee obligations, if required, or (iii) what certain holders may have expected to recover

---

[1] All capitalized terms not otherwise defined herein shall have the same meaning as set forth in UMB's moving brief.  Citations preceded by "Opp." are to CEC's opposition filed in the *BOKF* action, which CEC incorporates by reference into its opposition to UMB's motion for summary judgment.  Citations preceded by "Mov. Br." are to UMB's memorandum of law in support of its motion for partial summary judgment.

[2] CEC states that UMB failed to challenge certain issues not discussed in the motion, such as whether there has been a breach of the Indentures. *See, e.g.*, Opp. at 2-3.  UMB's motion is expressly limited to Count II of its Complaint, and UMB did not address issues other than those relevant to the Court's consideration of the narrow legal issues presented in the motion.  UMB expressly reserves its right to address any legal or factual issues at the appropriate time, if necessary.

from CEC on the Guarantee, have absolutely no bearing on the operative question under Section 316(b) of whether the First Lien Noteholders' right to payment was impaired by the release of the Guarantee.  The Court need not reach any of CEC's purported factual issues because none of these supposed factual issues have any bearing on the operative legal question under Section 316(b) of the TIA of whether the First Lien Noteholders' right to payment was impaired by the release of the Guarantee.

*Finally,* in a last ditch effort to delay the Court's ruling, CEC states that summary judgment is inappropriate because CEC requires additional discovery.  As the facts relevant to UMB's motion are undisputed, and the issues on which CEC seeks discovery are irrelevant, UMB's motion is ripe for adjudication.

For the reasons below, UMB's motion for partial summary judgment should be granted.

## ARGUMENT

**I.      CEC'S FORMALISTIC INTERPRETATION OF THE TIA IS WRONG.**

By its terms, Section 316(b) of the TIA protects against the impairment of a noteholder's right to receive payment of principal and interest absent the holder's consent.  15 U.S.C. § 77ppp(b).  Nevertheless, CEC asserts that there can be no violation of Section 316(b) absent a formal "restructuring" of the underlying debt, which CEC defines as "any change in the governing Indenture, any coercive effort to induce noteholders to abandon their rights, or the elimination of any prospect of repayment." *See* Opp. at 4.  However, Section 316(b) contains no such limitations, as this Court, and others within this District, have held repeatedly in *Marblegate I*, *Marblegate II*, *MeehanCombs*, and *Federated Strategic*.  Instead, the courts in each of those cases rejected a narrow interpretation of the TIA and properly focused on the *effect* of an issuer's or guarantor's actions in determining whether a holder's ultimate right to receive payment was impaired in violation of Section 316(b).  Mov. Br. at 12-13.  And the effect need

2

not be as extreme as to leave the noteholders with no payment whatsoever; Section 316(b) protects noteholders from any impairment of their right to receive timely payment of the full amount owing to them.  *Marblegate I*, 2014 WL 7399041, *21.  The effect of CEC's actions in releasing the Guarantee is precisely the sort of non-consensual impairment that the TIA prevents.

### A. Section 316(b) Protects Against Non-Consensual Impairments of the Right to Payment.

While the right to receive payment may be impaired when the core terms of an indenture are modified and "when such modifications effect an involuntary debt restructuring," it is also clear that a transaction designed to "disinherit" bondholders, like the ones at issue here, "violates the fundamental purpose of the [TIA]."  *Marblegate I*, 2014 WL 7399041, at *19.  Moreover, contrary to CEC's assertions in its opposition, the court in *Marblegate II* rejected the narrow interpretation of the TIA that CEC offers, explaining:

> [t]here is no reason to think that the [TIA] was targeted only at a particular method of restructuring—straightforward amendment—as opposed to an undesirable result: allowing 'a majority to force a non-assenting security holder to accept a reduction or postponement of his claim' . . . . [T]he [TIA], by protecting the individual's right to 'receive' the bargained-for principal and interest, is broad enough to prevent that result, whether carried out straightforwardly or circuitously.

*Marblegate II*, 2015 WL 3867643, at *12.  The First Lien Noteholders have been similarly "forced to accept a reduction or postponement" of their claim—and thus are subjected to the very "undesirable result" that the TIA seeks to prevent.  *See id.*

Similarly, neither *MeehanCombs* nor *Federated Strategic* supports CEC's contention that only a formal restructuring or amendment of a core term can "impair" or "affect" the holder's rights under Section 316(b).  *See* Opp. at 17.  This Court recognized in *MeehanCombs* that, under Section 316(b), "a company cannot—outside of bankruptcy—alter its obligation to pay bonds without the consent of each bondholder."  *MeehanCombs*, 2015 WL 221055, at *3.

3

CEC further argues that releasing a guarantee does not automatically violate Section 316(b) and cites an observation made by the court in *Marblegate I* that "one can imagine contexts where [guarantee release] clauses would be invoked without implicating Section 316(b)." Opp. at 16; *Marblegate I*, 2014 WL 7399041, at *20. This is not, however, such a case.[3] Critically, the court in *Marblegate I* held that the release of the parent guarantee violated the TIA, despite an offering circular accompanying the notes stating expressly that purchasers "should not assign any value to such [parent] guarantee." *Id.* at *4. The *Marblegate I* court found that Section 316(b) does not "protect[] only against formal, explicit modification of the legal right to receive payment," because such an interpretation would "allow[] a sufficiently clever issuer to gut the Act's protections through a transaction such as the one at issue here." *Marblegate I*, 2014 WL 7399041, at *18. As in *Marblegate I*, this case involves transactions designed to restructure the obligations of an issuer to strip the parent's guarantee from the loans, thus gutting the protections afforded to the First Lien Noteholders under Section 316(b). *See id.* at *4-7. As a result, the same determination reached in *Marblegate I* is appropriate here.

B.   The Challenged Transactions Violate Section 316(b)

Section 316(b) is violated by the impairment of a holder's right to payment without consent. The statute does not require that any impairment be made in the context of a "restructuring." CEC seeks to gut the purpose of Section 316(b), by reading a new limitation into 316(b)—*i.e.*, that 316(b) cannot be violated absent a restructuring, which CEC defines to mean "a change in the material economic terms of the underlying [debt] instrument." Opp. at 19. Courts, including this one, have repeatedly rejected this narrow interpretation of the TIA. *See*

---

[3]   The court in *Marblegate I* cited examples of benign guarantee releases which hold no resemblance to the guarantee releases at issue here—including "where the Noteholders determined that it impaired flexibility and bargained it away." *Id.* at *20.

4

*MeehanCombs*, 2015 WL 221055, at *4. Tellingly, CEC's self-serving definitions of "restructuring" have not been adopted by a single court and do not appear in Section 316.

Nor is there any genuine dispute that the transactions at issue impaired the First Lien Noteholders' rights. CEC's own descriptions of the relevant transactions in its opposition make clear that these transactions were debt restructurings and part of an overall restructuring plan that "[a]mong other things . . . [was] part of a years' long effort by CEC to improve CEOC's financial condition [and] enabled CEOC to obtain 1.75 billion in new loans and to reduce its debt by hundreds of millions of dollars."[4]  Opp. at 1. CEC further conceded in its response that:

- "These transactions increased liquidity and gave CEOC the time and tools to continue with its business plan." Opp. at 4;

- "[T]he 6% Stock Transfer allowed CEOC to disperse ownership of its stock and thus facilitated the potential creation of a liquid and tradable equity currency for CEOC that could be used in future capital markets transactions and debt-for-equity exchanges." Opp. at 12;

- "Under the [August Unsecured Notes Transaction], the Participating Noteholders transferred to CEC and CEOC approximately $155.4 million of the 2016 and 2017 Notes and consented to amendments to the indentures governing the 2016 and 2017 Notes to remove CEC's guarantee on the 2016 and 2017 Notes. In total, the transaction reduced CEOC's outstanding debt by $582 million, at a cost to CEOC of only $78 million." Opp. at 13; and

- "Over 2014, CEC and CEOC took action to enhance CEOC's overall financial condition and reposition CEOC for an improved gaming market. As a result of the transactions and efforts . . . CEOC increased its cash reserves and decreased its debts." Opp. at 13.

CEC suggests that because these transactions allegedly improved CEOC's financial condition that the transactions were not restructurings and could not have impaired the holders. That self-serving assertion is not relevant to UMB's motion for a number of reasons. *First*, one

---

[4] CEC argues in its opposition that the challenged transactions improved CEOC's financial condition. Opp. at 13. That fact is not only immaterial for the purposes of this motion on its TIA claim, but also soundly refuted by the fact that CEOC filed for bankruptcy protection.

of the very purposes of a restructuring is improving a company's financial condition. More importantly, for purposes of Section 316(b), it is wholly irrelevant that a transaction benefits the issuer or the guarantor. Whatever the impact on the balance sheets of CEC or CEOC of the various restructuring transactions, the obligations to the First Lien Noteholders are due and the First Lien Noteholders are entitled to payment from CEC pursuant to the terms of the Guarantee. CEC's purported unilateral release of the Guarantee has materially impaired the rights of the First Lien Lenders to receive timely payment—a right expressly protected by the TIA.

*Second,* the case law focuses on the *substance* of the transactions and the effect of an issuer's or guarantor's actions on noteholders, not on the *labels* the parties use (or carefully avoid using) or on the benefit to the issuer or the guarantor. *See Marblegate I*, 2014 WL 7399041, at *19-20; *Federated Strategic*, 1999 WL 993648, at *3-7. As demonstrated above, even though CEC does its best to avoid the term "restructuring," there can be no dispute that the transactions it describes are in fact restructurings. Indeed, in *MeehanCombs*, this Court already determined that the August Unsecured Notes Transactions independently constituted "an impermissible out-of-court debt restructuring," *MeehanCombs*, 2015 WL 221055, at *5, and those transactions comprise one of several undertaken by CEC in an effort to restructure CEOC's debt and strip away CEC's Guarantee. Since these transactions directly impaired the First Lien Noteholders' payment rights and were undertaken without consent, they violate Section 316(b).

## II. CEC'S OPPOSITION FAILS TO REFUTE THAT TERMINATION OR RELEASE OF THE GUARANTEE WOULD IMPAIR THE FIRST LIEN NOTEHOLDERS' RIGHT TO PAYMENT.

CEC's assertions that stripping the Guarantee from the Indentures would not practically or legally impair the First Lien Noteholders' right to payment run counter to law, indisputable facts, and logic. In its moving brief, UMB demonstrated that it is beyond dispute that terminating the Guarantee deprived the First Lien Noteholders of their right to receive payment

6

upon maturity of the amounts due and owing from CEC. Mov. Br. at 14. In opposition, CEC makes three arguments, each of which is irrelevant and without merit.

### A. Releasing the Guarantee Violated the TIA Irrespective of CEOC's Solvency.

UMB demonstrated that a right to payment can be impaired before the payment is due and owing. Mov. Br. at 13. Rather than respond to the argument, CEC attempts to manufacture a factual issue by claiming that the transactions at issue cannot result in a violation of Section 316(b) unless it is established that CEOC was insolvent at the time of those transactions. Opp. at 24-27.[5] That is patently false. An issuer need not be insolvent at the time of a transaction in order for that transaction to violate the TIA by impairing a noteholder's right to payment. *See* Mov. Br. at 11-16. Critically, the plain language of Section 316(b) contains no such qualification. *See* 15 U.S.C. § 77ppp(b). That is not by mistake. Just as an insolvent issuer may not engage in non-consensual transactions that impair noteholders' right to payment (*e.g.*, by amending the payment terms of the underlying indenture, by transferring away its assets, or by releasing a parent guarantee of the debt), so too a solvent issuer may not engage in such transactions. If it were otherwise, a clever, solvent issuer could "gut the Act's protections through a transaction such as the one at issue here." *Marblegate I*, 2014 WL 7399041, at *18.

### B. CEC Fails to Rebut UMB's Showing that the First Lien Noteholders' Right to Payment Is Impaired.

UMB argued in its motion, among other things, (i) the fact that the First Lien Notes are due and owing and the First Lien Noteholders have not been paid is itself conclusive, uncontroverted evidence of impairment; and (ii) that the First Lien Noteholders may obtain some speculative amount of recovery at some unknown time in the future from CEOC's bankruptcy

---

[5] CEC's lengthy insolvency argument is simply an attempt to distract from the pure legal issue raised in the motion and convince the Court that a factually intensive insolvency inquiry is required to resolve UMB's Section 316(b) claim on summary judgment. *See* Section III, *infra*.

estate does not ameliorate this impairment; to the contrary, that fact proves that First Lien Noteholders have been impaired. *See* Mov. Br. at 15, 16.[6] In response, CEC argues both that CEC was never "a realistic source of recovery" and that the First Lien Noteholders' potential recovery in the CEOC bankruptcy relieves CEC of liability under the TIA. Opp. at 27. CEC offers no legal authority for either of these propositions and, of course, there is none. Both defy common sense. In issuing the Guarantee for the benefit of the First Lien Noteholders, CEC "irrevocably and unconditionally" agreed to pay "the full and punctual payment when due" of all principal and interest under the First Lien Notes. Mov. Br. at 13-14. This right is of particular value to the First Lien Noteholders now, when the full amount of the debt is presently due and owing and the primary issuer is in bankruptcy.

Similarly, CEC's purported inability to pay is irrelevant to the issue of whether the First Lien Noteholders have been impaired. CEC also argues that the Guarantee was merely one of convenience and "had nothing to do with" the right to receive payment." Opp. at 28. Although completely untrue, the court in *Marblegate I* rejected a nearly identical argument on more persuasive facts. There, the offering circular accompanying the notes stated expressly that purchasers "should not assign any value to such [parent] guarantee." *See id.* at *20. No such disclaimer is found in the Indenture or the offering memorandum that described the First Lien Notes. Nevertheless, CEC relies on the testimony of an Apollo director and a hired gun who also testified in the *Marblegate* case in an effort to demonstrate that CEC's "irrevocabl[e] and unconditional[]" Guarantee was neither irrevocable nor unconditional. *See* Opp. at 29 (citing Sambur and Gadsden Declarations). But CEC's and/or the First Lien Noteholders' views of the value of the Guarantee have no relevance to the Court's determination of the legal rights and

---

[6] Even CEC acknowledges in its opposition that First Lien Noteholders are not expected to receive payment in full, much less immediate payment, from CEOC's estate. Opp. to UMB at 5.

8

obligations accorded by the Guarantee, which was undisputedly part of the Indenture.[7]  As a result, this Court can and should find as a matter of law that stripping the Guarantee from the Indenture impaired the First Lien Noteholders' right to payment.

Ultimately, CEC fails to effectively distinguish the decisions in *MeehanCombs*, *Federated Strategic*, or *Marblegate II*, all of which held that the removal of a guarantee from an indenture without the consent of noteholders violates Section 316(b).  *See MeehanCombs*, 2015 WL 221055, at *1 (noting that the "crux of plaintiffs' allegations [was] that the release of the Guarantees . . . affected plaintiffs' practical ability to recover payment in violation of section 316 of the TIA."); *Federated Strategic*, 1999 WL 993648, at *7 (finding violation of TIA where defendant's actions eliminated the holder's "safety net" even though bondholders retained a legal right to seek payment from the issuer); *Marblegate II*, 2015 WL 3867643, at *13 (holding removal of parent guarantee from notes violated the TIA); *see also* Mov. Br. at 15-16.  Unrebutted, these cases demonstrate that by disavowing the Guarantee without the consent of noteholders, CEC has violated Section 316(b) of the TIA as a matter of law.

   C. **The TIA Prohibits Any Impairment of the Right to Payment.**

As UMB demonstrated in its opening brief, the TIA prohibits actions that "operate[], *in context*" to impair a right to payment, and is not limited to transactions that formally impair holders' legal rights to payment.  Mov. Br. at 12; *see also MeehanCombs*, 2015 WL 221055, at *4-5; *Marblegate I*, 2014 WL 7399041, at *20.  While acknowledging in its opposition that the Court has previously adopted the position argued by UMB in its *MeehanCombs* decision, CEC argues that the TIA prohibits only the impairment of holders' legal, not practical, rights to

---

[7] Indeed, this Court already expressed skepticism of this argument, asking counsel for CEC how evidence of subjective belief would alter a contract.  *See* H'rg Tr., *UMB Bank, N.A. v. Caesars Entm't Corp.*, 15 Civ. 04634 (SAS) (S.D.N.Y. Jul. 23, 2015), at 15, 19, 24-26, 38, 52.

9

payment. Opp. at 30-32. CEC is wrong. In support of its argument, CEC relies on inapposite and out-of-Circuit authority, none of which supports CEC's position. *See id.* For example, *Greylock Global Opportunity Master Fund Ltd. v. Province of Mendoza*, on which CEC relies heavily, is distinguishable for reasons including that the TIA did not apply in that case and, unlike here, the *Greylock* court concluded that the debtholders retained the right to sue the issuer. *See* Opp. at 30-31 (citing *Greylock,* No. 04-cv-7643 (HB), 2005 WL 289723 (S.D.N.Y. Feb. 8, 2005) and *Greylock*, 162 F. App'x 85 (2d Cir. 2006)). By contrast, the TIA unquestionably applies in this case and CEC's attempt to remove the Guarantee would strip the First Lien Noteholders of their contractual right to seek payment from CEC.[8]

### III. NO ADDITIONAL FACTS ARE NECESSARY TO RULE ON UMB'S MOTION.

To avoid unnecessary duplication, UMB incorporates by reference, as if fully set forth herein, Section III of BOKF's Reply Brief (ECF No. 52), and the legal arguments set forth therein supporting the above-referenced point. Whether CEC violated Section 316(b) is a narrow question of law requiring the consideration of minimal undisputed facts. The Court need only consider the Indentures and the Guarantee provisions (attached to the Complaint), and certain undisputed facts memorialized in public documents, all of which have been submitted by UMB.

### CONCLUSION

For the foregoing reasons, UMB respectfully requests that the Court grant its motion for summary judgment on Count II of the Complaint.

---

[8] CEC's citation to *Retired Board of the Policemen's Annuity & Benefit Fund of the City of Chicago v. Bank of New York Mellon* is misplaced as plaintiffs there had abandoned the claim and the court cited *In re Northwestern* only in restating BONY's argument. 914 F. Supp. 2d 422, 432 (S.D.N.Y. 2012), *aff'd in part*, 775 F.3d 154 (2d Cir. 2014). CEC's remaining three cases are out of Circuit. *See In re Northwestern Corp.*, 313 B.R. 595, 600 (Bankr. D. Del. 2004); *Brady v. UBS Fin. Servs.*, 538 F.3d 1319 (10th Cir. 2008); *YRC Worldwide Inc. v. Deutsche Bank Trust Co. Americas*, No. 10-2106-JWL, 2010 WL 2680336 (D. Kan. July 1, 2010).

Dated: August 7, 2015
       New York, New York

                                                                                              Respectfully Submitted,

                                                                                            **KATTEN MUCHIN ROSENMAN LLP**

                                                                                            By:  /s/  David A. Crichlow

                                                                                                 Craig A. Barbarosh
            craig.barbarosh@kattenlaw.com
            David A. Crichlow
            david.crichlow@kattenlaw.com
            Karen B. Dine
            karen.dine@kattenlaw.com
            Rebecca Kinburn
            rebecca.kinburn@kattenlaw.com

            575 Madison Avenue
            New York, New York 10022
            Tel.:  (212) 940-8941
            Fax:  (212) 940-8776

            *Attorneys for Plaintiff UMB Bank, N.A.*