**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| BOKF, N.A., solely in its capacity as successor Indenture Trustee for the 12.75% Second-Priority Senior Secured Notes due 2018,<br><br>Plaintiff,<br><br>v.<br><br>CAESARS ENTERTAINMENT CORPORATION,<br><br>Defendant. | : : : : : : : : : : : : : | Case No. 1:15-cv-01561 (JSR) |
| UMB BANK, N.A. solely in its capacity as Indenture Trustee under those certain indentures, dated as of June 10, 2009, governing Caesars Entertainment Operating Company, Inc.'s 11.25% Notes due 2017; dated as of February 14, 2012, governing Caesars Entertainment Operating Company, Inc.'s 8.5% Senior Secured Notes due 2020; dated as of August 22, 2012, governing Caesars Entertainment Operating Company, Inc.'s 9% Senior Secured Notes due 2020; dated as of February 15, 2013, governing Caesars Entertainment Operating Company, Inc.'s 9% Senior Secured Notes due 2020,<br><br>Plaintiff,<br><br>v.<br><br>CAESARS ENTERTAINMENT CORPORATION,<br><br>Defendant. | : : : : : : : : : : : : : : : : : : : : : : : : | Case No. 1:15-cv-04634 (JSR) |

**PLAINTIFFS' REPLY IN FURTHER SUPPORT OF THEIR**
**MOTION FOR PARTIAL SUMMARY JUDGMENT**

## TABLE OF CONTENTS

**Page**

INTRODUCTION ...................................................................................................................1

ARGUMENT ........................................................................................................................2

I. THE TRUSTEES ARE ENTITLED TO SUMMARY JUDGMENT ON THEIR TIA CLAIMS (BOKF COUNTS IV, V; UMB COUNT II). ......................................................2

    A. CEC Asks this Court to Reject the TIA Opinion and Adopt an Unworkable and Unjustifiable Legal Definition of an Out-of-Court Restructuring. .........................2

        1. Out-of-court reorganization need not bear features common in formal bankruptcy proceedings. ...............................................................................4

        2. Other limitations on the scope of out-of-court reorganization urged by CEC are contrary to the TIA Opinion and precedent in this district. ..........5

    B. CEC Fails to Raise Any Genuine Issue of Material Fact That Could Preclude Summary Judgment in the Trustees' Favor on Their TIA Claims. .......................6

        1. CEC raises disputes of law, not facts. ....................................................7

        2. CEC raises disputes of facts that are not material. ...................................8

        3. CEC raises disputes that are not genuine. ...............................................10

        4. CEC raises disputes that are not supported by admissible evidence. ........12

    C. CEC Cannot Credibly Deny that the Trustees Have Standing to Bring The TIA Claims and to Recover Principal, Interest, and Costs. ......................................13

II. IN ADDITION, THE TRUSTEES ARE ENTITLED TO SUMMARY JUDGMENT ON THEIR REMAINING CONTRACT CLAIMS. ...............................................................14

    A. The Parent Guarantee Was Not Terminated Pursuant to § 12.02(c)(i)-(iii) Because "And" Means "And.". ..................................................................................14

        1. Section 12.02(c) is unambiguous and must be interpreted without resort to evidence of commercial reasonableness or other extrinsic evidence, and CEC's proffered authority does not prove otherwise. ..............................14

        2. Literal interpretation of "and" conjunctively in § 12.02(c)(i)-(iii) does not result in absurdity. ................................................................................17

        3. Even *if* § 12.02(c) were ambiguous, the Trustees are entitled to summary judgment that the Parent Guarantee was not terminated because CEC submits no admissible extrinsic evidence on § 12.02(c). .........................18

    B. CEC Fails to Prove Its Affirmative Defense of Release Under § 12.02(c). ..........23

    C. CEC Fails to Prove that the Parent Guarantee Was Terminated Following the August 2014 Transaction. ...................................................................................24

CONCLUSION ...................................................................................................................25

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*A.E. Ottaviano, Inc. v. State*,
   277 N.Y.S.2d 538 (Ct. Cl. 1967), *modified*, 299 N.Y.S.2d 938 (App. Div.
   1969)................................................................................................25

*BOKF, N.A. v. Caesars Entertainment Corp.*,
   No. 15-CV-1561 SAS, 2015 WL 5076785 (S.D.N.Y. Aug. 27, 2015)..........................*passim*

*Celotex Corp. v. Catrett*,
   477 U.S. 317 (1986) ...............................................................................23

*Coan v. State Farm Mut. Auto. Ins. Co.*,
   911 F. Supp. 81 (E.D.N.Y. 1996) ...............................................................15

*Faulkner v. National Geographic Society*,
   452 F. Supp. 2d 369 (S.D.N.Y. 2006), *aff'd sub nom. Ward v. National
   Geographic Society*, 284 F. App'x 822 (2d Cir. 2008) ....................................19, 20

*Federated Strategic Income Fund v. Mechala Group.. Jamaica Ltd.*,
   No. 99 CIV 10517 HB, 1999 WL 993648 (S.D.N.Y. Nov. 2, 1999) .................................5, 6

*In re First Central Financial Corp.*,
   269 B.R. 481 (Bankr. E.D.N.Y. 2001), *aff'd*, 377 F.3d 209 (2d Cir. 2004).........................20

*In re Fosamax Products Liability Litigation*,
   707 F.3d 189 (2d Cir. 2013) .....................................................................10

*Fundamental Long Term Care Holdings, LLC v. Cammeby's Funding LLC*,
   985 N.E.2d 893 (N.Y. 2013) .....................................................................16

*Hudson-Port Ewen Associates v. Kuo*,
   566 N.Y.S.2d 774 (App. Div. 1991), *aff'd*, 578 N.E.2d 435 (N.Y. 1991) .............................19

*Katzman v. Helen of Troy Texas Corp.*,
   No. 12 CIV. 4220 PAE, 2013 WL 325562 (S.D.N.Y. Jan. 28, 2013)....................................18

*Lamborn v. National Park Bank of New York*,
   208 N.Y.S. 428 (App. Div. 1925), *aff'd*, 148 N.E. 664 (N.Y. 1925) ....................................15

*Marblegate Asset Management, LLC v. Education Management Corp.*,
   111 F. Supp. 3d 542, 556–57 (S.D.N.Y. 2015) .........................................................5

*Marblegate Asset Management v. Education Management Corp.*,
   75 F. Supp. 3d 592, 613 (S.D.N.Y. 2014) .........................................................4, 5, 6

*Marx & Co. v. Diners' Club, Inc.*,
   550 F.2d 505 (2d Cir. 1977) ............................................................................ 21

*Maxwell v. State Farm Mutual Automobile Insurance Co.*,
   461 N.Y.S.2d 541 (App. Div. 1983) ........................................................... 15, 16

*Morocho v. New York City*,
   No. 13 CIV. 4585 KPF, 2015 WL 4619517 (S.D.N.Y. July 31, 2015) ................. 8

*Murphy v. Long Island Oyster Farms, Inc.*,
   491 N.Y.S.2d 721 (App. Div. 1985) ................................................................. 15

*Osborn v. Wilson & Co.*,
   193 N.Y.S. 241 (Sup. Ct. 1922), *aff'd*, 200 N.Y.S. 938 (App. Div. 1923) ............ 15

*Perma Research & Developgment Co. v. Singer Co.*,
   410 F.2d 572 (2d Cir. 1969) ............................................................................ 10

*Price v. Worldvision Enterprises, Inc.*,
   455 F. Supp. 252 (S.D.N.Y. 1978), *aff'd*, 603 F.2d 214 (2d Cir. 1979) ............... 10

*Progressive Northeastern Insurance. Co. v. State Farm Insurance*,
   916 N.Y.S.2d 454 (App. Div. 2011) ................................................................. 15

*Process America, Inc. v. Cynergy Holdings, LLC*,
   No. 12 CIV. 772 BMC, 2014 WL 3844626 (E.D.N.Y. Apr. 30, 2014) ................ 25

*In re Trusteeship Created by JER CRE CDO 2005-1, Ltd.*, No. 13 Civ. 2232
   (JSR), 2013 WL 6916912 (S.D.N.Y. Dec. 31, 2013) ....................................... 16

*U.S. Bank National Association v. U.S. Timberlands Klamath Falls, L.L.C.*,
   No. CIV.A. 112-N, 2004 WL 1699057 (Del. Ch. July 29, 2004) ........................ 25

**Statutes**

15 U.S.C. § 77aaa *et seq.* ..................................................................... *passim*

**Other Authorities**

REST. (SECOND) OF CONTRACTS § 202 ...................................................... 21

## CITATION CONVENTIONS AND DEFINED TERMS[1]

- "CEC's Motion" or "CEC's Mem." refers to CEC's Memorandum in Support of its Motion for Summary Judgment [*BOKF* ECF No. 143].

- "CEC's Opposition" or "CEC's Opp." refers to CEC's Opposition to the Trustees' Motion [*BOKF* ECF No. 154].

- "Gadsden Decl." refers to the Expert Declaration of James Gadsden [*BOKF* ECF No. 162].

- "Grien Decl." refers to the Expert Declaration of Robert C. Grien [*BOKF* ECF No. 158].

- "Nadel Decl." refers to the Expert Declaration of Alan Nadel [*BOKF* ECF No. 161].

- "Sambur Suppl. Decl." refers to the Supplemental Declaration of David B. Sambur in Support of CEC's Motion for Summary Judgment [*BOKF* ECF No. 157].

- "Silfen Decl." refers to the Declaration of Andrew I. Silfen in Support of Plaintiffs' Statement of Undisputed Material Facts Pursuant to Local Civil Rule 56.1 in Support of Motion for Partial Summary Judgment [*BOKF* ECF No. 151].

- "Silfen Reply Decl."refers to the Declaration of Andrew I. Silfen in Support of Plaintiffs' Reply in Further Support of Their Motion for Partial Summary Judgment, being filed contemporaneously herewith.

- "SMF R." refers to CEC's Response to Plaintiffs' Statement of Undisputed Material Facts [*BOKF* ECF No. 155].

- "SMF" refers to the Plaintiffs' Statement of Undisputed Material Facts Pursuant to Local Civil Rule 56.1 in Support of Their Motion for Partial Summary Judgment [*BOKF* ECF No. 148].

- "Smith Decl." refers to the Expert Declaration of David C. Smith, Ph.D. [*BOKF* ECF No. 159].

- "TIA Opinion" refers to *BOKF, N.A. v. Caesars Entertainment Corp.*, Nos. 15-cv-1561 (SAS), 15-cv-4634 (SAS), 2015 WL 5076785 (S.D.N.Y. Aug. 27, 2015).

- "TIA SMF R." refers to CEC's Local Civil Rule 56.1 Response to BOKF's Statement of Material Facts and Counter-Statement of Material Facts [*BOKF* ECF No. 39].

---

[1]  Citation conventions and capitalized terms not otherwise defined herein have the meaning set forth in the Trustees' Motion or in the SMF.

- "TIA SMF" refers to Plaintiff BOKF, N.A.'s Statement of Undisputed Material Facts Pursuant to Local Civil Rule 56.1 in Support of Its Motion for Partial Summary Judgment [*BOKF* ECF No. 33].

- "Trilogy/Danner Br." refers to the Memorandum of Law in Support of Plaintiffs' Joint Motion for Partial Summary Judgement in the *Trilogy* and *Danner* actions, Nos. 1:14-cv-07973, 1:14-cv-07091 [*Trilogy* ECF No. 145].

- "Trustees' Motion" or "Trustees' Mem." refers to the Memorandum of Law in Support of Plaintiffs' Motion for Partial Summary Judgment [*BOKF* ECF No. 147].

- "Trustees' Opposition" or "Trustees' Opp." refers to the Trustees' Opposition to CEC's Motion [*BOKF* ECF No. 163].

**<u>INTRODUCTION</u>**

"Section 316(b) was designed to provide judicial scrutiny of debt readjustment ***plans*** to ensure their equity." *BOKF, N.A. v. Caesars Entertainment Corp.*, No. 15-CV-1561 SAS, 2015 WL 5076785, at *4 (S.D.N.Y. Aug. 27, 2015) (emphasis added).  The sole issue left open by the TIA Opinion is "whether the transactions were undertaken ***as part of a plan to accomplish an out-of-court restructuring***." *Id*. at *11 (emphasis added).  That issue is a question of law, not a question of fact.

CEC has now admitted the following facts:



Silfen Decl. Ex. 4 ("<u>Hession Dep.</u>") at 157:8–18 (emphasis added).



*Id.* at 172:13–173:3 (emphasis added).



*Id.* at 162:5–16 (emphasis added).



*Id.* at 167:8–16 (emphasis added).



*Id.* at 230:13–17 (emphasis added).

The undisputed facts demonstrate that the Trustees are entitled to summary judgment.

## ARGUMENT

**I.      THE TRUSTEES ARE ENTITLED TO SUMMARY JUDGMENT ON THEIR TIA CLAIMS (BOKF COUNTS IV, V; UMB COUNT II).**

### A.      CEC Asks this Court to Reject the TIA Opinion and Adopt an Unworkable and Unjustifiable Legal Definition of an Out-of-Court Restructuring.

The TIA Opinion correctly describes "reorganization" under a totality of the circumstances approach as a "process designed to revive a financially troubled or bankrupt firm," and "an attempt to extend the life of a company facing bankruptcy through special arrangements and restructuring in order to minimize the possibility of past situations recurring."  2015 WL 5076785, at *5 n.53, *11; *see also* Trustees' Mem. at 14, 17; Trustees' Opp. at 16 & n.13.  Indicia of a restructuring include "negotiations with creditors," and "restatement of assets and liabilities;" but the TIA Opinion does not indicate that all of these indicia must be present for a transaction to be a restructuring.  *See* Trustees' Mem. at 17; Trustees' Opp. at 16 & n.13.

The Trustees have shown that CEC's "strategic plan to maximize value," and in particular its efforts to "extend CEOC's runway," amount to a restructuring as a matter of law.  CEC's "Plan" was to deal with liquidity, maturity and covenant pressures that by early 2014 were threatening to push CEOC into bankruptcy, with the hope that productive negotiations with creditors would

eventually result in deleveraging through debt exchanges.  *See generally* Trustees' Mem. at 18–20; Trustees' Opp. at 16–17.  The Plan resulted in the modification and restructuring of the balance sheets of CEOC, CEC, and other Caesars entities.   It also expressly contemplated creditor negotiations, the stated goal of which was "███████████████████████████████████ ████████████████████" Trustees' Opp. at 17; SMF ¶¶ 174–188.  The stripping of the Parent Guarantee as well as each of the Guarantee Transactions were an integral part of CEC's Plan. Trustees' Mem. at 19–21.  Alternatively, each Guarantee Transaction was itself a restructuring under the totality of circumstances definition adopted by the TIA Opinion.  *Id.* at 21–23.  As detailed in Part I.B below, the underlying material facts are not in dispute.

Bound by its own factual admissions, CEC argues that the TIA Opinion's standard is "unworkable."  CEC's Opp. at 22.  CEC cites a "parade of horribles" that it claims will necessarily flow from the TIA Opinion's construction of Section 316(b).  CEC's Opp. at 21–23.  But CEC ignores the non-consensual impairment requirement of Section 316(b) that, when coupled with the restructuring requirement, avoids any chilling result.  *See* CEC's Opp. at 21–26  The TIA Opinion does not hold, and the Trustees do not suggest, that out-of-court reorganizations always violate the TIA.  It is only those reorganizations that *impair* nonconsenting holders' rights that are prohibited. Therefore, the TIA Opinion leaves firms free to work on building consent in an effort to avoid bankruptcy and engage in other distressed transactions, so long as they do not result in nonconsensual impairment.

Moreover, CEC's proposed standard for determining whether an out-of-court reorganization has occurred is unduly narrow and injects into the definition features of formal bankruptcy proceedings, as well as other limitations not supported by the TIA Opinion or applicable case law.

### 1. Out-of-court reorganization need not bear features common in formal bankruptcy proceedings.

CEC claims that only those transactions that include features of formal bankruptcy proceedings may be considered a restructuring. *See* CEC's Mem. at 25 ("[T]he criteria . . . should be understood as analogs to features of reorganizations in Chapter 11 proceedings."); *see also* CEC's Opp. at 26. Those features include negotiations with groups representing all creditor classes culminating in a "contractual agreement" or a "comprehensive restructuring agreement" that allocates all of the organization's value among all creditor classes. CEC's Opp. at 26; *see also* CEC's Mem. at 25–27. But this insistence that out-of-court reorganizations include creditor protections and consensus-building mechanisms of the Bankruptcy Code ignores the Congressional intent of Section 316(b), which was enacted to prevent the "[e]vasion of judicial scrutiny of the fairness of debt-readjustment plans." Trustees' Opp. at 6; *see also Marblegate Asset Mgmt. v. Educ. Mgmt. Corp.* ("*Marblegate I*"), 75 F. Supp. 3d 592, 613 (S.D.N.Y. 2014). If an out-of-court restructuring included creditor protections analogous to those present in bankruptcy, there would be no need for Section 316(b).

CEC also argues that an out-of-court restructuring must include a "restatement" of assets and liabilities, as the term is defined formally in the narrow sense of a "fresh start accounting" restatement. CEC's Opp. at 24–26 (citing Smith Decl. ¶¶ 19, 33–36). This is another improper attempt to inject bankruptcy features into the definition of an out-of-court reorganization. Absent the need to make a retroactive correction—an issue not implicated in out-of-court reorganization— such a "restatement" can only occur following bankruptcy. Indeed, CEC's "expert," David Smith, concedes that restatement in the narrow technical sense occurs when "firms exit[] a Chapter 11 reorganization." Smith Decl. ¶ 19; *see also id*. ¶ 33 ("firms reorganized under Chapter 11" restate

4

financials).[1]  CEC's proposed limitations would ensure that no out-of-court transaction could ever amount to reorganization, even on facts as egregious as those present here.  This is not one of the "close, difficult cases" the *Marblegate* court thought impairment in the context of an out-of-court reorganization may produce.  *Marblegate I*, 75 F. Supp. 3d at 615.

### 2. Other limitations on the scope of out-of-court reorganization urged by CEC are contrary to the TIA Opinion and precedent in this District.

CEC injects other, more subtle, limitations into the definition of reorganization in an effort to avoid Section 316(b) scrutiny.  These limitations are contrary to the TIA Opinion and prior decisions from this District.  First, nowhere does the TIA Opinion state that negotiations must take place all at once, with unrelated creditor groups; or that negotiations need to be productive, continuous, or direct (as opposed to with creditors' advisors or counsel).  CEC's Opp. at 26.  Nor does the Court indicate that negotiations instigated by a creditor group (as opposed to by the organization itself) are any less indicative of a restructuring.  CEC's Opp. at 28 (arguing that the B-7 was instigated by third-party creditors who asked for release of the Parent Guarantee).  *Federated* and *Marblegate* do not support these limitations either.  They each found that Section 316(b) was violated despite the fact that creditor negotiations were unproductive and left holdouts.  *Federated Strategic Income Fund v. Mechala Grp. Jamaica Ltd.*, No. 99 CIV 10517 HB, 1999 WL 993648, at *7 (S.D.N.Y. Nov. 2, 1999); *Marblegate Asset Mgmt., LLC v. Educ. Mgmt. Corp.*, 111 F. Supp. 3d 542, 556–57 (S.D.N.Y. 2015).

Moreover, contrary to CEC, out-of-court reorganization is not limited to transactions that

---

[1] CEC attempts to find support in the TIA Opinion for its position that "restated" financials, in the word's technical sense, can occur outside of bankruptcy.  CEC's Mem. at 25.  CEC's assertion is simply untrue: the TIA Opinion references the term only twice, without any elaboration.  2015 WL 5076785, at *5 n.53, *11.  The TIA Opinion does not ascribe to the term "restatement" the narrow meaning urged by CEC or suggest that "restatement" in that narrow sense can occur out-of-court.

are unusual or serve no ordinary business purpose. CEC's Opp. at 29–30. Imposing this limitation would "allow 'a sufficiently clever issuer to gut the Act's protections'" by carefully designing the out-of-court restructuring to have ordinary features but nevertheless result in impairment. *TIA Opinion*, 2015 WL 5076785, at *4 (quoting *Marblegate I*, 75 F. Supp. 3d at 613).

Therefore, even transactions undertaken in the context of an out-of-court restructuring that serve legitimate business purposes can violate the TIA if their <u>effect</u> was impairment in context of a restructuring. *See* Trustees' Mem. at 23–24.[2] In fact, the transactions that violated Section 316(b) in *Federated* and *Marblegate* were no more extraordinary or unusual than the transactions comprising CEC's Plan. The reorganization in *Federated* included a tender offer, modification of covenants, removal of events of default, and stripping of the parent guarantee. *Federated Strategic Income Fund*, 1999 WL 993648, at *3. In *Marblegate*, the reorganization included negotiating "short-term relief" from certain creditors in exchange for enhanced credit support under a new parent guarantee (strikingly similar to the B-7 Refinancing), debt exchange offers, foreclosure by secured lenders, transfer of assets to a subsidiary of the issuer, and the stripping of the parent guarantee. *Marblegate I*, 75 F. Supp. 3d at 599–600.[3]

In summary, CEC's narrow definition of an out-of-court reorganization is contrary to the TIA Opinion, precedent from this District, and the core purpose of the TIA.

### B.   CEC Fails to Raise Any Genuine Issue of Material Fact That Could Preclude Summary Judgment in the Trustees' Favor on Their TIA Claims.

CEC contends that even applying the TIA Opinion's standard for an out-of-court reorganization, there are genuine disputes of material fact. CEC's Opp. at 26–30. But the disputes

---

[2] Indeed, CEC concedes that routine corporate transactions can be subject to TIA scrutiny if they are also part of a restructuring. CEC's Opp. at 29.

[3] The lack of these additional constraints on the indicia of a reorganization renders immaterial the bulk of factual disputes CEC raises in an effort to avoid summary judgment. *See infra* § I.B.2.

CEC raises do not amount to *genuine disputes* of *material fact*, as all of CEC's alleged disputes fall into one or more of the following categories:  (a) disputes of law, not of fact, (b) disputes of facts that are not material, (c) disputes that are not genuine, and (d) disputes that are not supported by proper evidence.  The most relevant examples are discussed below.

### 1.  CEC raises disputes of law, not facts.

CEC raises several purported factual disputes that are actually legal disputes.  Most fundamentally, CEC disputes the legal significance of its efforts to extend the "runway" and whether those efforts were tantamount to a restructuring.  *See* CEC's Opp. at 14; SMF R. ¶ 46.  CEC's inclusion of this legal argument into its responses to the SMF  does not convert the legal issue into a factual one.  SMF R. ¶¶ 45–46 (admitting all of the facts underlying CEC's efforts to extend the runway but disputing that "'extending the runway' relates in any way to an out-of-court restructuring"); *see also supra* § I.A.  The actions CEC admits to have taken—forestalling defaults and bankruptcy through special arrangements, negotiations with creditors, and modification of the balance sheet—fit squarely within the legal definition of "restructuring."  *TIA Opinion*, 2015 WL 5076785, at *5 n.53, *11.

CEC further disputes the legal definition of "restructuring" as it applies to the following undisputed facts:

- CEC does not dispute that Blackstone was retained to "provide advice to [CEC] regarding certain financial and strategic alternatives" or what those "alternatives" were, SMF ¶ 81, but disputes whether Blackstone was retained to conduct a "restructuring" or "out-of-court restructuring."  CEC's Opp. at 16; SMF R. ¶ 81.

- CEC challenges whether CEC's own reference to a "restructuring" in its SEC filings, SMF ¶ 36, and in an email written by CEC's then-CEO Gary Loveman, SMF ¶¶ 23, 37, demonstrate whether "a restructuring had already occurred" or "related to an out-of-court restructuring." SMF R. ¶¶ 36–37.  CEC does not dispute that both it and Mr. Loveman actually used the word "restructuring."

In short, it is the legal consequences of these facts—not the facts themselves—that CEC

disputes.  As it is the Court's role to determine whether the undisputed facts meet the definition of "restructuring," these disputes do not preclude summary judgment in the Trustees' favor.

**2.**     **CEC raises disputes of facts that are not material.**

CEC raises numerous disputes of immaterial facts that do not affect the outcome of the suit under the substantive law.[4]  For example, CEC contends that it somehow matters *when* CEC moved from contemplating the release of the Parent Guarantee to actually deciding to release the Parent Guarantee, arguing that CEC only decided to release the Parent Guarantee at the request of the B-7 lenders.  CEC's Opp. at 3, 15; SMF R. ¶ 55.  Collateral to this irrelevant dispute are CEC's protestations that it did not finalize its self-proclaimed "Plan" until after the B-7 Refinancing was "disclosed." CEC's Opp. at 3; SMF R. ¶¶ 44, 47, 48, 51, 133.[5]

CEC also disputes whether it decided unilaterally to remove the Parent Guarantee or did so at the request of the B-7 lenders.  But CEC's intent is irrelevant:  only the purported removal's "effect[]" on the Noteholders matters under the Court's standard of restructuring.  *TIA Opinion*, 2015 WL 5076785 at *11 n.86.  The "effect" of the purported Parent Guarantee stripping is not affected at all by *why* it was done.  However, even *if* it mattered *why* CEC decided to strip the Parent Guarantee, CEC's version of the facts still establishes beyond dispute that there was a restructuring.  CEC contends that it removed the Parent Guarantee without the Noteholders' consent in order to enable the B-7 Refinancing and thereby "extend CEOC's runway."  SMF ¶

---

[4] A fact is "material" only "if it 'might affect the outcome of the suit under governing law.'" *Morocho v. New York City*, No. 13 CIV. 4585 KPF, 2015 WL 4619517, at *2 (S.D.N.Y. July 31, 2015) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986)).

[5] Though not material, CEC's own documents and testimony suggest that CEC contemplated removing the guarantee in order to protect the Sponsors' equity stake long before the B-7 lenders had an opportunity to request it.  SMF ¶¶ 89, 90; *see also* SMF R. ¶¶ 89 ("Undisputed"), 90 (not disputing that CEC was contemplating removing the guarantee "prior to the B-7 Refinancing lenders allegedly requesting" it, but disputing that CEC had "*decided* at that time" to do so).

8

115; SMF R. ¶ 115 ("Disputed [only] to the extent that the statement implies that 'runway' means anything *other than what CEC understood that term to mean*."(emphasis added)).

But the B-7 Refinancing was a quintessential restructuring that eased liquidity, covenant and maturity pressures, SMF ¶¶ 105–106; SMF R. ¶¶ 105–106 ("Undisputed"), that otherwise would have "caused [CEOC] to file for bankruptcy at that point." SMF ¶ 30; SMF R. ¶ 30 (disputed only as to the "characterization" of *quoted deposition testimony*). As the TIA Opinion holds, "it might be that *taking on new debt, where the new investors require as a condition of their investment that the rights of existing bondholders be altered—**in other words, the terms of the B-7 Transaction**—constitutes an out-of-court reorganization* that impairs bondholders' rights under the TIA." 2015 WL 5076785, at *10 (emphasis added). CEC's admissions as to the nature of the B-7 Refinancing and its assertion that the Guarantee was stripped to enable the transaction answer the question left open by the TIA Opinion and unequivocally make all of the Guarantee Transactions an integral part of an out-of-court restructuring.[6]

---

[6] Other disputes as to immaterial facts include:

- Whether other aspects of the Plan, such as debt exchanges, were merely "contemplated" or also "implemented." CEC's Opp. at 25. That CEOC ran out of runway before all steps of the Plan were completed does not make those contemplated steps any less indicative that restructuring was afoot. And, there is no dispute that each of the Guarantee Transactions was not merely "contemplated" but in fact approved by the CEC board and implemented. SMF R. ¶¶ 104–09; 112–14; 117–119; 131–32; 157; 160–170.

- CEC's intent, or the lack thereof, to restructure debts (CEC's Opp. at 3, 14);

- The facts that the transactions were commonplace or routine (CEC's Opp. at 17; Nadel Decl. *passim*; Smith Decl. *passim*), or that CEC had undertaken similar transactions in the past (CEC's Opp. at 17; SMF R. ¶ 51). That this was potentially not CEC's first out-of-court restructuring, or that CEC engaged in similar activity without incurring TIA liability in the past, is irrelevant to determining its TIA liability now, when the restructuring resulted in nonconsensual impairment; and

- Specific details about creditor negotiations, including whether they were preliminary in nature, whether CEC negotiated with creditors "directly," and whether the discussions were "related," "continuous," or "fruitful." SMF R. ¶¶ 174, 177–79, 181–82. *See supra* § I.A.

### 3. CEC raises disputes that are not genuine.

CEC also manufactures disputes that are not genuine as a matter of law.  These disputes, although innumerable, fall within the following general categories:

*First*, CEC attempts to create fact disputes by contradicting directly quoted sworn deposition testimony of its own senior executives.[7]  For example, "CEC disputes that there was any specific 'Plan' or that the evidence supports the existence of such a 'Plan.'"  SMF R. ¶ 44.  In support, CEC cites Mr. Hession's own testimony that "███████████████████████ ██████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████"  SMF R. ¶ 44; Hession Dep. at 166:18-22 (emphasis added).  Hession agreed Beato presented a "plan." Hession Dep. at 157:17:18 (emphasis added) ("Yeah.  It's a ***plan*** or strategy").  And the deposition exhibit being discussed was an outline of a regulatory presentation that began as follows:



Silfen Decl. Ex. 22 (emphasis added); SMF ¶ 44 (citing Ex. 22).

CEC also disputes its current CFO's statements (i) that the 2014 performance incentive plan (the "PIP") was the "potential management compensation component" of equity transfers presented to, and approved by, the CEC board on April 21, 2014, SMF ¶ 133, SMF R. ¶ 133, and

---

[7] Attempts to contradict the party's own prior sworn statements do not create "genuine" disputes. *In re Fosamax Prods. Liab. Litig.*, 707 F.3d 189, 193 (2d Cir. 2013) (quoting *Perma Research & Dev. Co. v. Singer Co.*, 410 F.2d 572, 578 (2d Cir. 1969)); *see Perma*, 410 F.2d at 578 (affidavit that contradicted previous deposition testimony did not create genuine dispute); *Price v. Worldvision Enters., Inc.*, 455 F. Supp. 252, 265 (S.D.N.Y. 1978), *aff'd*, 603 F.2d 214 (2d Cir. 1979) (same).  The same holds true for expert witnesses. *See In re Fosamax Prods. Liab. Litig.*, 707 F.3d at 194 (self-contradictory expert testimony could not manufacture a fact issue).

(ii) that the release of the Parent Guarantee was "an intended effect" of the equity transfers.  SMF ¶ 87, SMF R. ¶ 87.[8]  CEC further disputes its former CFO's testimony that CEC believed that "█████████████████████████████████████████" SMF ¶ 93, SMF R. ¶ 93.  CEC even denies that until the 5% Stock Transfer, "██████████████████████ ████████" Hession Dep. at 63:25–64:7, by stating that "CEOC maintained its own Board . . . and the Board was *responsible* for approving *certain* transactions," SMF R. ¶ 22 (emphasis added).

CEC's similarly attempts to impeach its own expert's testimony.  CEC's expert testified that the core features of the PIP necessitated by CEC's plan to disperse CEOC stock—immediate vesting of the award and the resulting need for a gross-up—were atypical.  *See* SMF ¶¶ 141, 146; SMF R. ¶¶ 141, 146.  CEC's submission of a declaration that proclaims that the PIP was typical, in direct contradiction to prior deposition testimony, does not create a genuine issue of fact.[9]  *See* Nadel Decl. *passim*, CEC's Opp. at 11–12, 30.

**Second**, CEC quibbles over synonyms where it cannot dispute the underlying facts.  *See* SMF R. ¶¶ 93 (facilitating negotiations was not a "rationale" of the Plan, but rather was "identified as one benefit"); 44 (disputing existence of Plan, calling it a "series of steps"); 95 (denying that Blackstone "anticipated" a "larger CEOC deleveraging transaction" when Blackstone referenced

---

[8] Although CEC's intent is immaterial, this is another example of CEC's efforts to create a factual dispute where none can genuinely exist.

[9] Whether the PIP possesses "typical" features is also immaterial since that would at best render it a "dual purpose" transaction subject to TIA scrutiny.  *See supra* § I.A.2.  In any event, CEC's expert testified that not only vesting and gross-up but other "principal features" of the PIP were atypical.  Silfen Reply Decl. Ex. A ("Nadel Dep.") at 249:19–22, 251:17–21 (vesting, who participates, clawback, and gross-up are "principal features" of the PIP), 251:13–16 (PIP clawback provision that CEC now claims "created a retentive effect," SMF R. ¶ 140, was not typical), 324:25–325:4 (issuing subsidiary stock to employees of the parent is not typical).  The expert also readily admitted that his claim that companies provide cash to pay tax liabilities "not infrequently," SMF R. ¶ 146, referred to arrangements structured differently than the PIP.  Nadel Dep. at 387:17–19 ("Q: That is not how the PIP gross-up was structured, correct?  A.  Not directly, no.").

such a possible transaction in a presentation); 181 (calling "negotiations" "preliminary discussions"). The underlying facts remain undisputed.

**Third**, CEC misstates the Trustees' assertions and then disputes the misstatements. For example, the Trustees state that Blackstone had completed all work *under its first retainer letter* in May 2014 (and therefore began operating under the second letter that expressly contemplated a "restructuring" thereafter). SMF ¶ 81. CEC ignores the actual factual assertion and disputes instead that Blackstone had completed "*all* of its work." SMF R. ¶ 81 (emphasis added).

**Fourth**, CEC contradicts its own prior admissions made in the Trustee Actions. For example, CEC claims that the 5% Stock Transfer buyers were "not affiliated" with CEC (CEC's Opp. at 10), despite its earlier admission that two of the buyers were CEC shareholders. SMF R. ¶ 120.[10]

**Finally**, CEC attempts to manufacture factual disputes by arguing that the Trustees' assertions mischaracterize testimony. *See, e.g.*, SMF R. ¶¶ 30, 34, 38, 41, 42, 76, 79, 93, 133, 143, 174. But the Trustees' underlying assertions in these paragraphs of their SMF are comprised of direct quotations of witness testimony. No genuine dispute exists as to these underlying facts.

### 4.    <u>CEC raises disputes that are not supported by admissible evidence.</u>

CEC also fails to support its alleged disputed facts with admissible evidence. For example, according to Mr. McLellan, individual grants of CEOC stock to the participants in the PIP were completed only after the participants signed the plan documents, returned them to the company, and the company counter-signed. SMF ¶ 147. CEC nevertheless disputes this description without providing any contrary evidence in support of its denial, such as evidence that Mr. McLellan did

---

[10] *Compare also* TIA SMF ¶ 25 and TIA SMF R. ¶ 25, *with* SMF R. ¶ 33; TIA SMF ¶ 66 and TIA SMF R ¶ 66, *with* SMF R. 171; TIA SMF ¶ 77 and TIA SMF R. ¶ 77, *with* SMF R. ¶ 196.

not so testify, or that company policy actually requires something different. And tellingly, there is no evidence in the record that these documents were ever countersigned.[11] *See infra* § II.B.

In sum, none of the factual disputes that CEC manufactures are "genuine" disputes of "material" fact. Accordingly, there is no need for a trial on these issues.

### C.     CEC Cannot Credibly Deny that the Trustees Have Standing to Bring The TIA Claims and to Recover Principal, Interest, and Costs.

CEC's further opposes summary judgment for the Trustees because it alleges that the Trustees lack standing to bring this suit and recover damages demanded in the Complaints. CEC's Opp. at 30–31. This argument is specious: CEC cannot deny that the Trustees are *explicitly* authorized by the TIA and the Indentures to seek the recovery of principal and interest upon an event of default. *See* 15 U.S.C. § 77qqq; Indentures §§ 6.03, 6.08. Because CEC failed to pay principal and interest when due, the Trustees have standing both as "a trustee of an express trust" and as "a party authorized by statute" to sue CEC for the amounts currently due and owing. *See* Trustees' Opp. at 20–22. CEC's argument that the Trustees need to prove "derivative" standing and "out-of-pocket damages" ignores the Trustees' absolute right to bring suit to recover principal and interest in their own names, and is based on inapposite case law relating to tort claims and suits against indenture trustees. *See id*. at 21–22.

For the reasons set forth herein and in the Trustees' other briefs, the Trustees are entitled to summary judgment on their TIA Claims.

---

[11] *See also* SMF R. ¶ 27 (disputing CEOC's 19.7 debt to leverage ratio without citing any evidence, even though the ratio is readily determined by dividing undisputed amount of debt by the undisputed EBITDA figure); *id* ¶ 121 (disputing the precise amount of stock held by Paulson at the time of the 5% Stock Sale without supporting evidence).

## II.     IN ADDITION, THE TRUSTEES ARE ENTITLED TO SUMMARY JUDGMENT ON THEIR REMAINING CONTRACT CLAIMS.

### A.     The Parent Guarantee Was Not Terminated Pursuant to § 12.02(c)(i)-(iii) Because "And" Means "And."

CEC's summary judgment opposition adds little to its argument for a tortured reading of the word "and" in § 12.02(c)(i)-(iii).  *Id.* at 33–36.  CEC's position flouts well-settled and clear New York rules of contract construction by ignoring the Indentures' plain terms in favor of a reading that CEC believes is "commercially reasonable."  Inadmissible extrinsic evidence in the form of market commentary, opinions of (not one, but two) experts who offer to interpret the provision for the Court, and self-serving after-the-fact assertions of what the parties intended but left unsaid in the Indentures do not bar summary judgment for the Trustees.

### 1.     <u>Section 12.02(c) is unambiguous and must be interpreted without resort to evidence of commercial reasonableness or other extrinsic evidence, and CEC's proffered authority does not prove otherwise.</u>

The Trustees have set forth in detail applicable New York rules of contract construction, requiring that unambiguous contract provisions be interpreted literally, without resort to considerations of commercial reasonableness, other rules of construction, or extrinsic evidence, unless the literal meaning results in outright absurdity.  *See* Trustees' Mem. at 28–30; Trustees' Opp. at 23–34; 27–28.  Even absurdity must be found, if at all, within the contract's four corners. Trustees' Mem. at 34 & n.18.  CEC raises no new arguments in its Opposition that call into question these settled principles of contract interpretation.

***First***, CEC erects and knocks down a strawman:  that the Trustees are arguing that "and" must always mean "and," no matter the context.  CEC's Opp. at 33, 34.  But the Trustees have never advocated that "and" *always* means "and"; rather, they simply contend that "and" means "and" in the context of § 12.02(c). The Trustees have cited cases that each hold that "and," as used to separate a list of triggering conditions, is read conjunctively.  Trustees' Mem. at 30–31;

Trustees' Opp. at 24–25.  CEC argues that "and" can sometimes mean "or,"  but fails to cite a single case where the court has interpreted "and" disjunctively in the context of a list of triggering conditions as presented here.  *See* Trustees' Opp. at 25–27.  All of the "new" authority CEC cites in its Opposition, CEC's Opp. at 33–34, is inapposite, for the same reasons previously established by the Trustees.  Two of CEC's cases interpret "and" inclusively in a "list of permitted activities or required obligations," such that "each and every one of the permitted activities or required obligations was encompassed within the provision at issue."  Trustees' Opp. at 25–26 & n. 19.[12] CEC's lone remaining case involves an ambiguous contract, as evidenced by the court's admission of extrinsic evidence to aid its interpretation.  *See Osborn v. Wilson & Co.*, 193 N.Y.S. 241, 241–42 (Sup. Ct. 1922), *aff'd*, 200 N.Y.S. 938 (App. Div. 1923).[13]

   ***Second***, CEC again attempts to distinguish the Trustees' authorities—which actually *do* interpret the word "and" in the appropriate context of a list of triggering conditions—by arguing that the conjunctive interpretation in those cases "led to a reasonable result," while a disjunctive interpretation was unreasonable.  CEC's Opp. at 34.  But the courts in the cases cited by the Trustees did not examine or compare the "commercial reasonableness" of the conjunctive and disjunctive interpretations, and instead applied the plain meaning of "and" in context.[14]  Indeed,

---

[12] *See Murphy v. Long Island Oyster Farms, Inc.*, 491 N.Y.S.2d 721 (App. Div. 1985) (provision authorizing use of leased property for each and every item within a list of permitted uses); *Lamborn v. Nat'l Park Bank of New York*, 208 N.Y.S. 428 (App. Div. 1925) (letter of credit permitting "shipments to be made during August and September, 1920" authorized shipments in each of those months), *aff'd*, 148 N.E. 664 (N.Y. 1925).

[13] Moreover, the very next paragraph following § 12.02(c)(i)-(iii) uses "and" conjunctively, stating that CEOC can elect to release the Parent Guarantee upon the election of the issuer _and_ notice to the trustee.

[14] *See* Trustees' Mem. at 30–32 (citing *Sasson v. TLG Acquisition LLC*, 9 N.Y.S.3d 2, 3 (App. Div. 2015); *Progressive Ne. Ins. Co. v. State Farm Ins.*, 916 N.Y.S.2d 454, 456–57 (App. Div. 2011); *Coan v. State Farm Mut. Auto. Ins. Co.*, 911 F. Supp. 81, 85 (E.D.N.Y. 1996); *Maxwell v. State Farm Mut. Auto. Ins. Co.*, 461 N.Y.S.2d 541, 543–44 (App. Div. 1983)).

*Maxwell* applied "and" conjunctively even though the plain meaning produced an interpretation that was "inexplicable" and contrary to a statutory provision.  461 N.Y.S.2d at 543–44.[15]

*Third*, CEC again argues that New York courts apply the commercial reasonableness rule to unambiguous contract provisions.  CEC's Opp. at 36.  Its repetition of a stale argument does not change well-settled New York law.  "An inquiry into commercial reasonableness is only warranted where a contract is ambiguous."  *Fundamental Long Term Care Holdings, LLC v. Cammeby's Funding LLC*, 985 N.E.2d 893, 897 (N.Y. 2013).  *See also* Trustees' Mem. at 28, 32–33; Trustees' Opp. at 27–28.  CEC does not cite a single case in which the court found an agreement unambiguous and nevertheless applied the commercial reasonableness rule anyway, *or* where the court applied the commercial reasonableness rule to vary an unambiguous contract's plain meaning.  *See* Trustees' Opp. at 28 & nn.23–24 (distinguishing cases).

*Finally*, CEC's assertion that this rule applies only when a party's proffered interpretation would *modify* a contract, CEC's Opp. at 36–37, is new, but it is a distinction without a difference. Indeed, by asking the Court to read "and" disjunctively and contrary to its plain meaning and context, CEC is asking the court to modify or "override" the plain language of § 12.02(c) in favor of a self-proclaimed reasonable interpretation.  *See, e.g.*, *In re Trusteeship Created by JER CRE CDO 2005-1, Ltd.*, No. 13 Civ. 2232 (JSR), 2013 WL 6916912, at *5 (S.D.N.Y. Dec. 31, 2013) (Rakoff, J.) ("[T]he Court is not empowered to override the unambiguous and plain language of an agreement in order to further a theoretical purpose unless the language leads to an absurd result . . . .").  Put simply, courts do not consider commercial reasonableness of an unambiguous

---

[15] CEC's selective quotation of *Maxwell*, CEC's Opp. at 34–35, is at best misleading, and ignores the conclusion that whether "the defendant may have actually intended something different is of no consequence, for the court must determine 'what is the intention of the parties as derived from the language employed.'"  461 N.Y.S.2d at 544; *see also* Trustees' Mem. at 33 & n. 16.

contractual provision, and enforce the provision as written absent inherent absurdity.

##      2.      Literal interpretation of "and" conjunctively in § 12.02(c)(i)-(iii) does not result in absurdity.

CEC has not met and cannot meet the high burden of demonstrating that a plain language, conjunctive reading of § 12.02(c) is absurd, i.e., that it completely deprives CEC of all benefits under the agreement.  Trustees' Mem. at 34–37; Trustees' Opp. at 28–31.  Again, there is little new to CEC's argument, CEC's Opp. at 35; CEC's Mem. at 7–8, and it is still based on a central fallacy that discharge and defeasance under § 12.02(c)(iii) of the Indentures amount to "paying off the bonds," such that "there would be no further obligations for CEC to guarantee."  Trustees' Opp. at 29–30 (quoting CEC's Mem. at 7); *see also* CEC's Opp. at 35 (arguing that survival of the Parent Guarantee after "repayment of the bonds in full" is unreasonable).  But under the Indentures, defeasance and discharge occur without the immediate effect of repayment of the bonds in full, necessitating retaining the Parent Guarantee until the Notes are actually paid in full.  Trustees' Opp. at 29–31; Trustees' Mem. at 35–37.  Moreover, § 12.01(g) of the Indentures separately provides that the Parent Guarantee terminates upon "payment in full of all the Guaranteed Obligations."  Indentures § 12.01(g).  CEC has argued that redundant protections in favor of the Noteholders are unreasonable.  CEC's Opp. at 35; CEC's Mem. at 34.  But under CEC's own logic, if discharge and defeasance equated to immediate repayment, then § 12.01(g) would render § 12.02(c)(iii) redundant and unnecessary.

The Indentures' language belies CEC's argument that satisfying § 12.02(c)(ii) "would relieve CEOC from its obligations under the Indentures."  CEC's Opp. at 7.  CEC argues that if § 12.02(c)(ii) is triggered, then CEOC has either transferred all of its assets to another entity or it has merged with another entity; in both instances, the new entity must assume CEOC's obligations under the Indentures.  *Id.*; Grien Decl. ¶¶ 27, 37, 39–40.  From this, CEC concludes that it would

be unreasonable for the Parent Guarantee to remain in place following satisfaction of § 12.02(c)(ii).  CEC's Opp. at 35; CEC's Mem. at 8.  CEC's interpretation misreads the Indentures: § 12.02(c)(ii) can also be satisfied if CEOC merges with and subsumes another entity and remains CEC's subsidiary.  *See also* Indentures § 5.01(a) (contemplating that CEOC may "surviv[e]" the merger and would then continue to be obligated on the Notes).  There is no reason to remove the protection of the Parent Guarantee in this event; indeed, the "new" CEOC's credit may be diminished.[16]  Thus, it is not absurd to also require discharge or defeasance (§ 12.02(c)(iii)) and cessation of CEC's complete control over CEOC (§ 12.02(c)(i)) as additional conditions to releasing the Parent Guarantee.[17]

Because "and" unequivocally means the conjunctive "and" in § 12.02(c), summary judgment should be granted in the Trustees' favor on BOKF's Count II and UMB's Count I.

### 3. Even if § 12.02(c) were ambiguous, the Trustees are entitled to summary judgment that the Parent Guarantee was not terminated because CEC submits no admissible extrinsic evidence on § 12.02(c).

CEC bears the burden of proof on its affirmative defense that the Parent Guarantee has been released, but it has failed to proffer any admissible evidence capable of creating an issue of fact for trial.  Even if there were ambiguity, summary judgment in the Trustees' favor is warranted because "[a]mbiguity without the existence of extrinsic evidence of intent presents not an issue of fact, but an issue of law for the court to rule on."  *Katzman v. Helen of Troy Texas Corp.*, No. 12 CIV. 4220 PAE, 2013 WL 325562, at *8 (S.D.N.Y. Jan. 28, 2013) (quoting *Williams & Sons*

---

[16] Nor would it make sense to remove the Parent Guarantee if another entity in fact assumed CEOC's obligations.  The Noteholders should be entitled to continue to look to CEC for repayment in the event the new primary obligor defaults.

[17] CEC admits that it made all of the corporate decisions for CEOC while it was CEOC's sole shareholder.  SMF ¶ 22.  The § 12.02(c)(i) requirement that CEC yield complete control over CEOC would protect CEOC's creditors from exactly the kind of corporate raiding CEC engaged in prior to the 5% Stock Sale in May 2014.

*Erectors, Inc. v. S.C. Steel Corp.*, 983 F.2d 1176, 1183–84 (2d Cir. 1993)).[18]   The evidence proffered by CEC does not fall within any category of admissible extrinsic evidence:

**The Miller testimony.**   CEC submitted deposition excerpts of William Miller, purported "counsel for the dealer-managers for the Notes," whose entire testimony is about his "understanding" of the Indentures.   CEC's Opp. at 8.   But CEC admits Mr. Miller is not a party. *See id*.   Even if he were, the record is undisputed that Mr. Miller did not share his "understanding" with any other party during the course of the negotiation process.   In fact, Mr. Miller testified that he did not discuss his opinion of § 12.02(c) with anyone other than colleagues at his firm until sometime within the two years prior to his 2015 deposition—well after the Indentures were drafted and executed and billions of dollars in Notes were sold to unsuspecting investors.   *See* Silfen Reply Decl. Ex. B ("<u>Miller Dep.</u>") at 91:12-92:5; *see also id*. at 94:19–25.[19]   His deposition testimony is nothing but inadmissible opinion evidence regarding how he now interprets the Indentures. *Faulkner*, 452 F. Supp. 2d at 378–79 (finding inadmissible the uncommunicated subjective opinion by individual who participated in drafting of contract).

**The Sambur declaration.**   The declaration of Mr. Sambur is no different.   Mr. Sambur's purported intent is inadmissible because it remained uncommunicated until long after the Indentures were negotiated.   *Id*. at 378 ("[S]tatements of subjective intention uncommunicated to the other contracting party are immaterial in construing the terms of the contract."); *Hudson-Port*

---

[18] *See also Faulkner v. Nat'l Geographic Soc'y*, 452 F. Supp. 2d 369, 377, 378–80 (S.D.N.Y. 2006) (granting summary judgment where non-movant failed to produce admissible and relevant extrinsic evidence regarding interpretation of ambiguous agreement), *aff'd sub nom. Ward v. Nat'l Geographic Soc'y*, 284 F. App'x 822 (2d Cir. 2008).

[19] CEC did not rely on Mr. Miller's testimony in its Motion for Summary Judgment, and submitted the declaration of Mr. Sambur regarding intent of the Parent Guarantee in its Opposition (see below), so the Trustees submit additional testimonial evidence of Mr. Miller and Mr. Sambur in response to these arguments raised for the first time in CEC's Opposition.

*Ewen Assocs. v. Kuo*, 566 N.Y.S.2d 774, 777 (App. Div. 1991) ("uncommunicated subjective intent" is not admissible and therefore there was no disputed issue of fact and summary judgment was proper), *aff'd*, 578 N.E.2d 435 (N.Y. 1991).  In fact, Mr. Sambur unequivocally testified at his deposition that he did *not* discuss the release of the Parent Guarantee with *anyone* during the time of drafting any of the indentures using similar language.  Silfen Reply Decl. Ex. C ("Sambur Dep.") at 107:6–17, 110:5–8; 134:20–138:25; 139:18–140:19; 140:20–142:11.

*Market analysts' reports*.  The financial analysts' opinions cited by Mr. Sambur and CEC's purported experts are inadmissible after-the-fact opinion evidence by nonparties to the Indentures, as well as inadmissible hearsay.  Sambur Suppl. Decl. ¶¶ 10–11 & Exs. A–D.  CEC further relies on documents produced by two noteholders.  CEC's Opp. at 9.  These, like the market analyst reports, are inadmissible opinions of outside observers about the meaning of a contract.  *Faulkner*, 452 F. Supp. 2d at 379 (holding as inadmissible "post hoc interpretations of the" contract written in different business documents well after execution of the agreement).  The documents also are inadmissible hearsay and lack authentication—there is no evidence regarding who wrote them or the authority of their authors.

*CEC's alleged financial statement filings*.  CEC also asserts that CEOC's alleged filing of unconsolidated financial statements beginning in May 2014 bolsters its disjunctive interpretation of § 12.02(c).  Sambur Suppl. Decl. ¶ 10.  But this fact is not informative "course of performance" regarding the Indenture.  At best, the decision to file unconsolidated financial statements represents self-serving conduct commenced *after* CEC had breached the Indenture by disaffirming its guarantee and at a time when CEC was positioning CEOC for bankruptcy (where it would need separate financials in any event).  *In re First Cent. Fin. Corp*., 269 B.R. 481, 498 (Bankr. E.D.N.Y. 2001) (declining to find a course of performance where section of the agreement

at issue was made to further only one party's self-interest), *aff'd*, 377 F.3d 209 (2d Cir. 2004); *see also* REST. (SECOND) OF CONTRACTS § 202(4) & comment g ("[Course of performance] does not apply to action on a single occasion or to action of one party only; in such cases the conduct of a party may be evidence against him that he had knowledge or reason to know of the other party's meaning, but self-serving conduct is not entitled to weight.").

***CEC expert opinions***.   CEC's "expert" opinions are nothing more than thinly veiled attempts to tell the Court how it should interpret the contract.  The purported experts are providing their own opinions regarding interpretation of the Indentures.  *See* Gadsden Decl. ¶ 3; Grien Decl. ¶ 3.  But it is the role of the Court, not of any would-be expert, to interpret the contract, and their opinions should be excluded for this reason alone.  *See Marx & Co. v. Diners' Club, Inc*., 550 F.2d 505, 509 (2d Cir. 1977) (expert precluded testifying as to meaning of contract provision because it is the judge's role to determine a contract's "legal effect").

To the extent CEC's experts provide any reasonableness analysis, that analysis should also be rejected because it is inextricably linked to their flawed opinions as to how the Indentures should be interpreted.  The opinions, therefore, are not helpful to the Court because they bear no connection to the actual language of the Indentures.  Both of CEC's would-be "experts" base their "reasonableness" analysis of § 12.02(c) on the notion that the Parent Guarantee "was provided primarily to facilitate financial reporting for CEOC," and was not intended to provide credit support.  Gadsden Decl. ¶ 3.[20]  The TIA Opinion *already considered and explicitly rejected* this

---

[20] *See also id.* ¶¶ 7 ("the principal purpose of the guarantee was to facilitate financial reporting"), 21 (describing financial reporting rationale for including the Parent Guarantee), 36–49 (disjunctive interpretation reasonable because of same); Grien Decl. ¶¶ 23 ("Parent Guarantees were included . . . primarily to comply with . . . Rule 3-10(c)"), 44–46 (disjunctive interpretation reasonable because of same); CEC's Opp. at 35 (disjunctive interpretation reasonable because Indentures "do not restrict CEC in a manner that would be expected were the Guarantee intended for credit support").

argument.  *TIA Opinion*, 2015 WL 5076785, at *6–7 (emphasis added) (holding that "***the plain language of the Guarantee section [alone] indicates that it provided credit support***" and rejecting CEC's argument that the Parent Guarantee was "nothing more than a 'guarantee of convenience'"). "Expert" analysis premised on an interpretation contrary to the law of the case and the plain language of the Indentures is unhelpful to the Court and is inadmissible.

Additionally, both opinions are premised on flawed interpretations of "defeasance" and "discharge," as those terms are used in § 12.02(c)(iii).  They argue, contrary to the plain language of the Indentures, that defeasance and discharge are tantamount to a full repayment of the bonds. Gadsden Decl. ¶¶ 21, 23; Grien Decl. ¶¶ 30–31; 34–36, 42, 47.[21]  Further, both "experts" equate defeasance with cash collateralization.  Gadsden Decl. ¶ 21 (Section 12.02(c)(iii) "operates . . . to release guarantee when payment of the notes is otherwise assured by liquid collateral"); Grien Decl. ¶¶ 28 ("defeasance . . . results in the At-Issue Notes so defeased becoming cash collateralized"), 34 (defeasance results in cash collateralization), 36 (same).  This ignores the fact that the issuer may also deposit United States securities in lieu of cash, which leaves the Noteholders with residual risk that the value of the securities may be diminished.  Trustees' Mem. at 35–36; Trustees' Opp. at 29–30.

Furthermore, Mr. Grien also misreads §§ 12.02(c)(ii) and 5.01(a).  As explained above, § 12.02(c)(ii) can be satisfied if CEOC merges with and subsumes another entity pursuant to § 5.01(a) while remaining CEC's subsidiary.  *See supra* § II.A.2.  Mr. Gadsden admits this point. Gadsden Decl. ¶ 21 (bullet two).  Mr. Grien, however, bases his reasonableness calculus on a

---

[21] Mr. Grien, for example, uses this flawed interpretation to conclude that the investors would receive "no benefit . . . in requiring that CEC fulfill both Clauses (i) and (ii) before the Parent Guarantee is terminated, *after the obligations have been satisfied in full*" through defeasance or discharge, again questioning whether the Noteholders need protection.  Grien Decl. ¶ 31.

conclusion that "[c]onsummation of the transactions referred to in Clause (ii) would result either in CEOC becoming a shell corporation . . . , or ceasing to exist," Grien Decl. ¶ 27; *see also id.* ¶¶ 37, 39, 40 (same).  The opinion cannot be reconciled with the text of the Indentures.

Finally, both "experts" opine on what constitutes sufficient protection for the Noteholders. *See* Gadsen Decl. ¶¶ 24–26 (noting that Noteholders are adequately protected during defeasance and discharge, asset sales and merger, even if § 12.02(c) is interpreted disjunctively); Grien Decl. ¶¶ 24, 28 n.11, 30–31, 34–35 (opining whether from a lender's perspective it makes sense to require all three clauses to be read conjunctively and whether the lender would have done so).  Not only is this testimony based on a flawed interpretation of the Indentures, it also is not proper opinion testimony.  Rather, it is a blatant effort to second-guess, after the fact, whether the parties should have agreed to their respective rights and obligations when entering into the Indentures.  To the extent CEC thought a disjunctive reading offered sufficient Noteholder protection, it should have communicated its view during negotiation and drafting of the Indentures.  It is now too late.

In sum, CEC has failed to meet its burden to produce any admissible extrinsic evidence demonstrating that "and" was intended *by the parties to the Indentures* to mean "or" at the time the Indentures were executed.  Even if this Court determines that the Indentures are ambiguous, summary judgment in the Trustees' favor is justified because CEC has failed to present any admissible evidence on an issue with respect to which it bears the burden of proof at trial.

**B.    CEC Fails to Prove Its Affirmative Defense of Release Under § 12.02(c).**

CEC bears the burden of proof on its affirmative defense that the Parent Guarantee has been released.  Trustees' Opp. at 32 n.27.  It was, therefore, required to produce admissible evidence on that issue to defeat summary judgment.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) ("The moving party is 'entitled to judgment as a matter of law' because the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to

which she has the burden of proof."). CEC has not met its burden because it failed to present admissible evidence that the Parent Guarantee of Existing Notes other than the Unsecured Notes was released. Trustees' Opp. at 32–34. Accordingly, CEC cannot avail itself of the last paragraph of § 12.02(c) even *if* CEC could prove that its guarantee of the Unsecured Indentures has been released. *See* Trilogy/Danner Br. at § I.D.

CEC has also failed to produce admissible evidence that *any* stock was actually transferred as a part of the PIP. According to CEC's own Vice President of Compensation and Leadership Development, Michael McLellan, SMF ¶ 136, individual CEOC stock grants were not completed unless participants signed the plan documents, returned them to the company, and the company counter-signed. SMF ¶ 147. CEC has not disputed Mr. McLellan's testimony with admissible evidence, *see supra* § II.B.4, and has failed to produce evidence that Caesars in fact counter-signed any plan documents or otherwise effectuated any of the individual transfers. Because CEC has failed to meet its burden, the Court should disregard the purported impact of the PIP on CEC's guarantee under the Indentures and the Unsecured Indentures.

### C.   CEC Fails to Prove that the Parent Guarantee Was Terminated Following the August 2014 Transaction.

CEC has also failed to show that the August Transaction relieved it of its Parent Guarantee obligations under the Existing Notes clause of the final paragraph of § 12.02(c). ***First***, as the Trustees have shown, CEC has failed to carry its burden of establishing that its guarantee of all Existing Notes other than the Unsecured Notes has been released or discharged. *See* Trustees' Opp. at 32–34. ***Second***, for the reasons set forth in the Trilogy/Danner papers, and incorporated by reference here, CEC's guarantee of the Unsecured Notes has also not been discharged. *See* Trilogy/Danner Brief *passim*. ***Third***, CEC's argument that the August Transaction retroactively cured its Event of Default under 6.01(h) of the Indentures is legally unsupportable. CEC

24

disavowed its Guarantee in May 2014.  *See* Trustees' Opp. at 34–35.  CEC's disavowal was an explicit Event of Default under the Indentures, and therefore a material breach.  New York law prevents a party in breach from availing itself of benefits under the contract it violated.  *See A.E. Ottaviano, Inc. v. State*, 277 N.Y.S.2d 538, 541 (Ct. Cl. 1967) ("having thus breached its contract, [defendant] cannot now, and for its own benefit, avail itself of an alleged waiver provision in the very same contract"), *modified*, 299 N.Y.S.2d 938 (App. Div. 1969).[22]

## CONCLUSION

For the foregoing reasons, and those set forth in the Trustees' Motion and their Opposition, the Trustees respectfully request that the Court grant their motion for partial summary judgement; award the Trustees damages in the amount of $6,345,000,000.00 for UMB and $750,000,000.00 for BOKF, representing the total principal outstanding under their respective Indentures; award all interest accrued under the Indentures; award all charges, expenses, costs and indemnities, including attorneys' fees, incurred in the enforcement of the Noteholders' contractual rights; and award such other and further relief as the Court deems just and proper.

---

[22] The case law cited by CEC is inapposite, since unlike the Indentures, the contract at issue in *Process Am., Inc. v. Cynergy Holdings, LLC* designed some, but not all, events of default as "breaches."  No. 12 CIV. 772 BMC, 2014 WL 3844626, at *10 (E.D.N.Y. Apr. 30, 2014).  Section 6.01 makes no such distinction, such that all of the events of default described therein constitute breaches.  Additionally, unlike *U.S. Bank Nat'l Ass'n v. U.S. Timberlands Klamath Falls, L.L.C.*, § 6.01(h) does not require notice by the Indenture Trustees before a breach ripens into an Event of Default.  No. CIV.A. 112-N, 2004 WL 1699057, at *3 (Del. Ch. July 29, 2004).

Dated: New York, New York
June 14, 2016

Respectfully submitted,

*Andrew Silfen*

Andrew I. Silfen (AS-1264)
Michael S. Cryan (MC-4887)
Mark A. Angelov (MA-5291)
ARENT FOX LLP
1675 Broadway
New York, NY  10019-5820
Tel:    (212) 484-3900
Fax:    (212) 484-3990
Email:  andrew.silfen@arentfox.com
        michael.cryan@arentfox.com
        mark.angelov@arentfox.com

-and-

Ralph A. Taylor, Jr. (*admitted pro hac vice*)
Jackson D. Toof (*admitted pro hac vice*)
ARENT FOX LLP
1717 K Street, N.W.
Washington, D.C. 20006
Tel:    (202) 857-6000
Fax:    (202) 857-6395
Email:  ralph.taylor@arentfox.com
        jackson.toof@arentfox.com

*Attorneys for BOKF, N.A., solely in its capacity as successor Indenture Trustee under the Indenture governing the Second Lien Notes*

*David Crichlow*

David A. Crichlow
Craig A. Barbarosh
Karen B. Dine
Rebecca Kinburn
KATTEN MUCHIN ROSENMAN LLP
575 Madison Avenue
New York, New York 10022-2585
Tel:    (212) 940-8800
Fax:    (212) 940-8776
Email:  craig.barbarosh@kattenlaw.com
        david.crichlow@kattenlaw.com
        karen.dine@kattenlaw.com
        rebecca.kinburn@kattenlaw.com